**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

FILED: JULY 8, 2008
08CV3867
JUDGE KENDALL
MAGISTRATE JUDGE BROWN
TG

| | | |
|---|---|---|
| MARGUERITE MARION,<br><br>Plaintiff,<br><br>v.<br><br>BANK OF AMERICA, NATIONAL ASSOCIATION,<br><br>Defendant. | ) | Case No. TG<br><br>The Honorable ________________ |

**NOTICE OF REMOVAL**

Defendant Bank of America Corporation[1] ("BOA"), by its attorneys and pursuant to 28 U.S.C. §§ 1331, 1332, 1441, and 1446, files this Notice of Removal on federal question and diversity grounds. In support of this notice, BOA states:

1. On May 20, 2008, Plaintiff Marguerite Marion ("Marion") filed a complaint titled *Marguerite Marion v. Bank of America National Association,* Case 2008 L 005559, in the Law Division of the Circuit Court of Cook County, Illinois ("state court action"). The Complaint seeks recovery under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") and the following Illinois statutes/regulations: (1) Wage Payment and Collection Act; (2) Sales Representatives Act; (3) Continuation Law; (4) Spousal Continuation Law; (5) Dependent Child Continuation Law; and (6) Illinois Earned Bonuses Administrative Code.

2. BOA was served with the Complaint and summons on June 10, 2008, copies of which are attached as Ex. 1. These documents constitute all "process, pleadings, and orders" served upon BOA in the state court action seeking recovery against it. 28 U.S.C. § 1446(a).

[1] The Complaint incorrectly names "Bank of America, National Association" as the Defendant.

3. This Notice of Removal is filed with this Court within 30 days of the service of the complaint and thus is timely under 28 U.S.C. § 1446(b).

4. Written notice of the filing of this Notice of Removal has been given to Marion together with a copy of the Notice of Removal and supporting papers and has been filed with the Clerk of the Circuit Court of Cook County, Illinois, as required by 28 U.S.C. § 1446(d).

**Removal Based On ERISA Federal Question Jurisdiction**

5. BOA may remove this action pursuant to 28 U.S.C. § 1441(b) because Marion's claims arise under the laws of the United States, specifically the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq.*

6. "[T]he ERISA civil enforcement mechanism is one of those provisions with such 'extraordinary pre-emptive power' that it 'converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004). Therefore, "causes of action within the scope of the civil enforcement provisions of § 502(a) [are] removable to federal court." *Id.* (quoting *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 66 (1987)).

7. Moreover, a cause of action filed in state court that comes within the scope of the enforcement provisions of § 502(a) is removable to federal court even where the complaint does not on its face allege that it arises under ERISA. "Because ERISA displaces all state law within its scope, such a case necessarily arises under federal law, namely under ERISA, and so is removable despite the complaint's reticence." *Hays v. Bryan Cave LLP*, 446 F.3d 712, 714 (7th Cir. 2006); *see, e.g., Davila*, 542 U.S. at 211; *Metropolitan Life Ins. Co.*, 481 U.S. at 67; *Lister v. Stark*, 890 F.2d 941, 944 (7th Cir. 1989).

8. ERISA's applicable enforcement provisions include ERISA § 502(a)(1)(B), which provides that an employee benefit plan participant may bring a civil action "to recover

benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

9. Marion's complaint alleges that she is entitled to receive incentive bonuses under two different incentive pay plans, the Corporate Incentive Plan ("CIP") and the Long Term Incentive Plan ("LTIP"), both of which were instituted by BOA's predecessor, LaSalle Bank Corporation, then part of ABN AMRO Bank NV ("LaSalle"). (Cmplt. ¶¶ 13-19). Specifically, Marion alleges that BOA breached the Illinois Wage Payment and Collection Act, the Sales Representative Act, and the Earned Bonuses Administrative Code when it refused to pay her incentive bonuses under the CIP and LTIP programs after her job was eliminated pursuant to a reduction in force. (Cmplt. ¶¶ 7, 19, 25, 29).

10. The CIP and LTIP specifically provide that an employee who terminates during a plan year is not ordinarily entitled to any incentive bonus for that year. Copies of the CIP and LTIP documents are attached as Exs. 2 and 3, respectively. *See Jass v. Prudential Health Care Plan*, 88 F.3d 1482, 1488 (7th Cir. 1996) (quoting *Burda v. Ecker Co.* 954 F.2d 434, 438 (7th Cir. 1992) (in the context of complete ERISA preemption, "a federal court may . . . look beyond the face of the complaint to determine" whether removal based on federal question jurisdiction is appropriate). In recognition that employees who terminate during the plan year receive no bonuses, ABN AMRO Group Severance Pay Plan ("ABN AMRO Severance Plan"), titled after LaSalle's then owner, filled this termination year gap by offering such bonuses as part of severance. Both the CIP and LTIP confirm that a former employee may be vested at the time of termination if the employee "meets all of the requirements for the payment of severance pay under the [ABN AMRO Severance Plan] (including without limitation execution of the Waiver and Release Agreement referred to therein)." (Ex. 2, p. 5; Ex. 3, p. 3).

11.    On September 30, 2007, as a result of LaSalle's concomitant sale to BOA, the ABN AMRO Severance Plan was amended so that it "shall be frozen in its entirety and no benefit thereunder shall be available to any person who terminated employment . . . after September 30, 2007." A copy of the ABN AMRO Severance Plan and Amendment is attached as Ex. 4. Thereafter, the former LaSalle employees who BOA terminated after September 30, 2007 were eligible to receive severance benefits under the BOA Corporate Severance Plan ("BOA CSP").

12.    The BOA CSP is an employee benefit plan as defined by ERISA, 29 U.S.C. § 1002(1). The BOA CSP, like the closed ABN AMRO Severance Plan, provides as a severance benefit monies equivalent to termination year bonuses. In that regard, BOA gave the former LaSalle employees it terminated a "Guide to the Corporate Severance Program – Legacy LaSalle Bank Corporation", which summarizes the eligibility requirements and severance benefits available under the BOA CSP. Copies of the Guide and the BOA CSP are attached as Exs. 5 and 6, respectively. The Guide expressly provides that "[e]ligible employees will receive severance for annual incentive programs in which they participate." (Ex. 5, p. 6). Similarly, like the closed ABN AMRO Severance Plan, the BOA CSP requires an employee to execute and not revoke a release agreement. (Ex. 5, pp. 3-4, 8; Ex. 6, p. 4).

13.    On December 1, 2007, BOA notified Marion of her termination. (Cmplt. ¶ 9). Included with Marion's termination notice was an agreement entitled "General Release and Program Agreement" ("CSP Agreement"), which BOA requested Marion execute so that she would be eligible to receive severance benefits, including the proportionate share of her CIP and LTIP bonuses, under the terms of the BOA CSP. (Cmplt. ¶ 9). Marion refused to sign the CSP Agreement. (Cmplt. ¶ 11).

14. Because the BOA CSP governs whether Marion is entitled to the benefits she seeks, resolving Marion's claims will necessarily require reference to and interpretation of the BOA CSP. As such, Marion's claims for recovery are completely preempted by ERISA because they relate to and require reference to and interpretation of an employee benefit plan. *See Boggs v. Boggs*, 520 U.S. 833 (1997); *Sembos v. Philips Components,* 376 F.3d 696, 703 (7th Cir. 2004); *Anderson v. Chrysler* Corp., 99 F.3d 846, 856 (7th Cir. 1996); *Russo v. Health, Welfare & Pension Fund, Local 705*, 984 F.2d 762, 767 (7th Cir. 1993).

15. Original federal question jurisdiction is vested in this Court by 29 U.S.C. § 1132(e) and 28 U.S.C. § 1331. *See Davila*, 542 U.S. at 207-08 (ERISA is one of the federal statutes which "completely pre-empts the state-law cause of action . . . even if pleaded in terms of state law, [because it] is in reality based on federal law") (citation omitted); *see also* 29 U.S.C. § 1331.

16. Pursuant to 28 U.S.C. § 1441(a), "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." Under 28 U.S.C. § 93(a)(1), this Court embraces all of the County of Cook, State of Illinois. Accordingly, this Court is the appropriate court for removal of this action. 28 U.S.C. § 1441(a).

**Removal Based On COBRA Federal Question Jurisdiction**

17. This Court also has original federal question jurisdiction over this action under 28 U.S.C. § 1331, which provides that the "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Marion's Complaint alleges that BOA violated a federal statute, COBRA. (Cmplt. ¶¶ 21-22, 24-25).

Because Marion's COBRA claim arises under the laws of the United States, this action may be removed to this Court pursuant to 28 U.S.C. § 1441(a)-(b) and 28 U.S.C. § 1331.

**Removal Based On Diversity Jurisdiction**

18. In addition, this action may be removed to this Court based on diversity jurisdiction. 28 U.S.C. § 1332 provides that "the district courts shall have original jurisdiction of all civil actions where the matter in controversy exceed the sum of $75,000, exclusive of interest and costs, and is between (1) citizens of different states." 28 U.S.C § 1332(a)(1).

19. There is complete diversity among the parties. Marion is a citizen of the State of Illinois. (Cmplt. ¶ 1). BOA is, and has been at all relevant times, a Delaware corporation with its principal place of business in Charlotte, North Carolina. See Declaration of Merrily S. Gerrish attached as Ex. 7. 28 U.S.C. § 1332(c)(1).

20. BOA believes in good faith that the amount in controversy exceeds $75,000, exclusive of interest and costs, as required by 28 U.S.C. § 1332(a). In support of its good faith belief, BOA relies on the allegations in the Complaint and Marion's prayers for relief.

21. Marion alleges that she is entitled to no less than $248,549.76 in compensatory damages. (Cmplt. ¶ 19). Further, Marion alleges that she is entitled to a "penalty of 1% interest per calendar day per each day of the delay in payment" of her CIP and LTIP bonuses. (Cmplt. ¶ 19). Finally, Marion requests that the Court award her "[c]osts of bringing this action, including attorneys' fees and filing fees" as well as "[s]uch other relief as this Court deems just and proper." (Cmplt. ¶ 19). *See Rising-Moore v. Red Roof Inns, Inc.*, 435 F.3d 813, 816 (7th Cir. 2006) ("Rising-Moore's lawyer has revealed what he thinks his loss amounts to: between $180,000 and $200,000. This is the amount in controversy."); *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 449 (7th Cir. 2005) (holding that "amount in controversy" is based on what the stakes of litigation could be and are based on plaintiff's own demands).

22. Because diversity of citizenship exists under 28 U.S.C. § 1332(a)(1) and the amount in controversy exceeds $75,000, as required by 28 U.S.C. § 1332(a), this case is within the original jurisdiction of this Court and is subject to removal under 28 U.S.C. § 1441(a).

23. Finally, removal of the entire case is appropriate because this court has original jurisdiction over Marion's ERISA and COBRA claims and supplemental jurisdiction over her remaining state law claims pursuant to 28 U.S.C. § 1367(a). *See also* 28 U.S.C. § 1441(c) (explaining that when non-removable claims are joined with removable claims, "the entire case may be removed and the district court may determine all issues therein"). Specifically, all of the counts arise from the same facts and circumstances allegedly giving rise to Marion's ERISA and COBRA claims. Therefore, Marion's state law claims are so related to Marion's ERISA and COBRA claims that they "form part of the same case or controversy" under Article III of the Constitution, giving rise to this Court's jurisdiction over the remaining claims under 28 U.S.C. § 1367(a).

WHEREFORE, Defendant Bank of America Corporation requests that this Court assume full jurisdiction of this proceeding as if originally filed in this Court and issue any orders to stay proceedings in the state court action.

Respectfully submitted,

BANK OF AMERICA CORPORATION

By: s/ Kathryn S. Clark
One of Its Attorneys

Jeffrey K. Ross
Ronald J. Kramer
Kathryn S. Clark
SEYFARTH SHAW LLP
131 South Dearborn Street, Suite 2400
Chicago, Illinois 60603
(312) 460-5000 (telephone)
(312) 460-7000 (facsimile)

July 8, 2008

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that a true and correct copy of the foregoing **Notice of Removal** was served upon:

Laurel G. Bellows
Kristen E. Prinz
BELLOWS AND BELLOWS, P.C.
209 South LaSalle Street, Suite 800
Chicago, Illinois 60604

by first class U.S. Mail, postage pre-paid, this 8th day of July, 2008.

s/Kathryn S. Clark
Kathryn S. Clark

# EXHIBIT 1

Jon Vilumis
885/0000128
"in person"
6/10/08
10:18 a.m.

2120 - Served
2220 - Not Served
2320 - Served By Mail
2420 - Served By Publication
SUMMONS

2121 - Served
2221 - Not Served
2321 - Served By Mail
2421 - Served By Publication
ALIAS - SUMMONS

CCG N001-10M-1-07-05 (

312.828.1201

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

RECEIVED
JUN 10 2008
FL-LOPD

(Name all parties)

MARGUERITE MARION

v.

BANK OF AMERICA, NATIONAL ASSOCIATION

No. ______________

Bank of America
Chicago Legal Department
[illegible]
Chicago, Illinois [illegible]

SUMMONS

To each Defendant:

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

☑ Richard J. Daley Center, 50 W. Washington, Room 801, Chicago, Illinois 60602

☐ District 2 - Skokie, 5600 Old Orchard Rd., Skokie, IL 60077

☐ District 3 - Rolling Meadows, 2121 Euclid, Rolling Meadows, IL 60008

☐ District 4 - Maywood, 1500 Maybrook Ave., Maywood, IL 60153

☐ District 5 - Bridgeview, 10220 S. 76th Ave., Bridgeview, IL 60455

☐ District 6 - Markham, 16501 S. Kedzie Pkwy., Markham, IL 60426

☐ Child Support, 28 North Clark St., Room 200, Chicago, Illinois 60602

You must file within 30 days after service of this Summons, not counting the day of service.
IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.

To the officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

Atty. No.: 01000
Name: Kristen Prinz/Bellows and Bellows, P.C.
Atty. for: Plaintiff
Address: 209 South LaSalle Street, Suite 800
City/State/Zip: Chicago, IL 60604
Telephone: 312-332-3340

WITNESS, ______________

MAY 20 2008

Clerk of Court

Date of service: ______________
(To be inserted by officer on copy left with defendant or other person)

Service by Facsimile Transmission will be accepted at: 312 (Area Code) 332-1190 (Facsimile Telephone Number)

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

IN THE CIRCUIT COURT OF COOK COUNTY, COUNTY DEPARTMENT, LAW DIVISION

2008L005559
CALENDAR/ROOM U
TIME 00:00
Statutory Action

MARGUERITE MARION

Plaintiff,

v.

BANK OF AMERICA, NATIONAL ASSOCIATION

Defendant.

Case No.

## COMPLAINT

08 MAY 20 PM 4:09

NOW COMES Plaintiff Marguerite Marion, by her undersigned attorneys, Bellows and Bellows, P.C. and for her Complaint against Defendant Bank of America, National Association ("BOA" or "Defendant") alleges the following:

### Facts Common to All Counts

1. Plaintiff, Marguerite Marion, is a citizen of the State of Illinois, residing at 1419 South Indiana Avenue, Chicago, Illinois 60605.

2. Plaintiff was employed by Defendant BOA, through their assignee LaSalle Bank Corporation ("LaSalle"), from at least 1984 through December 15, 2007. LaSalle was previously owned by ABN AMRO National Association.

3. DefendantBOA maintains its corporate office at 101 South Tryon Street, Charlotte, North Carolina 28255, with offices throughout the State of Illinois.

4. Venue is properly laid in this County because Defendant at all relevant times transacted business in Cook County, and all acts giving rise to this action occurred in Cook County.

**COUNT I**
**Violation of Illinois Wage Payment and Collection Act**

5. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 4 of the Complaint as if set forth fully herein.

6. At various times prior to October 2007, Plaintiff, a Senior Vice President at LaSalle, was notified that LaSalle would merge into BOA and layoffs would ensue. In an effort to encourage employees to stay on during this uncertain time, LaSalle represented to Plaintiff and other employees that their outstanding Long Term Incentive Plan ("LTIP") units would fully vest (See Exhibit "A") and would vest at a rate of $200 per unit (See Exhibit "B") and that, so long as Plaintiff stayed on with LaSalle through the merger and until she was hired by BOA or terminated as a result of a reduction in force, her 2007 Corporate Incentive Plan ("CIP") bonus would be guaranteed at target. (See Exhibit "C")

7. On or about October 1, 2007, at the beginning of the merger process, Plaintiff was informed by LaSalle that, as a Senior Vice President and in exchange for her continued service, she would receive an opportunity to interview for a position with BOA. In reliance upon these assertions, Ms. Marion remained employed with LaSalle through and until she was terminated in what has been labeled "as part of a reduction in force."

8. Despite LaSalle's representations, Plaintiff was never provided a retention bonus or an opportunity to interview with BOA.

9.      On December 1, 2007, Plaintiff received notice from LaSalle's Human Resources Department that she was terminated effective December 15, 2007, "as part of [a] necessary reduction in force."   Included with that notice was LaSalle's General Release and Program Agreement ("CSP Agreement").  (See Exhibit "D")

10.     The CSP Agreement detailed a severance package granting Plaintiff fifty-two (52) weeks of severance pay totaling $166,999.63, outplacement services, and medical and dental benefits through the weeks she was entitled to receive severance payment. The CSP Agreement also contained a restrictive covenant inhibiting Plaintiff's ability to obtain employment that, upon information and belief, was not included in the CSP Agreements offered to earlier terminated employees who were part of the same "reduction in force."

11.     Because of her inability to obtain gainful employment if subject to such a restrictive covenant, Plaintiff requested that the provision be removed from the CSP Agreement.  BOA refused to make any changes to the provision and, as a result, Plaintiff refused to sign the CSP Agreement.

12.     On January 18, 2008, Plaintiff received correspondence from LaSalle regarding her LTIP benefit and the schedule of its payment.  (See Exhibit "E")

13.     Despite LaSalle's numerous written and oral representations to Plaintiff that her LTIP and CIP payments were guaranteed, in or around March 2008, Plaintiff was informed by BOA that her LTIP and CIP payments would only be made if she signed and submitted the CSP Agreement.

14.     Plaintiff had earned 675 LTIP units valued at $200 per unit totaling $135,000.  Payment is due within twelve months of Plaintiff's termination date, but

Defendant has already informed Plaintiff that it will not be paid.

15. Plaintiff had a 2007 target CIP bonus of $108,549.76. This guaranteed bonus was scheduled for payment in March 2008.

16. To date, Plaintiff has not received her guaranteed LTIP or CIP payments.

17. At all times applicable herein, there existed in the State of Illinois a statute entitled the Wage Payment and Collection Act which reads in part:

> Every employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee. 820 ILCS 115/5

18. Plaintiff has not received the final compensation she earned as an employee of LaSalle.

19. For the foregoing reasons, Defendant has violated the Wage Payment and Collection Act.

WHEREFORE, Plaintiff Marguerite Marion prays that judgment be entered in her favor and against Defendant Bank of America National Association for the following relief:

1) Compensatory damages in an amount to be determined at trial but in no event less than $248,549.76;

2) Costs of bringing this action, including attorney's fees and filing fees;

3) A penalty of 1% interest per calendar day for each day of delay in payment pursuant to 820 ILCS 115/14; and

4) Such other relief as this Court deems just and proper.

**COUNT II**
**Violation of the Sales Representatives Act**

20. Plaintiff repeats and realleges the allegations contained in paragraphs 1

through 19 of the Complaint as if set forth fully herein.

21. At all times applicable herein, there existed in the State of Illinois a statute entitled the Sales Representative Act which reads in part:

> A principal who fails to comply with the provisions of Section 2 concerning timely payment or with any contractual provision concerning timely payment of commissions due upon the termination of the contract with the sales representative, shall be liable in a civil action for exemplary damages in an amount which does not exceed 3 times the amount of the commissions owed to the sales representative. Additionally, such principal shall pay the sales representative's reasonable attorney's fees and court costs. 820 ILCS 120/3

22. The position of Senior Vice President at Bank of America was essentially a sales position whereby bonuses were earned based upon business generated by the employee and the employee's division.

23. Plaintiff solicited and booked business for LaSalle through the date of her separation from LaSalle and thereby earned her CIP and LTIP bonuses as a result of her sales efforts.

24. Defendant continues to withhold payment to Plaintiff despite her requests for such payment.

25. For the foregoing reasons, Defendant has violated the Illinois Sales Representatives Act.

WHEREFORE, Plaintiff Marguerite Marion prays that judgment be entered in her favor and against Defendant Bank of America National Association for the following relief:

1) Compensatory damages in an amount to be determined at trial but in no

event less than $248,549.76;

2) Costs of bringing this action, including attorney's fees and filing fees;

3) Exemplary damages of three times $248,549.79 totaling $745,649.37 pursuant to 820 ILCS 120/3; and

4) Such other relief as this Court deems just and proper.

**COUNT III**
**Violation of the Earned Bonuses Administrative Code**

26. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 25 of the Complaint as if set forth fully herein.

27. At all times applicable herein, there existed in the State of Illinois an administrative code entitled Earned Bonuses which reads in part: "A claim for an earned bonus arises when an employee performs the requirements for a bonus set forth in a contract or an agreement between the parties." IL Admin. Code § 300.500.

28. Despite its numerous written representations to Plaintiff that her bonuses would be paid, Defendant has continuously and wrongfully withheld such payments.

29. For the foregoing reasons, Defendant has violated the Illinois Earned Bonuses administrative code.

WHEREFORE, Plaintiff Marguerite Marion prays that judgment be entered in her favor and against Defendant Bank of America National Association for the following relief:

1) Compensatory damages in an amount to be determined at trial but in no event less than $248,549.76;

2) Costs of bringing this action, including attorney's fees and filing fees;

3) Punitive damages at a reasonable multiple of compensatory damages; and

4) Such other relief as this Court deems just and proper.

**COUNT IV**
**Violation of Illinois Continuation Law**

20. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 19 of the Complaint as if set forth fully herein.

21. As of March 13, 2008, Plaintiff had not received any notice of COBRA or Illinois Continuation Law from LaSalle and/or BOA.

22. On or around March 13, 2008, Plaintiff contacted BOA's benefits department and inquired as to the status of her COBRA (the Consolidated Omnibus Budget Reconciliation Act) and/or Illinois Continuation Law notice. In violation of federal and state law, BOA informed Plaintiff that she would not be allowed access to COBRA and/or Illinois Continuation unless and until she signed and submitted the CSP Agreement.

23. On the same date, counsel for Plaintiff contacted counsel for BOA and informed him of BOA's attempt to coerce Plaintiff into signing the CSP Agreement by denying her access to COBRA and/or Illinois Continuation. Counsel for BOA insisted that the problem would be immediately addressed.

24. On May 1, 2008, Plaintiff and her family were still without medical insurance coverage. Plaintiff again contacted BOA's benefits department and was informed that they were not responsible for providing her with access to COBRA and/or Illinois Continuation because their benefits provider had changed.

25. To date, despite her numerous attempts to access her benefits over the past

four months, Plaintiff and her family have been denied access to COBRA and/or Illinois Continuation in violation of the Illinois Continuation Law, Illinois Spousal Continuation Law, Illinois Dependent Child Continuation Law and COBRA.

26. For the foregoing reasons, Defendant has violated the Illinois Continuation Law, Illinois Spousal Continuation Law and Illinois Dependent Child Continuation Law.

WHEREFORE, Plaintiff Marguerite Marion prays that judgment be entered in her favor and against Defendant Bank of America National Association for the following relief:

1) Compensatory damages in an amount to be determined at trial but in no event less than $166,999.63;
2) Costs of bringing this action, including attorney's fees and filing fees; and
3) Such other relief as this Court deems just and proper.

Plaintiff Marguerite Marion,

By: ______________________
One of Her Attorneys

Laurel G. Bellows, Esq.
Kristen E. Prinz, Esq.
BELLOWS AND BELLOWS, P.C.
209 South LaSalle Street, Suite 800
Chicago, Illinois 60604
Attorney No. 01000

JUDGE KENDALL
MAGISTRATE JUDGE BROWN
TG

# EXHIBIT 2

**ABN AMRO GROUP CORPORATE INCENTIVE PLAN**
**AS AMENDED AND RESTATED EFFECTIVE JANUARY 1, 2007**

## 1. PURPOSE

The purpose of the Corporate Incentive Plan (the "Plan") is to provide an incentive to certain officers of LaSalle Bank Corporation ("LaSalle"), and its subsidiaries and affiliates (hereinafter referred to collectively as the "Corporation" and individually as an "Employer"). The Plan was originally established by ABN/LaSalle North America, Inc. as the Annual Management Incentive Plan, and was subsequently adopted by LaSalle, revised and renamed the Corporate Incentive Plan. The Plan is hereby amended and restated in its entirety, effective as of January 1, 2007.

## 2. DEFINITIONS

a. "CIP Group" means each line of business, function or services group the officers of which are eligible to participate in the Plan.

b. "CIP Pool", with respect to each CIP Group, means the total amount of funds available to pay Incentive Awards to all Participants employed by the CIP Group in a Plan Year. The CIP Pools are used solely for the purpose of calculating the maximum amount of Incentive Awards that may be paid, and shall not be construed to require that any funds be segregated for the purpose of paying Incentive Awards.

c. "Corporate Incentive Plan" or "Plan" means the management incentive compensation plan herein described, as the same may be amended from time to time.

d. "Incentive Award" or "Award" means any amount paid to a Participant under the Plan.

e. "Participant" means any employee of the Corporation selected by LaSalle to be eligible to receive Awards under the Plan.

f. "Performance Metrics" means the financial metrics established by LaSalle for each Plan Year, the achievement of which will determine the extent to which the CIP Pools are funded.

g. "Plan Year" or "Year", unless otherwise specified, means the fiscal year of LaSalle.

h. "Target Bonus" means the Incentive Bonus determined by multiplying a Participant's Target Percentage by his or her base salary. If a Participant's base salary changes during a Plan Year, the Base Salary as of the end of the Plan Year will be used.

i. "Target Funding" for each CIP Pool with respect to a Plan Year means the sum of the Target Bonuses of all Participants eligible to receive an Incentive Award from such CIP Pool.

j. "Target Percentage" means a percentage assigned to each category of Participants used to determine a Participant's Target Bonus.

3. **ADMINISTRATION**

The Plan shall be administered by LaSalle. The authority of LaSalle to administer the Plan shall be vested in the Head of the ABN AMRO Business Unit North America ("BU NA"), or the successor to such position, and shall be exercised on his behalf by the Head of Human Resources of BU NA and the BU NA Center of Expertise (CoE) for Rewards. LaSalle shall have all powers and authority necessary for the administration of the Plan, including the authority to: (a) prescribe, amend and rescind Plan rules, regulations and procedures; (b) approve financial performance goals and determine from time to time the eligibility of employees for participation in the Plan; (c) adopt Performance Metrics; (d) determine the amount of individual Incentive Awards; (e) make such adjustments to benefits payable under the Plan as may be necessary or appropriate to correct mistakes of fact; and (f) take any other action necessary or appropriate for the administration of the Plan. The examples in the immediately preceding sentence are listed herein solely for purposes of illustration and not limitation.

4. **ELIGIBILITY**

Eligibility for participation in the Plan shall be limited to those officers of the Corporation who are selected by LaSalle in its sole discretion in the manner set forth in Section 5 below. Officers who participate in an annual incentive compensation plan sponsored by an Employer, including commission and bonus plans sponsored by any department of an Employer, except the Delivering the Bank Cross Sell Incentive Plan, are not eligible to participate in the Plan, unless there is approval by the BU NA Head of Human Resources in consultation with the BU NA CoE Rewards.

5. **PARTICIPANTS**

For each Year, each member of the BU NA Regional Management Committee (RMC) or their delegates shall nominate the categories of officers in his or her area who shall be eligible to participate in the Plan for that Year. All recommendations shall be reviewed and approved by the BU NA Head of Human Resources and BU NA CoE Rewards and subject to changes, if any, requested by the Head of BU NA. Each such person eligible to participate in the Plan for a Plan Year is referred to as a "Participant." The BU NA CoE Rewards, in consultation with the appropriate BU NA RMC member shall determine the Target Percentage for each category of Participant. The initial designation of Participants for each Plan Year and assignment of Target Percentages shall ordinarily be made within the first 90 days of the Plan Year, but in no event later than June 1 of the Plan Year.

An employee who is hired during the Year in a category of officers eligible to participate in the Plan, or who is promoted during the Year into a category of officers eligible to

participate (or a category that has a higher Target Percentage) shall receive the Incentive Award payable as if the employee had been a Participant (and with the higher Target Percentage) for the entire year. A participant who is transferred to a category of officers eligible to participate at a lower Target Percentage shall receive the Incentive Award payable as if the employee had been a Participant at the original Target Percentage for the entire year.

LaSalle shall, at the beginning of each Year (or for Participants designated as such during the Year, as soon as practicable after such designation), send a letter ("Notification Letter") to each officer who has who has been designated a Participant in the Plan for the upcoming Plan Year. The Notification Letter shall indicate for that Plan Year: (1) the Participant's Target Percentage and (2) the Performance Metrics that must be achieved for each Incentive Award Level.

6. INCENTIVE AWARDS

A Participant's award shall be based on the attainment of identified Performance Metrics for the Plan Year, the Participant's individual performance or a combination of both.

a. Performance Metrics. LaSalle shall, during the first 90 days of the Plan Year, establish one or more Performance Metrics consistent with the purposes of the Plan, as determined in the sole discretion of LaSalle, for that Year. One set of Performance Metrics shall be established for the Corporation as a whole. A set of Performance Metrics may be established for each separate line of business, function or services group. The determination of which lines of business, functions or services groups will have separate Performance Metrics will be made by the Head of BU NA in consultation with the CoE Rewards for BU NA and BU NA Finance. Attainment of the Performance Metrics will determine the CIP Pool funding. The Performance Metrics for 2007 are as set forth in Exhibit A.

(i) Performance Metric Hurdles. For each Performance Metric, LaSalle shall establish a set of increasing goals to be met for the Plan Year, and a funding factor associated with each goal. For example, in 2007 the increasing goals and funding factors are outlined below. In future Plan Years LaSalle may establish a different number of goals and/or different multiples.

(A) Minimum: The goal that must be attained before any portion of the CIP Pool is funded for the Performance Metric. The funding factor if the minimum goal is achieved in 2007 is 0.8.

(B) Target: The budgeted goal for the Performance Metric. The funding factor if the target goal is achieved in 2007 is 1.0.

(C) Overachievement: A goal that exceeds the budgeted goal for the Performance Metric. The funding factor if the overachievement goal is achieved in 2007 is 1.5.

(D) Far Exceeds: A goal that represents performance significantly in excess of the budgeted goal for the Performance Metric. The funding factor if the far exceeds goal is achieved in 2007 is 2.0.

(ii) Weighting of Performance Metrics. The determination of weighting of Performance Metrics for the lines of business, functions or services groups will be made by the Head of BU NA in consultation with the CoE Rewards for BU NA and BU NA Finance. The CIP pool for each line of business, functions or services group for which individual metrics have been designated will fund partly on the achievement of the metrics for the Corporation and/or partly on the achievement of the metrics for the individual line of business, functions or services group. For 2007, the CIP pool for each function and services group will fund 100% based on the achievement of the metrics applicable to the Corporation as a whole, and the lines of business will fund 50% based on the achievement of the metrics applicable to the Corporation as a whole and 50% based on the metrics applicable to that line of business. The percentage of funding contingent on the line of business, functions or services group's performance will be determined during the first 90 days of the Plan Year.

LaSalle may, from time to time during the Plan Year, make such adjustments in Performance Metrics as LaSalle may determine, in its sole discretion, to be appropriate to preserve the degree of incentive in Incentive Awards for the Plan Year in light of acquisitions, divestitures, accounting changes, restructuring charges, and other nonrecurring or nonoperating events.

b. Calculation of CIP Pools. For each Plan Year, the funding of each CIP Pool shall be determined as follows:

(i) Determine the Target Funding for the CIP Pool, equal to the sum of the Target Awards of all Participants eligible to participate in the CIP Pool for the Year.

(ii) Determine the funding factor for each Performance Metric based on the level of achievement. If the actual performance falls between two hurdles the funding factor will be interpolated. Multiply this by the Performance Metric's weight.

(iii) Add the products described in (ii) above for all Performance Metrics and multiply by the Target Funding. The results shall be the funding for the CIP pool.

c. Individual Incentive Awards. The CIP Pool funding, as described above, determines the total amount of Incentive Awards that may be paid to all Participants in a CIP Group. The actual amount of Incentive Award payable to each Participant shall be determined by such Participant's individual performance rating, as determined by the applicable CIP Group management in accordance

with guidelines developed by CoE Rewards for BU NA. The total allocation of the CIP Pool shall not exceed the maximum funding level determined by the Performance Metrics, which in 2007 is two times the Target Funding.

Soley for the purposes of illustration, assume that for a given Plan Year LaSalle has established three Performance Metrics for a given CIP pool, with weightings of 50% for Performance Metric A and 25% for each of Performance Metric B and C. Assume further that the Target Funding for the CIP Pool is $1,000 and that the CIP Group for the CIP Pool achieves the target goal for Performance Metric A, the overachievement goal for Performance Metric B , and midway between the overachievement and far exceeds goal for Performance Metric C. The CIP Pool funding would be as follows:

| Performance Metric | Performance Metric Final Result | Performance Metric Weighting | Performance Metric Final Result x Weighting |
|---|---|---|---|
| A | 1.00 | 50% | .5000 |
| B | 1.50 | 25% | .3750 |
| C | 1.75 | 25% | .4375 |

CIP Pool Funding = 1.3125 x $1,000 = 1,312.50

7. VESTING

Except as provided below in this Section 7, if a Participant is actively employed by the Corporation on the date on which Incentive Awards are paid for a Plan Year (the "Payment Date"), he shall be vested, on such Payment Date, in his right to receive his Incentive Award for that Year.

If a Participant is not actively employed by the Corporation on the Payment Date for a Plan Year the portion of his Incentive Award for such Year that vests on the Payment Date shall be adjusted as provided below:

a. If a Participant dies, becomes fully disabled as defined in the ABN AMRO Group Long Term Disability Plan, or retires under a qualified retirement plan maintained by the Corporation before the end of a Year, then subject to the other provisions of this Section 7, such Participant shall be vested on the Payment Date in the amount of the Incentive Award that he or she would otherwise have been entitled to multiplied by a fraction, the numerator of which is the number of full months he was employed by the Corporation during the Year, and the denominator of which is twelve. Such Incentive Award shall be paid on the Payment Date.

b. A Participant whose employment is terminated by reason of the elimination or his or her position on or after August 1 of a Year, and who otherwise meets all of the requirements for the payment of severance pay under the ABN AMRO Group Severance Plan (including without limitation execution of the Waiver and Release Agreement referred to therein) shall be vested at the time of termination in his or

her Target Award, multiplied by a fraction, the numerator of which is the number of full months he was employed by the Corporation during the Year, and the denominator of which is twelve. Such Incentive Award shall be paid as soon as practical, but in no event more than 90 days, after his termination of employment.

The balance of a Participant's Incentive Award for any Year that is not vested as provided above shall automatically be forfeited by the Participant as of the date on which the Participant's employment is terminated. Any individual who voluntarily terminates prior to the Payment Date shall forfeit his or her entire Incentive Award. LaSalle, in its discretion, may from time to time provide for accelerated vesting. Certain accelerated vesting provisions applicable to terminations occurring in 2007 are set forth in Exhibit A.

If a Participant transfers employment prior to the end of the performance period to a position with an Employer, or an affiliate of LaSalle that is not an Employer, in which he or she is no longer eligible to participate in the Plan, he will continue to be a Participant and will receive his Incentive Award for the Year provided that he is still an employee of the Employer or affiliate on the Payment Date (or on the date on which his employment terminates pursuant to paragraph (a) or (b)); provided that if as a result of such transfer he becomes entitled to participate in a different annual bonus plan for the same Year his Incentive Award under this Plan will be multiplied by a fraction, the numerator of which is the number of full months during which he participated in the Plan, and the denominator of which is twelve.

Notwithstanding the foregoing provisions of this Section 7, a Participant shall forfeit his entire Incentive Award (whether or not vested) in the event that LaSalle determines:

(i) that such Participant has been terminated for Cause prior to the last day of the vesting period. "Cause" shall be defined as any of the following, as determined in the sole discretion of Company management:

(A) Violation of Company policies and procedures sufficient to warrant termination; or

(B) Conviction of, or entry of a plea of guilty or nolo contendere to, a felony or a crime involving dishonesty, theft, breach of trust or sale, manufacturing or distribution of controlled substances, or immoral conduct; or

(C) Failure to substantially perform the duties of the employee's position, or

(ii) that such Participant is guilty of any illegal act or act of misconduct (alone or in conjunction with others) in connection with his employment by any Employer, whether or not such act occurred while he was a Participant hereunder, and whether or not the Participant was terminated by reason of such act; or

(iii) that such Participant enters into competition (alone or in conjunction with others whether individually or as an employee, partner or 5% or more shareholder of or as an independent contractor with any other person or organization) with or assists

or is employed by or has contracted to render personal services with any other business entity that is in competition with any financial institution that is an Employer.

8. **BENEFITS.**

a. Form of Payment of Benefits. All Incentive Awards payable hereunder will be paid in cash.

b. Time of Payment. Except as otherwise provided for herein, all Incentive Awards for each Plan Year will be paid on the Payment Date, which shall not be later than March 15 of the year following the end of the Plan Year. Commencing with the 2008 Plan Year, a Participant who is otherwise eligible to participate in the ABN AMRO Group Supplemental Savings Plan (the "SSP") may, if permitted by LaSalle, elect by an irrevocable election to defer all or a percentage of the Incentive Award for such Plan Year in accordance with the terms of the SSP. Such election must be made, in accordance with the SSP either

(A) prior to the beginning of the Plan Year,

(B) if the Performance Metrics for the Plan Year are established not later than the 90th day of the Plan Year, the Participant has been employed since the date on which the Performance Metrics are established, and the Incentive Awards for the Plan Year otherwise meet the requirements for "performance based compensation" pursuant to section 409A of the Internal Revenue Code, not later than June 30 of the Plan Year, or

(C) in the case of a Participant who has never previously been eligible to participate in any elective account balance deferred compensation plan maintained by the Corporation or any of its subsidiaries or affiliates, not later than 30 days after the Participant first becomes eligible to participate in the Plan; provided that in such case the total amount deferred shall not exceed the Participant's Incentive Award multiplied by a fraction, the numerator of which is the number of days in the Plan Year after the day the election is made and the denominator of which is the total number of days in the Plan Year.

All Incentive Awards deferred prior to 2007, including limitations and provisions to ensure compliance with section 409A of the Internal Revenue Code, shall be governed by the SSP.

9. **DESIGNATION OF BENEFICIARY**

In the event of the death of a Participant, all benefits to which that Participant is entitled but which are unpaid at the time of his death shall be paid to the beneficiary or beneficiaries of that Participant who are designated in writing by the Participant or in the absence of any such designation, to the Participant's estate. LaSalle shall determine in its sole discretion whether the Participant has effectively designated a beneficiary, but shall

have no obligation to solicit beneficiary designations, and in any event LaSalle shall have no obligation to any other person as a result of any payment made to a person whom LaSalle has determined in good faith to be the Participant's beneficiary. The Incentive Award for the Plan Year in which the Participant dies shall be paid in accordance with Section 7(b), and any election the Participant had made to defer such payment shall be revoked by his death. Payment for Incentive Awards that the Participant had previously elected to defer shall be paid in accordance with the terms and conditions of the SSP.

**10. AMENDMENT OR TERMINATION OF PLAN**

LaSalle may terminate, amend or modify this Plan at any time and from time to time; provided however, any such termination, amendment or modification, or any administrative action may not divest any Participant of any of his benefits under this Plan as of the date of such termination, amendment or modification.

**11. GENERAL PROVISIONS**

a. No Right of Continued Employment. Nothing contained in the Plan shall give any Participant the right to be retained in the employment of an Employer or affect the right of an Employer to dismiss any Participant.

b. No Right of Continued Payments. The receipt of an Award for any Plan year shall not guarantee a Participant the right to receive an award for any subsequent Plan Year.

c. No Right to Receive an Award. A Participant will not be eligible to receive an Award unless the Participant attains the individual goals, if any, approved for such Participant, notwithstanding that the Corporation, or the line of business, function, or services group of which the Participant is an employee, attains its Performance Metrics.

d. No Right of Assignment. The interest of any Participant in the Plan shall not be assignable, or subject to the claim of any creditor.

e. Withholding for Taxes. Each Employer shall have the right to deduct from all amounts paid under this Plan any taxes required by federal, state or local law to be withheld with respect to such payments.

f. Law to Govern. All questions pertaining to the construction, regulation, validity and effect of the provisions of the Plan shall be determined in accordance with the laws of the State of Illinois.

g. Special Compensation. Except as otherwise provided by law, or as explicitly provided in such plan, benefits received under the Plan shall not be included or taken into account in determining benefits under pension, retirement, profit sharing, group insurance, or any other benefit plan maintained by the Corporation; provided that effective January 1, 2007, such benefits shall be considered compensation for purposes of the ABN AMRO Group 401(k) Retirement Savings

Plan. Neither the corporation nor LaSalle guarantee in any way the deferral of tax liability if a Participant defers the payment of Plan benefits.

h. Funding of Benefits. Benefits payable hereunder to or on account of any Participant shall be paid directly by the Corporation from its general assets. The Corporation shall not be required to segregate on its books or otherwise set aside any amount to be used for the payment of benefits under this Plan.

i. Interpretation. LaSalle shall have the sole and complete authority to interpret the provisions of and decide all disputes arising under the Plan, which interpretations and decisions shall be final and binding on all parties having any interests arising under or by virtue of the Plan.

j. Litigation. If any Participant, former Participant or beneficiary shall bring a suit or proceeding against LaSalle or the Corporation, or if any dispute shall arise as to the person or persons to whom payment or delivery of any funds shall be made by the Corporation, the costs (including attorneys' fees) to the Corporation of defending the action, where the result is adverse to the complainant, or pursuant to the authorization of the court or other forum in which the suit or proceeding is brought, shall be charged against the Plan benefits of the applicable Participant, former Participant or beneficiary and only the excess of such Plan benefits, if any, over the amount of such costs shall be payable by the Corporation.

IN WITNESS WHEREOF, the undersigned has caused this Amended and Restated Plan to be executed as of the 27 day of June 2007.

ABN AMRO BANK N.V.

By: [signature]

By: [signature]

By: [signature]

ANNEMIEKE VAN DER WERFF
AS COUNTER SIGNATORY

EXHIBIT A
2007 PERFORMANCE METRICS
AND VESTING REQUIREMENTS

The 2007 Performance Metric hurdles for the Corporation as a whole and each line of business, the weighting of each Performance Metric, and the multiple applied for CIP Pool funding upon the achievement of each hurdle, are set forth below.  If the Performance Metric achievement falls between two of the hurdles, the multiple is interpolated.

The three Performance Metrics used for 2007 are:

(1)    Return on Assigned Risk Capital (RoARC) (50% weighting).  RoARC equals Net Income/Assigned Risk Capital (i.e., Economic Capital x 1.25).

(2)    Revenue Growth (25% weighting).  Revenue Growth equals the percentage increase in current year revenue over prior year revenue.

(3)    Efficiency Ratio (25% weighting).  Efficiency Ratio equals Total Expense / Total Revenue.

For 2007 only, the funding of each CIP Pool shall not be less than the Target Funding.

All metrics are subject to adjustment based on changes in the Performance Contract for that Plan Year.

Performance Metrics for the Corporation (excluding Global Clients)
Determines 100% of Funding for all Functions and Services and 50% of Funding
for Lines of Business

|  | Minimum .8 x | PFC Target 1.0 x | Above Target 1.5 x | Far Exceeds 2.0 x |
|---|---|---|---|---|
| RoARC (average) (50% weighting) | 20.1% | 20.7% | 21.3% | 22.1% |
| Revenue Growth (25% weighting) | 0.9% | 2.3% | 6.5% | 10.0% |
| Efficiency Ratio (25% weighting) | 66.9% | 65.3% | 64.9% | 63.9% |

Performance Metrics for Commercial Banking
Determines 50% of Funding

|  | Minimum .8 x | PFC Target 1.0 x | Above Target 1.5 x | Far Exceeds 2.0 x |
|---|---|---|---|---|
| RoARC (average) (50% weighting) | 20.6% | 20.9% | 21.6% | 22.2% |
| Revenue Growth (25% weighting) | -1.1% | 0.5% | 5.0% | 8.9% |
| Efficiency Ratio (25% weighting) | 46.6% | 45.9% | 45.2% | 44.5% |

Performance Metrics for Personal Financial Services
Determines 50% of Funding

| | Minimum .8 x | PFC Target 1.0 x | Above Target 1.5 x | Far Exceeds 2.0 x |
|---|---|---|---|---|
| RoARC (average) (50% weighting) | 13.0% | 13.8% | 15.1% | 16.0% |
| Revenue Growth (25% weighting) | 1.5% | 2.9% | 7.0% | 10.6% |
| Efficiency Ratio (25% weighting) | 86.4% | 85.1% | 83.8% | 82.4% |

Performance Metrics for GSTS
Determines 50% of Funding

| | Minimum .8 x | PFC Target 1.0 x | Above Target 1.5 x | Far Exceeds 2.0 x |
|---|---|---|---|---|
| RoARC (average) (50% weighting) | 110.3% | 112.2% | 114.9% | 116.2% |
| Revenue Growth (25% weighting) | 6.2% | 7.2% | 10.3% | 12.8% |
| Efficiency Ratio (25% weighting) | 73.7% | 72.6% | 71.4% | 70.3% |

Performance Metrics for ALM & Capital Markets
Determines 50% of Funding

| | Minimum .8 x | PFC Target 1.0 x | Above Target 1.5 x | Far Exceeds 2.0 x |
|---|---|---|---|---|
| RoARC (average) (50% weighting) | 36.0% | 36.3% | 37.2% | 37.8% |
| Revenue Growth (25% weighting) | -27.1% | -26.4% | -24.1% | -22.1% |
| Efficiency Ratio (25% weighting) | 41.8% | 41.1% | 40.5% | 39.8% |

Performance Metrics for Transaction Banking
Determines 50% of Funding

| | Minimum .8 x | PFC Target 1.0 x | Above Target 1.5 x | Far Exceeds 2.0 x |
|---|---|---|---|---|
| RoARC (average) (50% weighting) | 83.5% | 87.8% | 90.9% | 92.7% |
| Revenue Growth (25% weighting) | -0.9% | 1.8% | 5.2% | 7.9% |
| Efficiency Ratio (25% weighting) | 74.2% | 73.0% | 71.9% | 70.7% |

Accelerated Vesting

In accordance with Section 7 of the Plan, the following accelerated vesting provisions shall apply to Participant's whose employment terminates during 2007.

1.  If the Participant's employment is terminated by reason of retirement, death or disability pursuant to Section 7(a) on or after April 23, 2007, the Incentive Award for the Year will be the full amount of the Award to which he Participant would otherwise have been entitled and will not be reduced by the fraction set forth in Section 7(a).

2.  If the Participant's employment is terminated on or after April 23, 2007, and the Participant meets all of the requirements to receive an Incentive Award as part of his or her severance benefit pursuant to Section 7(b) (without regard to the requirement that the Participant be terminated on or after August 1), then the Participant's severance benefit will be his Target Benefit without reduction by the fraction set forth in Section 7(b).  In addition, if such a Participant's employment is terminated on or after October 1, 2007, the Participant may also be eligible for an Incentive Award in excess of his or her Target Award, provided that his or her CIP Pool is funded at an amount that exceeds the Target Funding.  Such a Participant will receive his Target Award upon termination as set forth in Section 7(b), and will be considered for the additional Incentive Award, based upon the funding of the CIP Pool and his individual performance, on the Payment Date.

**FIRST AMENDMENT**
**TO THE**
**ABN AMRO GROUP CORPORATE INCENTIVE PLAN**

WHEREAS, the ABN AMRO Group Corporate Incentive Plan (the "Plan") was amended and restated effective as of January 1, 2007;

WHEREAS, effective August 28, 2007, sponsorship of the Plan was transferred from ABN AMRO Bank N.V. to ABN AMRO North America Holding Company;

WHEREAS, it is now desirable to amend the Plan to reflect the change in Plan sponsorship;

WHEREAS, no deferral elections were allowed with respect to any incentive awards made for the 2007 Plan Year; and

WHEREAS, ABN AMRO Bank N.V. has entered into an agreement to sell the stock of ABN AMRO North America Holding Company to Bank of America Corporation, effective October 1, 2007, and immediately prior to the consummation of such transaction ABN AMRO North America Holding Company will distribute the stock of ABN AMRO WCS Holding Company ("WCS Holding Company") to ABN AMRO Bank N.V., so that the businesses of the Excluded Employers will not be included in the sale to Bank of America Corporation.

NOW, THEREFORE, the Plan is amended as follows:

1. Effective August 28, 2007, the first Section, Purpose, shall be amended to read as follows:

   The purpose of the Corporate Incentive Plan (the "Plan") is to provide an incentive to certain officers of ABN AMRO Bank N.V. and its subsidiaries and affiliates (hereinafter referred to as the "Corporation" and individually as an "Employer"). The Plan was originally established by ABN/LaSalle North America, Inc. as the Annual Management Incentive Plan, and was subsequently adopted by ABN AMRO Bank N.V., revised and renamed the Corporate Incentive Plan. Sponsorship of the Plan was transferred to ABN AMRO North America Holding Company effective as of August 28, 2007. The Plan is hereby amended and restated in its entirety, effective as of January 1, 2007."

2. Effective August 28, 2007, ABN AMRO North America Holding Company shall be the sponsor of the Plan;

3. Effective August 28, 2007, the last sentence of Section 8, Benefits, shall be amended to read as follows:

   "No deferral elections are allowed with respect to any incentive awards made for the 2007 Plan Year. All Incentive Awards deferred prior to 2007, including limitations and provisions to ensure compliance with Section 409A of the Internal

Revenue Code, and all promulgations thereunder) shall be governed by the Supplemental Savings Plan.";

4. Effective October 1, 2007, a new term "Excluded Employer" shall be included to mean "ABN AMRO WCS Holding Company, ABN AMRO Asset Management, Inc., ABN AMRO Incorporated, ABN AMRO Advisory, Inc., ABN AMRO Associates Corp., their respective subsidiaries, ABN AMRO Bank N.V., and any other branch or subsidiary of ABN AMRO Bank N.V. other than ABN AMRO North America Holding Company and its subsidiaries."; and

5. Effective October 1, 2007, all Excluded Employers, to the extent previously participating in the Plan, shall cease participating, and the Plan shall have no further liability for benefits payable to the active employees of an Excluded Employer. The bonuses for employees who are not employed by an Excluded Employer shall be paid in accordance with the normal terms of the Plan.

In all other respects, the Plan, as heretofore amended and in effect, is hereby ratified and confirmed.

* * * *

**[Signature Page Follows]**

IN WITNESS WHEREOF, ABN AMRO Bank N.V., as original sponsor of the Plan, and ABN AMRO North America Holding Company, as the new sponsor of the Plan, have caused this Amendment to be executed by their duly authorized representatives this 28th day of September, 2007.

| ABN AMRO BANK N.V. | ABN AMRO NORTH AMERICA HOLDING COMPANY |
|---|---|
| By: [signature]<br>Its: Managing Board Member | By: [signature]<br>Its: President and CEO |
| By: [signature]<br>Its: Authorized Signatory | |

CHI 11312009.4

# EXHIBIT 3

# ABN AMRO GROUP LONG TERM INCENTIVE PLAN AMENDED AND RESTATED EFFECTIVE JANUARY 1, 2007

1. PURPOSE

The purpose of the ABN AMRO Group Long Term Incentive Plan ("Plan") is to provide additional incentive for certain officers of LaSalle Bank Corporation ("LaSalle"), and its subsidiaries and affiliates (hereinafter referred to collectively as the "Corporation" and individually as an "Employer"). The Plan is hereby amended and restated in its entirety, effective as of January 1, 2007. Except as otherwise provided herein, all Performance Units outstanding on January 1, 2007, or thereafter granted, shall be governed by the terms of the Plan as herein amended and restated.

2. ADMINISTRATION

The Plan shall be administered by LaSalle. The authority of LaSalle to administer the Plan shall be vested in the Head of the ABN AMRO Business Unit North America ("BU NA"), or the successor to such position, and shall be exercised on his behalf by the Head of Human Resources of BU NA and BU NA Center of Expertise (CoE) for Rewards. LaSalle shall have all powers and authority necessary for the administration of the Plan, including the authority to: (a) prescribe, amend and rescind Plan rules, regulations and procedures; (b) approve financial performance goals and determine from time to time the eligibility of employees for participation in the Plan; (c) determine the number of Performance Units to be allocated to each Participant for each Performance Period; (d) make such adjustments to benefits payable under the Plan as may be necessary or appropriate to correct mistakes of fact; and (e) take any other action necessary or appropriate for the administration of the Plan. The examples in the immediately-preceding sentence are listed herein solely for purposes of illustration and not limitation.

3. ELIGIBILITY

Participants in the Plan for each Performance Period shall be those officers of the Corporation who are selected by LaSalle in its sole discretion in the manner set forth below.

For each Performance Period, each member of the BU NA Regional Management Committee or his or her delegate shall nominate the officers in his or her area who shall be eligible to participate in the Plan for that Performance Period and shall recommend the number of Performance Units to be allocated to each person so nominated. All recommendations shall be reviewed and approved by the BU NA Head of Human Resources and BU NA CoE Rewards and subject to changes, if any, requested by the Head of BU NA. Each such person eligible to participate in the Plan for a Performance Period is referred to as a "Participant." The designation of Participants for each Performance Period shall ordinarily be made within the first 90 days of the Performance Period, but in no event later than June 1 of the first year of the Performance Period. In unusual circumstances, and with the specific approval of the Head of BU NA, an employee may be designated as a Participant and allocated Performance Units for a

Performance Period after the first 90 days have elapsed. The designation of Participants, and the allocation of Performance Units, is in the sole discretion of LaSalle, and the fact that an employee is designated as a Participant for one Performance Period shall not imply any right to be designated as a Participant in any future Performance Period.

LaSalle shall, at the beginning of each Performance Period (or for Participants designated as such during the Performance Period, as soon as practicable after such designation), send a letter ("Notification Letter") to each Participant who has been allocated Performance Units for that period. The Notification Letter shall indicate for that Performance Period: (a) the number of Performance Units being allocated to that Participant; (b) the cash value of each such Performance Unit based upon the level of performance achieved; and (c) the Performance Goals applicable for such Performance Period.

4. PERFORMANCE UNITS

Performance Units shall be allocated for each Performance Period annually by LaSalle to Participants. Within the first 90 days of each Performance Period, LaSalle shall establish the cash value or range of cash values for each Performance Unit to be allocated during such Performance Period or shall establish a formula by which such cash value will be determined based upon the achievement of Performance Goals as provided in Section 5.

5. PERFORMANCE PERIODS AND GOALS

A new Performance Period shall begin on January 1 of each year, and shall last for a period of three calendar years. For avoidance of doubt, at any time there will be three overlapping Performance Periods in process, and a Participant may have been allocated Performance Units for any or all of such Performance Periods. Each Performance Period shall be treated separately for all purposes of the Plan. LaSalle may from time to time in its discretion alter the commencement, frequency or length of future Performance Periods.

During the first 90 days of each Performance Period, LaSalle shall establish one or more performance goals ("Performance Goals") consistent with the purposes of the Plan, as determined in the sole discretion of LaSalle, for that Performance Period, and if appropriate the weight to be given to each such Performance Goal for that period. The Performance Goals for the 2005, 2006 and 2007 plans, and the formula by which the Performance Units are to be valued, are as set forth in Exhibit A. LaSalle may, from time to time thereafter, make such adjustments in Performance Goals as LaSalle may determine, in its sole discretion, to be appropriate to preserve the degree of incentive in open performance periods in light of acquisitions, divestitures, accounting changes, restructuring charges, and other nonrecurring or nonoperating events.

As soon as practicable after the end of each Performance Period, LaSalle shall determine the extent to which the Performance Goals for that period were achieved, and the value of Performance Units. LaSalle shall at such other times as it deems appropriate review the status of the performance goals for open periods and may communicate such status as it

deems appropriate. If the achievement falls between two Performance Goals, the value of the Performance Units shall be interpolated.

6. VESTING

Except as provided below in this Section 6, if a Participant is actively employed by the Corporation at the end of the Performance Period, he shall be vested, at the end of such Performance Period, in his Performance Units allocated to him for that Performance Period.

If a Participant is not actively employed by the Corporation at the end of the Performance Period the number of Performance Units in which such Participant shall vest for such Performance Period shall be adjusted as provided below:

a. If a Participant dies, becomes fully disabled as defined in the ABN AMRO Group Long Term Disability Plan, or retires under a qualified retirement plan maintained by the Corporation before the end of a Performance Period, then subject to the other provisions of this Section 6, such Participant shall be vested at the end of the Performance Period in the number of Performance Units he would have received had his employment with the Corporation continued to the end of the Performance Period, multiplied by a fraction, the numerator of which is the number of full months he was employed by the Corporation during the Performance Period, and the denominator of which is the total number of months in the Performance Period.

b. A Participant whose employment is terminated by reason of the elimination or his or her position on or after August 1 of the first year of a Performance Period, and who otherwise meets all of the requirements for the payment of severance pay under the ABN AMRO Group Severance Plan (including without limitation execution of the Waiver and Release Agreement referred to therein) shall be vested at the end of the Performance Period in the number of Performance Units he would have received had his employment with the Corporation continued to the end of the Performance Period, multiplied by a fraction, the numerator of which is the number of full months he was employed by the Corporation during the Performance Period and the denominator of which is the total number of months in the Performance Period.

If the provisions of paragraph (a) or (b) apply to more than one Performance Period, then the fraction referred to in paragraph (a) or (b), as applicable, shall be calculated separately for each such Performance Period, based upon the number of full months he was employed during such Performance Period, and shall be multiplied by the number of Performance Units granted to the Participant for such Performance Period.

The balance of a Participant's Performance Units for any Performance Period that are not vested as provided above shall automatically be forfeited by the Participant as of the last day of that Performance Period. Any individual who voluntarily terminates prior to the end of the Performance Period shall forfeit all unvested units. LaSalle, in its discretion,

may from time to time provide for accelerated vesting. For purposes of this Section, any Participant who transfers employment to a position with an Employer, or an affiliate of LaSalle that is not an Employer, in which he is no longer eligible to participate in the Plan shall remain a Participant with respect to all outstanding Performance Units, and such Performance Units shall be fully vested at the end of the Performance Period provided that he or she is still employed by an Employer or affiliate of LaSalle at the end of the Performance Period (or shall be partially vested under paragraph (a) or (b), if applicable, if at the time of his termination of employment he was employed by an Employer or affiliate of LaSalle).

Notwithstanding the foregoing provisions of this Section 6, a Participant shall forfeit all of his Performance Units allocated to him for all Performance Periods (whether or not vested in such Performance Units) in the event that LaSalle determines

a. that such Participant has been terminated for cause prior to the last day of the vesting period. "Cause" shall be defined as any of the following, as determined in the sole discretion of Company management:

   (i) Violation of Company policies and procedures sufficient to warrant termination; or

   (ii) Conviction of, or entry of a plea of guilty or nolo contendere to, a felony or a crime involving dishonesty, theft, breach of trust or sale, manufacturing or distribution of controlled substances, or immoral conduct; or

   (iii) Failure to substantially perform the duties of the employee's position, or

b. that such Participant is guilty of any illegal act or act of misconduct (alone or in conjunction with others) in connection with his employment by any Employer, whether or not such act occurred during any Performance Period or while he was a Participant hereunder, or

c. that such Participant enters into competition (alone or in conjunction with others whether individually or as an employee, partner or 5% or more shareholder of or as an independent contractor with any other person or organization) with or assists or is employed by or has contracted to render personal services with any other business entity that is in competition with any financial institution that is an Employer.

7. BENEFITS.

a. Form of Payment of Benefits. The benefits of a Participant under the Plan will be the cash value of those Performance Units in which such Participant becomes vested.

b. Time of Payment. Except as otherwise provided for herein, payments due hereunder for vested Performance Units will be made by March 15 of the year

following the end of the Performance Period in which such Performance Units vested. Commencing with Performance Units granted for the Performance Period that ends on December 31, 2008, a Participant who is otherwise eligible to participate in the ABN AMRO Group Supplemental Savings Plan (the "SSP") may, if permitted by LaSalle, elect by an irrevocable election to defer all or a percentage of the payments due to him for Performance Units that vest during such Performance Period in accordance with the terms of the SSP. Such election must be made, in accordance with the SSP either

(i) prior to the beginning of the Performance Period, or

(ii) if the formula for valuing the Units for a Performance Period is established not later than the 90th day of the Performance Period, the Participant has been employed since the date on which the formula is established, and the payment for the Units for such Performance Period otherwise meets the requirements for "performance based compensation" pursuant to section 409A of the Internal Revenue Code, not later than six months prior to the end of the Performance Period.

Unless (ii) applies, a Participant who is hired after the beginning of a Performance Period shall not be eligible to defer any Performance Units granted for that Performance Period.

c. Prior Deferrals. All Units deferred prior to 2007 shall be governed by the SSP, including limitations and provisions to ensure compliance with section 409A of the Internal Revenue Code.

8. DESIGNATION OF BENEFICIARY

In the event of the death of a Participant, all benefits to which that Participant is entitled but which are unpaid at the time of his death shall be paid to the beneficiary or beneficiaries of that Participant who are designated in writing by the Participant or in the absence of any such designation, to the Participant's estate. LaSalle shall determine in its sole discretion whether the Participant has effectively designated a beneficiary, but shall have no obligation to solicit beneficiary designations, and in any event LaSalle shall have no obligation to any other person as a result of any payment made to a person whom LaSalle has determined in good faith to be the Participant's beneficiary. Performance Units for Performance Periods that have not ended at the time of the Participant's death shall be paid at the same time and in the same manner as payments to other Participants, and any election the Participant has made to defer such payments shall be revoked by his or her death. Payment for Performance Units for Performance Periods that have ended and for which the Participant had previously elected to defer shall be paid in accordance with the terms and conditions of the SSP.

9. AMENDMENT OR TERMINATION OF PLAN

LaSalle, or its successor, may terminate, amend or modify this Plan at any time and from time to time; provided however, any such termination, amendment or modification, or

any administrative action may not divest any Participant of any of his benefits under this Plan as of the date of such termination, amendment or modification.

10. GENERAL PROVISIONS

a. No Right of Continued Employment. Nothing contained in the Plan shall give any Participant the right to be retained in the employment of any Employer or affect the right of any Employer to dismiss any Participant.

b. No Right to Continued Payments. The allocation of any Performance Units, the vesting therein or the payment of any Plan benefits for any Performance Period shall not guarantee a Participant the right to receive any such allocation, vesting or payment for any subsequent Performance Period.

c. No Right of Transfer. The interests of persons entitled to benefits under the Plan are not subject to their debt; or other obligations and except for tax withholding requirements or as otherwise specifically provided herein, may not be voluntarily or involuntarily sold, transferred, alienated, assigned or encumbered.

d. Withholding for Taxes. Each Employer shall have the right to deduct from all amounts paid under this Plan any taxes required by federal, state or local law to be withheld with respect to such payments.

e. Special Compensation. Except as otherwise provided by law, or as explicitly provided in such plan or agreement, benefits received under the Plan shall not be included or taken into account in determining benefits under pension, retirement, profit sharing, group insurance, or any other benefit plan or employment agreement maintained or entered into by the Corporation; provided that effective January 1, 2007, such benefits shall be considered compensation for purposes of the ABN AMRO Group 401(k) Retirement Savings Plan. Neither the Corporation nor LaSalle guarantee in any way the deferral of tax liability if a Participant defers the payment of Plan benefits. To the extent that any such plan or agreement refers to Units that are paid or payable for any year, or that vest in any year, for purposes of calculating the amount of any benefit or entitlement, such plan or agreement shall be construed as referring only to the Units granted for the Performance Period that ends on the last day of such year and not to any other Units, regardless of the time of actual payment or vesting of such Units or any other Units.

f. Acceleration or Deferral of Payments; Effect of Section 409A. With respect to all Units granted on or after January 1, 2005, the Plan shall be construed and administered in accordance with the requirements of Section 409A of the Internal Revenue Code, anything else contained herein to the contrary notwithstanding. In no event shall any payment to any Participant with respect to any such Units be deferred to any time later, or accelerated to any time earlier, than as specified in Section 7, whether by exercise of LaSalle's discretion, a separate agreement between the Corporation and a Participant. Notwithstanding the foregoing,

LaSalle may enter into agreements prior to December 31, 2007, with individual Participants providing for an acceleration of the payment for their Units upon the occurrence either of a change of control of LaSalle, or certain terminations of employment prior to a change of control, provided that

(i) if such acceleration occurs upon a change of control that occurs while the Participant is still employed and such change of control occurs after December 31, 2007, the change of control satisfies the definition of a "change of control event" as defined in the regulations under section 409A,

(ii) if such acceleration occurs upon a termination of employment prior to the change of control, the termination constitutes a "separation from service" as defined in the SSP and, if the Participant is a "key employee" as defined in the SSP the payment will be made not earlier than six months after the date of termination, and

(iii) in any event, no amount payable pursuant to any such agreement that would not otherwise have been payable during 2007 shall be paid prior to January 1, 2008.

g. Law to Govern. All questions pertaining to the construction, regulation, validity and effect of the provisions of the plan shall be determined in accordance with the laws of the State of Illinois, to the extent not preempted by applicable Federal law.

h. Funding of Benefits. Benefits payable hereunder to or on account of any Participant shall be paid directly by the Corporation from its general assets. The Corporation shall not be required to segregate on its books or otherwise set aside any amount to be used for the payment of benefits under this Plan.

i. Interpretation. LaSalle shall have the sole and complete authority to interpret the provisions of and decide all disputes arising under the Plan, which interpretations and decisions shall be final and binding on all parties having any interests arising under or by virtue of the Plan.

j. Litigation. If any Participant, former Participant or beneficiary shall bring a suit or proceeding against LaSalle or the Corporation, or if any dispute shall arise as to the person or persons to whom payment or delivery of any funds shall be made by the Corporation, the costs (including attorneys' fees) to the Corporation of defending the action, where the result is adverse to the complainant, or pursuant to the authorization of the court or other forum in which the suit or proceeding is brought, shall be charged against the Plan benefits of the applicable Participant, former Participant or beneficiary and only the excess of such Plan benefits, if any, over the amount of such costs shall be payable by the Corporation.

IN WITNESS WHEREOF, the undersigned has caused this Amended and Restated Plan to be executed as of the 27 day of June 2007.

ABN AMRO BANK N.V.

By:____________________

By:____________________

By: ANNEMIEKE VAN DER WERFF

EXHIBIT A

PERFORMANCE GOALS AND PERFORMANCE UNIT VALUATION FORMULAE
FOR PERFORMANCE PERIODS BEGINNING IN 2005, 2006 AND 2007

The following sets forth the Performance Goals and the formula to be used to value Performance Units for the Performance Periods beginning in 2005, 2006, and 2007. For each year:

1.    The maximum value for Performance Units is $200 per Unit.

2.    If the achievement falls between two Performance Goals, the value of the Units shall be interpolated.

3.    LaSalle may, from time to time, make such adjustments in Performance Goals as LaSalle may determine, in its sole discretion, to be appropriate to preserve the degree of incentive in open Performance Periods in light of acquisitions, divestitures, accounting changes, restructuring charges, and other nonrecurring or nonoperating events.

For the Performance Period commencing January 1, 2007, and ending December 31, 2009, Performance Units will be valued based upon LaSalle's average Return on Assigned Risk Capital ("RoARC") over the Performance Period, which aligns to BU NA's Performance Contract, as follows.

| RoARC | Unit Value |
|---|---|
| 22.5% | $200 |
| 21.0% | $150 |
| 19.5% | $100 |
| 18.0% | $50 |
| 17.25% | $25 |
| Below 17.25% | $  - |

For the Performance Period commencing January 1, 2006, and ending December 31, 2008, Performance Units will be valued based upon LaSalle's average Return on Economic Capital ("RoEC") over the Performance Period. The Performance Goals have been revised to reflect the reorganization of BU NA, as follows.

| RoEC | Unit Value |
|---|---|
| 26.5% | $200 |
| 25.0% | $150 |
| 23.5% | $100 |
| 22.0% | $50 |
| 21.25% | $25 |
| Below 21.25% | $  - |

For the Performance Period commencing January 1, 2005, and ending December 31, 2007, Performance Units will be valued based upon LaSalle's average Return on Economic Capital ("RoEC") over the Performance Period. The Performance Goals have been revised to reflect the reorganization of BU NA, as follows.

| RoEC | Unit Value |
|---|---|
| 24.5% | $200 |
| 23.0% | $150 |
| 21.5% | $100 |
| 20.0% | $50 |
| 19.25% | $25 |
| Below 19.25% | $ - |

**AMENDMENT TO**
**ABN AMRO GROUP LONG TERM INCENTIVE PLAN**

Instrument of Amendment

THIS INSTRUMENT is executed by the Chief Administrative Officer of BANK OF AMERICA CORPORATION, a Delaware corporation with its principal office and place of business in Charlotte, North Carolina (the "Company"), on behalf of ABN AMRO North America Holding Company ("AANA").

Statement of Purpose

AANA previously adopted the ABN AMRO Group Long Term Incentive Plan (the "Plan") for the benefit of eligible employees and reserved the right to amend the Plan from time to time. Effective as of the consummation of the transactions contemplated by the Purchase and Sale Agreement dated April 22, 2007, as amended, by and between ABN AMRO Bank N.V. and the Company, the Company acquired AANA on October 1, 2007. Pursuant to applicable resolutions, the Company's Chief Administrative Officer currently has the right to execute Plan amendments on behalf of AANA. By this Instrument, AANA is amending the Plan to (1) set the value of outstanding Performance Units, (2) provide a new payment rule for payments made following a termination of employment, and (3) freeze the Plan effective December 31, 2007, as to the inception of new Performance Periods.

NOW, THEREFORE, AANA hereby amends the Plan effective as of October 1, 2007:

1. Section 4 of the Plan shall be amended by adding the following new sentence at the end thereof:

> "Notwithstanding the foregoing, the value of all Performance Units outstanding on October 1, 2007, shall be $200 per unit."

2. Section 5 of the Plan shall be amended by adding the following new paragraph at the end thereof:

> "Notwithstanding any other provisions of the Plan to the contrary, no new Performance Period shall begin on or after January 1, 2008. For the avoidance of doubt, (1) the Performance Period which began on January 1, 2007, shall be the final Performance Period under the Plan, (2) payments due hereunder for vested Performance Units allocated for the Performance Periods which began in 2005, 2006 and 2007 shall be made

in 2008, 2009 and 2010, respectively, pursuant to Plan terms, and (3) no additional Performance Units shall be allocated hereunder."

3. Subsection 7.b. of the Plan shall be amended by adding the following new paragraph at the end thereof:

"Notwithstanding any other provisions of the Plan to the contrary, payment of vested Performance Units to a Participant who has terminated employment shall occur on the earlier of (x) the date specified above in the first sentence of this subsection 7.b. and (y) the first anniversary of the Participant's date of termination, unless such Performance Units are otherwise forfeited pursuant to Section 6 of the Plan above."

4. Exhibit A of the Plan shall be amended by adding the following new paragraph at the end thereof:

"Notwithstanding the foregoing, the value of all Performance Units outstanding on October 1, 2007, shall be $200 per unit."

IN WITNESS WHEREOF, the Chief Administrative Officer of Bank of America Corporation hereby executes this Instrument on the 19th day of December, 2007 on behalf of ABN AMRO North America Holding Company.

By: ____________________
J. Steele Alphin
Chief Administrative Officer
Bank of America Corporation

JUDGE KENDALL
MAGISTRATE JUDGE BROWN
TG

# EXHIBIT 4

# ABN AMRO GROUP SEVERANCE PAY PLAN

## PLAN DOCUMENT

(Amended and Restated effective April 17, 2007)

# TABLE OF CONTENTS

| | Page |
|---|---|
| ESTABLISHMENT OF THE PLAN | 1 |
| PURPOSE OF THE PLAN | 1 |
| ELIGIBLE EMPLOYEES | 2 |
| ELIGIBILITY REQUIREMENTS | 2 |
| CONDITIONS OF INELIGIBILITY | 2 |
| SEVERANCE PAY AND SEVERANCE BENEFITS | 4 |
| PAYMENT OF SEVERANCE PAY | 8 |
| WAIVER AND RELEASE AGREEMENT | 9 |
| PLAN ADMINISTRATION | 9 |
| AMENDMENT/TERMINATION/VESTING | 10 |
| NO ASSIGNMENT | 10 |
| RECOVERY OF PAYMENTS MADE BY MISTAKE | 10 |
| CONFIDENTIAL INFORMATION/COOPERATION | 11 |
| REPRESENTATIONS CONTRARY TO THE PLAN | 11 |
| NO EMPLOYMENT RIGHTS | 11 |
| PLAN FUNDING | 11 |
| APPLICABLE LAW | 12 |
| SEVERABILITY | 12 |
| PLAN YEAR | 12 |
| MANDATED PAYMENTS | 12 |
| MISCELLANEOUS PROVISIONS | 12 |

# ABN AMRO GROUP SEVERANCE PAY PLAN

## ESTABLISHMENT OF THE PLAN

**ABN AMRO Bank N.V.** (hereinafter the "**Company**") hereby adopts the **ABN AMRO GROUP SEVERANCE PAY PLAN** (hereinafter the "**Plan**"), as amended and restated effective March 1, 2007, for the benefit of eligible employees of the Company and its United States subsidiaries and affiliates. Wherever the context requires, the term "Company" as used herein shall refer to the subsidiary or affiliate that is the employer of an eligible employee.

The Plan is an unfunded welfare benefit plan for purposes of the Employee Retirement Income Security Act of 1974, as amended (hereinafter "**ERISA**"). The Plan supersedes any prior formal or informal severance plans, programs or policies of the Company covering eligible employees.

The benefits provided under the Plan include a specified number of weeks of continued payment of the eligible employee's pay following termination of employment, referred to herein as "severance pay", and certain other welfare and fringe benefits, referred to herein as "severance benefits." The term "severance" includes both severance pay and severance benefits.

This restatement of the Plan supersedes the Plan effective January 1, 2007, as previously restated effective March 19, 2007. The amendments made by this restatement of the Plan are generally intended as clarifications and are effective as of the original effective date of the Plan; provided, however, that nothing contained in this restatement shall be construed to require any change to an offer of severance made prior to the date on which this restatement is executed.

## PURPOSES OF THE PLAN

The purposes of the Plan are

(a) to provide an eligible employee with severance for a specified period of time in the event that his/her employment is involuntarily terminated by the Company pursuant to a reduction in force or similar program (a "RIF") as hereinafter described; and

(b) to provide a mechanism for the payment of severance to individual employees whose employment is involuntarily terminated by the Company other than pursuant to a RIF and other than for cause, in the sole discretion of the Company.

## REDUCTIONS IN FORCE

From time to time, the Company, in its discretion, may decide to provide severance for employees in a specified group, class or business unit pursuant to a reduction in force, branch or division closing or restructuring, or similar program. Each such program shall be referred to in this Plan as a "RIF." Each such RIF shall be identified in a separate written appendix to this Plan, which shall specify the group or class of employees to whom the RIF will apply (which shall be defined in accordance with the definition of "decisional unit" as set forth in EEOC regulations 29 CFR §1625.22), the period during which the RIF will be in effect, the eligibility criteria for employees affected by the RIF, and any difference between the standard severance provided herein and the severance to be provided pursuant to the RIF. Each such RIF shall be administered as a separate program within this Plan, and in the event of any differences between the RIF program as set forth in the applicable appendix and this Plan, the terms of the RIF program shall control. Except as otherwise determined by the Company, any employee whose position is eliminated shall be treated as having been terminated pursuant to a RIF.

## ELIGIBLE EMPLOYEES

The Plan is applicable to each full time and part time United States based employee of the Company who is part of a class or group identified pursuant to a RIF as described in an Appendix to this Plan. From time to time the Company may in its sole discretion offer severance under this Plan (which may vary from the terms set forth below) to a full or part time United States based employee whose employment is involuntarily terminated other than for cause and who is not part of a RIF, but shall in no event be required to do so. No person shall be considered an eligible employee unless he or she has received a written notice specifying the severance he/she is eligible to receive and a Waiver and Release Agreement.

## ELIGIBILITY REQUIREMENTS

In order for an eligible employee to be eligible to receive Plan severance, an eligible employee must meet the following eligibility requirements: (i) he/she must receive a written notice specifying the severance for which he/she is eligible (ii) he/she must remain in the employ of the Company through the date of termination of employment designated in writing by the Company, (iii) through the date of termination of employment, he/she must fulfill the normal responsibilities of his/her position, including meeting regular attendance, workload and other standards of the Company, and (iv) he/she must submit the signed Waiver and Release Agreement required by the Plan by the time specified in the notice of severance eligibility and (v) he/she must not revoke the signed Waiver and Release Agreement within seven days after executing it.

## CONDITIONS OF INELIGIBILITY

An employee of the Company shall not be considered an eligible employee nor be eligible for severance under the Plan if:

(a) the employee is not or ceases to be an eligible employee as defined in the Plan;

(b) the employee's employment with the Company terminates prior to the date of termination of employment designated in writing by the Company by reason of employee's retirement, resignation, failure to report for work, death or discharge for cause, as determined in the sole discretion of the Company;

(c) the employee's employment with the Company terminates under any other circumstances other than meeting the eligibility requirements of the Plan;

(d) the employee is entitled to a benefit from a long term disability benefit plan sponsored by the Company;

(e) the employee is employed in a position or a Company division, department, operational unit, function or facility which is off-shored or out-sourced to a vendor, or sold, leased or otherwise divested and the employee is offered comparable employment by the vendor or successor entity (as determined in the sole discretion of the Company);

(f) the employee is a party to an employment, separation, or other agreement providing for payments in the nature of severance or separation pay, unless such agreement expressly provides that such payments are in addition to severance under this Plan;

(g) the employee's employment with the Company is terminated after the employee is offered comparable employment by the Company, as determined by the Company in its sole discretion, and the employee rejects such offer; or

(h) the Plan is terminated.

The foregoing list of conditions is intended to be illustrative and may not be all inclusive; the Plan Administrator will determine in the Plan Administrator's sole discretion whether an employee or other person is eligible for severance under the Plan.

For all purposes under the Plan, "**cause**" includes, but is not limited to, termination of the employee's employment because of (a) negligence or misconduct by the employee in the performance of his/her duties for the Company for activities including, but not limited to, insubordination, misappropriation or misuse of Company information, abusive or inappropriate behavior towards coworkers or customers, (b) violation of the Company's drug and alcohol policy, (c) the employee's conviction for or admission of a felony offense, or the employee's indictment for a criminal offense involving or relating to the business of the Company, (d) the employee's act of fraud, theft, dishonesty, or embezzlement with respect to the Company, or (e) the employee's misconduct which, in the judgment of the Company, brings the reputation of the Company into disrepute or causes the employee to be unable to perform his/her duties.

For all purposes of the Plan, an offer of "**comparable employment**" means (i) the employee receives an offer of employment by a vendor or successor employer with a regular weekly base salary compensation rate or regular hourly base compensation rate, as applicable, which is equal to or greater than such applicable rate with the Company on the date he/she receives such offer of employment, or (ii) the employee receives an offer of continuing employment by the Company (A) with a regular weekly base salary compensation rate or regular hourly base compensation rate, as applicable, which is equal to or greater than such applicable rate with the Company on the date he/she receives such offer and (B) the employee's commuting distance to such position with the Company is within 35 miles from the current location, or such other commuting distance as determined from time to time by the Company.

## SEVERANCE PAY AND SEVERANCE BENEFITS

If an eligible employee satisfies the eligibility requirements, his/her severance will be based upon his/her years of service, the amount of his/her pay and his/her employment classification.

In exchange for providing the Company with an enforceable Waiver and Release Agreement in a form acceptable to the Company, each eligible employee is eligible to receive as Plan severance the following (except as otherwise provided in an Appendix to the Plan with respect to a RIF, or in an employee's written notice of severance):

(a) **Severance Pay:**

Severance pay shall be determined in accordance with the following table:

| **Eligible Employee's Employment Classification** | **Amount of Severance Pay** |
|---|---|
| Executive Vice President/Corporate Managing Director or equivalent position | Twenty-six (26) weeks of pay plus two (2) weeks of pay for each year of service, to a maximum total of sixty-four (64) weeks of pay<br><br>Eligible to receive bonus as described below |
| Group Senior Vice President/Senior Vice President/Executive Director / Managing Director or equivalent position | Twenty-six (26) weeks of pay plus two (2) weeks of pay for each year of service, to a maximum total of fifty-two (52) weeks of pay<br><br>Eligible to receive bonus as described below |
| Vice President and First Vice President/Corporate Director/ Director or equivalent position | Sixteen (16) weeks of pay plus two (2) weeks of pay for each year of service, to a maximum total of fifty-two (52) weeks |

| | |
|---|---|
| | of pay<br><br>Eligible to receive bonus as described below |
| Officer/ Associate and Assistant Vice President or equivalent position | Twelve (12) weeks of pay plus two (2) weeks of pay for each year of service, to a maximum total of fifty-two (52) weeks of pay<br><br>Eligible to receive bonus as described below |
| Exempt (non Officer) with at least One Year of Service | Six (6) weeks of pay plus one (1) week of pay for each year of service, with a minimum total of eight (8) weeks of pay and a maximum total of fifty-two (52) weeks of pay |
| Nonexempt with at least One Year of Service | Four (4) weeks of pay plus one (1) week of pay for each year of service, with a minimum total of eight (8) weeks of pay and a maximum total of fifty-two (52) weeks of pay |
| Exempt (non Officer) Or Nonexempt With Less Than One Year of Service | Four (4) weeks of pay |

In the case of an employee whose position is not listed above, the amount of severance pay will be determined by the Company in its discretion and set forth in the employee's notice of eligibility for severance.

In addition to the number of weeks of pay described above, the severance pay of an eligible employee at the Officer/Associate and Assistant Vice President level and above, and who participates in an annual bonus and/or long-term incentive plan that does not ordinarily provide any benefit for the year in which the employee terminates, may include a proportionate share of the bonus and/or long-term incentive payment for the year in which the termination occurs. Such proportionate share shall be based on the number of months in the year of termination completed prior to the date of termination, and shall be payable only if the eligible employee's termination occurs after August 1 of the year. An eligible employee who is terminated before receiving a bonus for the prior year may be eligible for a bonus for the prior year at the Company's discretion, depending on the terms of the bonus plan, but such bonus will not be severance pay and will not be dependent upon the eligible employee's execution of the Waiver and Release Agreement. Any decision to include bonus and/or long term incentive payouts will be determined by the Company based on the employee's performance. The amount of the

bonus and/or long term incentive payment (prior to proration) shall normally be determined as follows, subject to the Company's discretion to adjust or eliminate bonuses in individual cases:

(a)     If the eligible employee participates in the Corporate Incentive Plan ("CIP"), the payment shall be based on the eligible employee's assigned target percentage for the year, and shall be paid as soon as administratively feasible following the termination date.

(b)     If the eligible employee participates in an annual bonus plan other than the CIP in which bonuses are based on a formula, the payment will be based on the average of the eligible employee's annual bonuses during the three prior years (or, if fewer, the number of years the eligible employee was eligible to participate in the bonus plan), and shall be paid as soon as administratively feasible following the termination date.

(c)     If the eligible employee participates in a discretionary annual bonus plan, the payment will be based on the eligible employee's annual bonus in the immediately prior year, and shall be paid as soon as administratively feasible following the termination date. If the eligible employee was not eligible for a discretionary bonus in the prior year, the eligible employee shall not be eligible for a pro rated share of the bonus in the year of termination.

(d)     If the eligible employee participates in the Long Term Incentive Plan ("LTIP"), the eligible employee shall vest in a proportionate number of the units that would otherwise have vested on the last day of the year of termination. The value of the units, and the time of payment, shall be as determined under the LTIP.

(e)     In the case of any annual bonus or long term incentive plan not described above, the amount of the payment shall be determined by the Plan Administrator applying principals analogous to those set forth above, and the Plan Administrator's determination shall be final and binding.

Anything else contained herein to the contrary notwithstanding, except as otherwise provided in the following sentence, in no event shall the total amount of severance pay payable to any eligible employee exceed two times the lesser of (i) the employee's annual rate of pay in the calendar year immediately preceding the year in which his/her employment was terminated (adjusted by any increase in base compensation that would have been expected to continue indefinitely had the employee's employment not been terminated) or (ii) the maximum amount of compensation that could be taken into account in a tax qualified retirement

plan pursuant to Section 401(a)(17) of the Internal Revenue Code in the year in which the employment is terminated (the "Maximum Benefit").

In the case of an officer whose total severance pay would otherwise exceed the Maximum Benefit, each payment of severance pay shall constitute a separate "payment" for purposes of Section 409A of the Internal Revenue Code, and the aggregate amount of payments paid to the employee after March 15 of the year following the year of termination of employment, but before the date that is six months after the termination of employment, shall not exceed the Maximum Benefit. To the extent the amount of such benefits would otherwise exceed the Maximum Benefit, the payments shall be reduced, in reverse order of payment, and the amount of such reductions shall be paid to the employee, in a lump sum, six months after the termination of employment.

For all purposes of the Plan, an eligible employee's "**years of service**" shall be determined from the eligible employee's hire date (or adjusted hire date, if any) in accordance with the Company's personnel records. Except as otherwise determined by the Company, an eligible employee whose termination date occurs more than six months from the most recent anniversary of his hire date (or adjusted hire date) shall be credited with an additional full year of service. An employee's years of service shall not include any period that was taken into account in determining the severance pay, under this Plan or any other severance plan of the Company, that was received by the employee on a previous termination of employment (and not required to be repaid by reason of reemployment), and the Company may make other adjustments to severance pay to reflect severance pay previously received.

For all purposes of the Plan, a "**week of pay**" (i) for a full-time eligible employee shall be determined by using for an Officer level or exempt eligible employee the regular weekly base salary compensation rate on his/her date of termination of employment with the Company and for a nonexempt eligible employee the regular hourly base compensation rate multiplied by his/her regularly scheduled number of hours per week on his/her date of termination of employment with the Company, and (ii) for a part-time eligible employee shall be determined on a prorated basis based upon his/her actual number of hours worked per week in the previous year of employment with the Company.

For all purposes of the Plan, an eligible employee's employment classification as an "**exempt**" or "**nonexempt**" employee shall be determined by the Plan Administrator in accordance with the definition of such terms under the Fair Labor Standards Act, as amended.

(b) <u>Severance Benefits:</u>

(i) Medical, dental and vision benefits coverage continuation:

If an eligible employee shall elect to exercise his/her applicable COBRA continuation rights to continue his/her Company sponsored medical, dental and vision benefits, such medical, dental and vision benefits shall be provided at the active employee monthly contribution cost to the eligible employee for the number of weeks equal to which he/she is entitled to receive payment of his/her severance pay. Thereafter, the eligible employee shall be required to pay the full applicable COBRA premium, including the COBRA administration fee..

All of the terms and conditions of the Company sponsored medical, dental and vision benefit plans, as amended from time to time, shall be applicable to an eligible employee (and his/her eligible dependents, if applicable) participating in any form of continuation coverage under the Company sponsored medical and dental benefit plans.

(ii) Career Transition Assistance:

Each full-time eligible employee shall be eligible to receive career transition assistance services at such level of services as determined by the Company. Career transition assistance services shall be provided by a career transition assistance firm selected and paid for by the Company. An eligible employee must begin the available career transition assistance services within sixty (60) days following return of the signed Waiver and Release Agreement.

The consideration for the voluntary Waiver and Release Agreement shall be the severance which the eligible employee would otherwise not be eligible to receive.

The amounts of severance pay and severance benefits set forth above are intended as guidelines. The Company shall have the complete discretion (which may be exercised in individual cases and need not be exercised consistently) to alter the amount or type of severance pay or severance benefits received by any employee. In all cases, the amount and type of severance pay and severance benefits stated in each employee's notice of severance shall govern, and no employee shall have any right to any severance pay or severance benefits in addition to the amounts set forth in his notice of severance.

PAYMENT OF SEVERANCE PAY

Severance pay will be paid in installments in accordance with the Company's regular payroll payment schedule as soon as practicable following the eligible employee's date of termination of employment (except for the proportionate share of annual bonuses and long-term incentives which shall be paid as described above), however any severance will be paid only after the seven (7) day revocation period for a signed Waiver and Release Agreement has passed. The Company reserves the right however, in its sole discretion, to pay severance pay (other than the amount of severance pay that exceeds

the Maximum Benefit) in a single lump sum payment. All legally required taxes and any sums owed the Company shall be deducted from Plan severance payments. In no event shall any amount of severance pay be paid after the last day of the second calendar year ending after the date of termination of employment.

In the event that an eligible employee who is receiving payment of severance pay under the Plan either is reemployed by the Company or an affiliate, the payment of severance under the Plan shall cease as of the date his/her reemployment begins. In the event an eligible employee has received his/her severance pay in a single lump sum payment and is then reemployed by the Company or an affiliate during a period of time during which he/she would have been receiving severance pay if paid to him/her in installments, he/she shall be required to repay to the Company that portion of the single lump sum payment attributable to the period of time from the date his/her reemployment begins to the date he/she would have received his/her last installment payment of severance pay.

## WAIVER AND RELEASE AGREEMENT

In order to receive the severance available under the Plan, an eligible employee must submit a signed Waiver and Release Agreement form to the Plan Administrator on or within forty five (45) days after his/her date of termination of employment. In the case of an employee who is offered severance other than as part of a RIF, the employee may be required to submit the signed Waiver and Release Agreement within a shorter period of time, but in no event less than twenty-one (21) days after his/her termination of employment. A form of Waiver and Release Agreement, which shall be modified as required, is attached hereto as Attachment I. An eligible employee may revoke his/her signed Waiver and Release Agreement within seven (7) days of his/her signing the Waiver and Release Agreement.

Any such revocation must be made in writing and must be received by the Plan Administrator within such seven (7) day period. An eligible employee who timely revokes his/her Waiver and Release Agreement shall not be eligible to receive any severance under the Plan. An eligible employee who timely submits a signed Waiver and Release Agreement form and who does not exercise his/her right of revocation shall be eligible to receive severance under the Plan.

Eligible employees shall be advised to contact their personal attorney at their own expense to review the Waiver and Release Agreement form if they so desire.

## PLAN ADMINISTRATION

**ABN AMRO Bank N.V.** shall serve as the "**Plan Administrator**" of the Plan and the "**named fiduciary**" within the meaning of such terms as defined in ERISA. The Plan Administrator shall have the discretionary authority to determine eligibility for Plan severance and to construe the terms of the Plan, including the making of factual determinations. The decisions of the Plan Administrator shall be final and conclusive with respect to all questions concerning the administration of this Plan. The Plan

Administrator will determine in the Plan Administrator's sole discretion whether an employee is an eligible employee and is eligible for severance under the Plan. Benefits under this plan will be paid only if the Plan Administrator decides in its discretion that the applicant is entitled to them.

The authority and duties of the Plan Administrator shall be performed on behalf of the Plan Administrator by the Company's Head of Human Resources/North America, or persons acting under his or her authority and supervision. The Plan Administrator may delegate to other persons responsibilities for performing certain of the duties of the Plan Administrator under the terms of this Plan and may seek such expert advice as the Plan Administrator deems reasonably necessary with respect to the Plan. The Plan Administrator shall be entitled to rely upon the information and advice furnished by such delegatees and experts, unless actually knowing such information and advice to be inaccurate or unlawful. The Plan Administrator shall establish and maintain a reasonable claims procedure, including a procedure for appeal of denied claims. In no event shall an eligible employee or any other person be entitled to challenge a decision of the Plan Administrator in court or in any other administrative proceeding unless and until the claim and appeals procedures established under this Plan have been complied with and exhausted.

In the event of a RIF or other group termination, as determined in the sole discretion of the Plan Administrator, the Plan Administrator shall furnish affected eligible employees with such additional information as may be required by law.

## AMENDMENT/TERMINATION/VESTING

Eligible employees do not have any vested right to severance under the Plan and the Company reserves the right in its sole discretion to amend or terminate the Plan at any time in writing signed by any Executive Vice President or higher titled officer of the Company, provided, however, that no amendment nor termination shall reduce severance which have commenced being provided to an eligible employee.

## NO ASSIGNMENT

Severance payable under the Plan shall not be subject to anticipation, alienation, pledge, sale, transfer, assignment, garnishment, attachment, execution, encumbrance, levy, lien, or charge, and any attempt to cause such severance to be so subjected shall not be recognized, except to the extent required by law. However, severance pay may be offset by any amounts owed by the eligible employee to the Company.

## RECOVERY OF PAYMENTS MADE BY MISTAKE

An eligible employee shall be required to return to the Company any severance payment, or portion thereof, made by a mistake of fact or law. Any amount paid to an eligible employee by mistake shall be held by such employee in a constructive trust for the benefit of the Company.

## CONFIDENTIAL INFORMATION/COOPERATION

Eligible employees may have had access to trade secrets and other confidential and proprietary information (hereinafter "**Confidential Information**") with regard to the business of the Company. Recognizing that the disclosure or improper use of such Confidential Information or the breach of any restrictive covenant agreement(s) covering the eligible employee will cause serious and irreparable injury to the Company, eligible employees with such access and/or restrictive covenant agreement(s) acknowledge that (i) they will not at any time, directly or indirectly, disclose Confidential Information to any third party or otherwise use such Confidential Information for their own benefit or the benefit of others (ii) they will not breach such restrictive covenant agreement(s), and (iii) payment of severance under the Plan shall cease if an eligible employee discloses or improperly uses such Confidential Information.

Each eligible employee shall cooperate with the Company and its legal counsel in connection with any current or future investigation, regulatory matter or litigation relating to any matter to which the eligible employee was involved or of which the eligible employee has knowledge or which occurred during the eligible employee's employment. Such assistance shall include, but not be limited to, depositions and testimony and shall continue until such matters are resolved. In addition, an eligible employee shall not in any way disparage the Company and its affiliates nor any person associated with the Company and its affiliates to any person, corporation, or other entity.

## REPRESENTATIONS CONTRARY TO THE PLAN

No employee, officer, or director of the Company has the authority to alter, vary, or modify the terms of the Plan except by means of an authorized written amendment to the Plan. No verbal or written representations contrary to the terms of the Plan and its written amendments shall be binding upon the Plan, the Plan Administrator, or the Company.

## NO EMPLOYMENT RIGHTS

This Plan shall not confer employment rights upon any person. No person shall be entitled, by virtue of the Plan, to remain in the employ of the Company and nothing in the Plan shall restrict the right of the Company to terminate the employment of any eligible employee or other person at any time.

## PLAN FUNDING

No eligible employee shall acquire by reason of the Plan any right in or title to any assets, funds, or property of the Company. Any severance which becomes payable under the Plan is an unfunded obligation and shall be paid from the general assets of the Company. No employee, officer, director or agent of the Company personally guarantees in any manner the payment of severance. The Company may, in its discretion, establish a separate fund or trust for the payment of benefits under the Plan, but no eligible employee shall have the right to require the Company to establish any

such fund or trust, or any interest in funds set aside for the payment of benefits other than that of a general unsecured creditor.

APPLICABLE LAW

This Plan shall be governed and construed in accordance with ERISA and in the event that any reference shall be made to State law, the laws of the State of Illinois shall apply, without regard to its conflicts of law provisions.

SEVERABILITY

If any provision of the Plan is found, held or deemed by a court of competent jurisdiction to be void, unlawful or unenforceable under any applicable statute or other controlling law, the remainder of the Plan shall continue in full force and effect.

PLAN YEAR

The ERISA plan year of this Plan shall be the twelve month period commencing on January 1 of each year.

MANDATED PAYMENTS

The severance available under the Plan are the maximum made available by the Company in the event of involuntary termination of employment. To the extent that a federal, State or local law may mandate the Company to make a payment to an eligible employee because of involuntary termination of employment or in accordance with a plant closing law, the severance available under the Plan may, in the sole discretion of the Plan Administrator, be reduced by the amount of such mandated payment.

MISCELLANEOUS PROVISIONS

In order for an eligible employee to receive and retain severance under the Plan, (i) he/she shall be required to return all Company property (including, but not limited to, Confidential Information, client lists, keys, credit cards, access cards, personal digital assistants, mobile telephones, documents and records, identification cards, equipment, laptop computers, software, and pagers), (ii) complete and submit all expense reimbursement requests, and (iii) repay any outstanding bills, advances, debts, or amounts due to the Company and clear any corporate credit card charges as of his/her date of termination of employment with the Company.

All pay and other benefits (other than severance) payable to an eligible employee as of his/her date of termination of employment with the Company according to the established policies, plans, and procedures of the Company shall be paid in accordance with the terms of those established policies, plans, and procedures. In addition, any benefit continuation or conversion rights which an eligible employee has as of his/her date of termination of employment with the Company according to the established policies, plans, and procedures of the Company shall be made available to him/her.

IN WITNESS WHEREOF, ABN AMRO Bank N.V. has caused this amendment and restatement of the Plan to be executed on the date set forth below.

**ABN AMRO BANK N.V.**

By____________________
Annemieke van der Werff

By Norman R. Bobins
Norman R. Bobins

Date April 17, 2007

ATTACHMENT I

**ABN AMRO GROUP**
**SEVERANCE PAY PLAN**

**WAIVER AND RELEASE AGREEMENT**

(1) **General Release.** In consideration for the severance pay and severance benefits to be provided to me under the terms of the **ABN AMRO GROUP SEVERANCE PAY PLAN**, I, on behalf of myself and my heirs, executors, administrators, attorneys and assigns, hereby waive, release and forever discharge **ABN AMRO BANK, N.V.** (hereinafter referred to as the "**Company**") together with the Company's parent, subsidiaries, divisions and affiliates, whether direct or indirect, its and their joint ventures and joint venturers (including their respective directors, officers, employees, shareholders, partners and agents, past, present, and future), and each of its and their respective successors and assigns (hereinafter collectively referred to as "**Releasees**"), from any and all known or unknown actions, causes of action, claims or liabilities of any kind which have been or could be asserted against the Releasees arising out of or related to my employment with and/or separation from employment with the Company and/or any of the other Releasees up to and including the date of this Waiver and Release Agreement, including but not limited to:

(a) claims, actions, causes of action or liabilities arising under Title VII of the Civil Rights Act, as amended, the Age Discrimination in Employment Act, as amended ("**ADEA**"), the Employee Retirement Income Security Act, as amended, the Rehabilitation Act, as amended, the Americans with Disabilities Act, as amended, the Family and Medical Leave Act, as amended, Worker Adjustment and Retraining Notification Act, as amended, [ADD SPECIFIC STATE LAWS AS APPLICABLE FROM ATTACHMENT II] and/or any other federal, state, municipal, or local employment discrimination statutes or ordinances (including, but not limited to, claims based on age, sex, attainment of benefit plan rights, race, religion, national origin, marital status, sexual orientation, ancestry, harassment, parental status, handicap, disability, retaliation, and veteran status); and/or

(b) claims, actions, causes of action or liabilities arising under any other federal, state, municipal, or local statute, law, ordinance or regulation; and/or

(c) any other claim whatsoever including, but not limited to, claims for pay/wages/commissions, severance pay, claims for bonus, claims for expense reimbursement, claims based upon breach of contract, wrongful termination, defamation, intentional infliction of emotional distress, tort, personal injury, invasion of privacy, violation of public policy, negligence

and/or any other common law, statutory, regulatory or other claim whatsoever arising out of or relating to my employment with and/or separation from employment with the Company and/or any of the other Releasees,

but excluding the filing of an administrative charge of discrimination, any claims which I may make under state workers' compensation or unemployment laws, and/or any claims which by law I cannot waive.

(2) **Covenant Not To Sue**. In addition to and apart from the General Release contained in paragraph 1 above, I also agree never to sue any of the Releasees or become party to a lawsuit on the basis of any claim of any type whatsoever arising out of or related to my employment with and/or separation from employment with the Company and/or any of the other Releasees, except I may bring a lawsuit to challenge this Waiver and Release Agreement under the ADEA.

(3) **Consequences Of Breach Of Covenant Not To Sue**. I further acknowledge and agree that if I breach the provisions of paragraph (2) above, then (a) the Company (and/or any of the other Releasees) shall be entitled to apply for and receive an injunction to restrain any violation of paragraph (2) above, (b) the Company (and/or any of the other Releasees) shall not be obligated to continue payment of the severance pay and availability of severance benefits to me, (c) I shall be obligated to pay to the Company (and/or any of the other Releasees) its costs and expenses in enforcing this Waiver and Release Agreement and defending against such lawsuit (including court costs, expenses and reasonable legal fees), and (d) as an alternative to (c), at the Company's (and/or any of the other Releasees) option, I shall be obligated upon demand to repay to the Company (and/or any of the other Releasees) all but $100 of the severance pay and cost of the severance benefits paid or made available to me. I further agree that the foregoing covenants in this paragraph (3) shall not affect the validity of this Waiver and Release Agreement and shall not be deemed to be a penalty nor a forfeiture.

(4) **Further Waiver And Acknowledgement**. To the extent permitted by law, I further waive my right to any monetary recovery should any federal, state, or local administrative agency pursue any claims on my behalf arising out of or related to my employment with and/or separation from employment with the Company and/or any of the other Releasees. I also acknowledge that I have not suffered any on-the-job injury for which I have not already filed a claim.

(5) **Reinstatement Rights**. To the extent permitted by law, I further waive, release and discharge Releasees from any reinstatement rights which I have or could have.

(6) **Non-Disparagement**. I also promise that I shall not at any time or in any way disparage the Company and/or any of the other Releasees to any person, corporation, entity or other third party whatsoever.

(7) **Consequences Of Other Breach**. I further agree that if I breach the Confidential Information/Cooperation provisions of the Plan or the provisions of paragraphs (5) and/or (6) above, then (a) the Company (and/or any of the other Releasees) shall be entitled to apply for without bond and receive an injunction to restrain such breach, (b) the Company (and/or any of the other Releasees) shall not be obligated to continue payment of the severance pay and availability of severance benefits to me, and (c) I shall be obligated to pay to the Company (and/or any of the other Releasees) its costs and expenses in enforcing the Confidential Information/Cooperation provisions of the Plan and the provisions of paragraphs (5) and (6) above (including court costs, expenses and reasonable legal fees).

(8) **Claim Or Refund**. If subsequent to my terminate date, the Company (and/or any of the other Releasees) discovers that it has overpaid Old-Age, Survivors and Disability Insurance Tax under Sections 3101 and 3111 of the Internal Revenue Code related to my employment with the Company (and/or any of the other Releasees), then I grant to the Company (and/or any of the other Releasees) my unconditional consent to file a claim for refund or credit of my portion of such overpayment. Furthermore, I have not or will not claim a refund or credit for any amount of over-collection of such tax without first notifying the Company (and/or any of the other Releasees).

Upon the Company's receipt of refund or granting of credit by the Internal Revenue Service of my portion of such overpayment, pursuant to the Company's (and/or any of the other Releasees) claim for refund or credit, the Company (and/or any of the other Releasees) shall within a reasonable period of time remit to me such over-collection of tax under Section 3101 of the Internal Revenue Code, to my last known residence.

Further and upon reasonable demand by the Company (and/or any of the other Releasees), I shall complete and timely deliver to the Company and/or other designated party(ies) any and all forms or documents that may be required or reasonably necessary with respect to the Company's (and/or any of the other Releasees) claim for refund or credit. The Company (and/or any of the other Releasees) retains within its discretion the right to set reasonable time periods for completion and delivery of said forms and documents.

(9) **Time To Consider Agreement**. I acknowledge that I have been given at least forty-five (45) days to consider this Waiver and Release Agreement thoroughly.

(10) **Attorney Consultation**. I acknowledge that I have been advised in writing to consult with an attorney at my own expense, if desired, prior to signing this Waiver and Release Agreement.

(11) **Time To Revoke Agreement**. I understand that I may revoke this Waiver and Release Agreement within seven (7) days after its signing and that any revocation must be made in writing and submitted within such seven day period to the Plan

Administrator at the address below. I further understand that if I revoke this Waiver and Release Agreement, I shall not receive the severance pay nor the severance benefits.

(12) **Consideration For Agreement**. I also understand that the severance pay and severance benefits which I will receive in exchange for signing and not later revoking this Waiver and Release Agreement are in addition to anything of value to which I already am entitled.

(13) **RELEASE OF UNKNOWN CLAIMS**. I FURTHER UNDERSTAND THAT THIS WAIVER AND RELEASE AGREEMENT INCLUDES A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS TO DATE.

(14) **Severability**. I acknowledge and agree that if any provision of this Waiver and Release Agreement is found, held or deemed by a court of competent jurisdiction to be void, unlawful or unenforceable under any applicable statute or controlling law, the remainder of this Waiver and Release Agreement shall continue in full force and effect.

(15) **Governing Law**. This Waiver and Release Agreement in all respects shall be interpreted, enforced and governed under applicable federal law and in the event reference shall be made to State law, the internal laws of the State of Illinois shall apply.

(16) **Acknowledgement**. I further acknowledge and agree that I have carefully read and fully understand all of the provisions of this Waiver and Release Agreement and that I voluntarily enter into this Waiver and Release Agreement by signing below.

Questions about severance pay and benefits should be directed to AskHR at 1-800-871-8877.

______________________________
(Name of Eligible Employee - Please Print)

______________________________
(Signature of Eligible Employee)

______________________________
(Date)

[LETTERHEAD OF EMPLOYER]

**AMENDMENT**
**TO THE**
**ABN AMRO GROUP SEVERANCE PAY PLAN**

WHEREAS, the ABN AMRO Group Severance Pay Plan (the "Plan") was amended and restated effective as of April 17, 2007;

WHEREAS, effective August 28, 2007, sponsorship of the Plan was transferred from ABN AMRO Bank N.V. to ABN AMRO North America Holding Company, which thereupon became the "Company" for all purposes of the Plan;

WHEREAS, it is now desirable to amend the Plan to reflect the change in Plan sponsorship; and

WHEREAS, effective September 30, 2007, the Plan shall be frozen in its entirety and no benefit thereunder shall be available to any person who terminates employment or who has not signed the required Waiver and Release Agreement with the Company after September 30, 2007.

NOW, THEREFORE, the Plan is amended as follows:

1. Effective August 28, 2007, all references to "Company" contained in the Plan shall mean ABN AMRO North America Holding Company;

2. Effective August 28, 2007, ABN AMRO North America Holding Company shall replace ABN AMRO Bank N.V. as Plan Administrator of the Plan and "named fiduciary" within the meaning of such terms as defined in ERISA.

3. Effective September 30, 2007, the Plan shall be frozen in its entirety and no benefits thereunder shall be available to any person who terminates employment or who has not signed the required Waiver and Release Agreement with the Company after September 30, 2007.

4. Effective October 1, 2007, a new term "Excluded Employer" shall be included to mean "ABN AMRO WCS Holding Company, ABN AMRO Asset Management, Inc., ABN AMRO Incorporated, ABN AMRO Advisory, Inc., ABN AMRO Associates Corp., their respective subsidiaries, ABN AMRO Bank N.V., and any other branch or subsidiary of ABN AMRO Bank N.V. other than ABN AMRO North America Holding Company and its subsidiaries."; and

5. Effective October 1, 2007, all Excluded Employers, to the extent previously participating in the Plan, shall cease participating, and the Plan shall have no further liability for benefits payable to the active employees of an Excluded Employer.

In all other respects, the Plan, as heretofore amended and in effect, is hereby ratified and confirmed.

* * * *

IN WITNESS WHEREOF, ABN AMRO Bank N.V., as original sponsor of the Plan, and ABN AMRO North America Holding Company, as the new sponsor of the Plan, have caused this Amendment to be executed by their duly authorized representatives this 28th day of September, 2007.

| ABN AMRO BANK N.V. | ABN AMRO NORTH AMERICA HOLDING COMPANY |
|---|---|
| By: [signature]<br>Its: Managing Board Member<br><br>By: [signature]<br>Its: Authorized Signatory | By: [signature]<br>Its: President and CEO |

08CV3867
JUDGE KENDALL
MAGISTRATE JUDGE BROWN
TG

# EXHIBIT 5

**Your Guide to the Corporate Severance Program - Section 1**

**Legacy LaSalle Bank Corporation**
**October 1, 2007**

*Table of Contents:*

| | |
|---|---|
| Table of Contents / Introduction | Section 1 |
| Important Telephone Numbers / How to Contact | Section 2 |
| To Do List | Section 3 |
| Severance Overview | Section 4 |
| Career Opportunities and Relocation | Section 5 |
| Severance Pay | Section 6 |
| Benefits While Receiving Severance | Section 7 |
| Benefits Grid | Section 8 |
| Other Benefits | Section 9 |

*The Bank of America Corporate Severance Program (CSP) is designed to help you through the transition period if you are displaced as a result of a workforce reduction, realignment or similar measure. This guide and the accompanying material in this folder contain important information affecting your participation in the CSP. Please take time to read them. We also encourage you to seek the advice of family, friends, financial advisors or others who can help you make decisions. After you have read this information, you may still have questions or want additional information. If so, please refer to the Important Telephone Numbers and Web sites listed in this guide.*

*For questions about the Corporate Severance Program, visit MyHR or call AskHR ......1.800.871-8877*

## Important Telephone Numbers / How to Contact - Section 2

| | Telephone Number | Website Address |
|---|---|---|
| Ask HR<br>• Medical, Dental, Vision, Other Insurance, Pension, Pay | 800.871.8877 | MyHR website via Currency |
| Reimbursement Accounts | 877.924.3967 | www.wageworks.com |
| Express Scripts | 800.451.1493 | www.express-scripts.com |
| COBRA | 800.877.7994 | n/a |
| WorkLife Matters/ EAP | 800.327.1092 | n/a |
| Employment Verification | 800.367.5690 | www.theworknumber.com / company code 10583 |
| 401(k) AccessLine | 800.328.3151 | www.retirementplans.abnamro.com |
| CAEL (Counsel for Adult and Experiential Learning) | 888.608.2235 | https://.secure.tamsonline.org/TAMS3Web/abnamro<br>email: tuition-abnamro@cael.org |
| Alliance Bernstein 529 CollegeBoundfund | 888.324.5057 | https://corporate.collegeboundfund.com |
| Finance (Controllers Customer Service) | 312.904.4357 | |
| IT Help Desk | 877.226.8400 | |
| Outplacement Services (Lee Hecht Harrison) | 877.227.8917 | |

## To Do List - Section 3

| Action | When |
|---|---|
| 1. Complete, sign and return the General Release and Program Agreement ("CSP Agreement") | **Within 45 days of your notification date** |
| 2. Complete, sign and return the Statement of Non-Revocation Form | **8 days from the date the CSP Agreement was signed** |
| 3. Contact Outplacement Resources | **As soon as possible, no later than 60 days from your termination date.** |

Severance Overview - Section 4

## Severance Pay and Benefits

Now that you have officially received a copy of this guide, you will receive severance pay and other benefits if:

- You are displaced as a result of a workforce reduction, realignment or similar measure;
- You successfully perform your work until your position is officially eliminated;
- You do not receive a comparable job offer (see definition below) at Bank of America during your active employment; and
- You properly sign, date and return the CSP Agreement and Non-Revocation Form.

You could lose your eligibility for severance pay and the other benefits of the Corporate Severance Program if, while you are receiving severance pay or other benefits, the company becomes aware of circumstances that could have caused your immediate termination, such as embezzlement, dishonesty, or violations of the conditions of employment.

## Comparable Job Offers

If you decline a comparable job offer, you will not be eligible for the Corporate Severance Program, including severance pay and related benefits. A comparable job, as defined by management, is generally:

- A job for which you are qualified;
- A job that does not reduce your base pay rate; and
- A job that does not require relocation or an excessive increase in your commute time (this criteria will be administered considering the commute "standards" for the geographic area, availability of public transportation, etc).

### Severance Pay

Severance Pay shall be determined in accordance with the following table.

| Eligible Employee's Employment Classification | Amount of Severance Pay (Base Salary) |
|---|---|
| Executive Vice President / Corporate Managing Director | Twenty-six (26) weeks of pay plus two (2) weeks of pay for each year of service, to a maximum total of sixty-four (64) weeks of pay. Eligible to receive bonus as described below. |
| Group Senior Vice President / Senior Vice President / Executive Director / Managing Director or equivalent | Twenty-six (26) weeks of pay plus two (2) weeks of pay for each year of service, to a maximum total of fifty-two (52) weeks of pay. Eligible to receive bonus pay as described below. |
| Vice President and First Vice President / Corporate Director / Director or equivalent | Sixteen (16) weeks of pay plus two (2) weeks of pay for each year of service, to a maximum total of fifty-two (52) weeks of pay. Eligible to receive bonus pay as described below. |
| Officer / Associate and Assistant Vice President or equivalent | Twelve (12) weeks of pay plus two (2) weeks of pay for each year of service, to a maximum total of fifty-two (52) weeks of pay. Eligible to receive bonus pay as described below. |
| Exempt (non Officer) with at least 1 year of service | Six (6) weeks of pay plus one (1) week of pay for each year of service, with a minimum total of eight (8) weeks of pay and a maximum total of fifty-two (52) weeks of pay. |
| Nonexempt with at least 1 year of service | Four (4) weeks of pay plus one (1) week of pay for each year of service, with a minimum total of eight (8) weeks of pay and a maximum total of fifty-two (52) weeks of pay. |
| Exempt (non Officer) Or Nonexempt With Less Than One (1) Year of Service | Four (4) weeks of pay. |

Severance pay for full-time hourly employees shall be based on the number of scheduled hours as of the termination date. Severance pay for part-time employees shall be based on the number of actual hours worked during the previous year of employment. Except as otherwise determined by Bank of America, an eligible employee whose termination date occurs more than six months from the most recent anniversary of his/her hire date (or adjusted hire date) shall be credited with an additional full year of service. The number of weeks of pay shall be determined by the employee's level as noted in the chart above.

In the case of an employee whose position is not listed above, the amount of severance pay will be determined by Bank of America in its discretion and set forth in the employee's notice of eligibility for severance.

### Commissioned Associates

Commissioned associates will receive severance pay based on the benefits base pay determined each year for health and wellness coverage for purposes of annual enrollment.

### Incentive Pay

Eligible employees will receive severance for annual incentive programs in which they participate. The amount received will be prorated based on the number of full months completed. Production incentives will be paid based on the provisions of the individual plans.

| Incentive Plan | Payout of Incentive |
|---|---|
| Annual Bonus | An employee must be employed as of August 1 to qualify to receive a pro-rated bonus for the current year. The bonus will be pro-rated based on the number of complete months of service in that year. Any decision to include bonus payouts will be determined by management based on the employee's performance.<br>CIP will be paid as soon as administratively possible based on the employee's assigned target percent that year.<br>All other formulaic bonus programs will be paid as soon as administratively possible based on the average of the employee's bonuses over the last three years (if available).<br>Discretionary bonuses will be paid as soon as administratively possible based on the previous year's bonus amount. |
| Long Term Incentive Program | An employee must be employed as of August 1 to vest in the plan for the current year. The bonus will be pro-rated based on the number of complete months of service in the performance period. |

### Perks

Employee perks end as of the last day of employment.

### Payment of Severance

You may elect to take your severance pay in the form of installments or as a lump sum payment. Details about your severance pay are covered in Section 6. Please note there are differences in benefit continuation if you choose a lump sum over installments.

### Separation of Service / Termination of Employment Relationship

Your employment ends on your termination date (i.e., when you receive or begin receiving severance pay). Solely for the purpose of ensuring you are properly paid your severance pay and benefits extended, Bank of America will continue to reflect your employment in its automated payroll/personnel records until your severance pay ends.

## Career Opportunities and Relocation - Section 5

### Discovering New Career Opportunities

In order to assist you in your transition to other employment, Bank of America has agreed to provide eligible employees with career transition assistance services provided by an outplacement firm selected and paid for by Bank of America. This transition assistance will be provided at such level of services as determined by Bank of America. An eligible employee must begin the available career transition services within sixty (60) days following his/her termination of employment with Bank of America.

Recognizing that each individual has different needs, career goals and interests, the first step is to utilize the resources available to you. Take advantage of the Internet: use it to research potential career opportunities. You may also want to contact WorkLife Matters for information on dealing with change, as well as researching local employment and job search agencies.

The sooner you begin this process, the greater your potential for success.

Please refer to the Transition / Outplacement Support Services and Inplacement materials in your severance package for the services available to you.

### Relocation

If a comparable job is not available in your current location, and you are offered a job within the company in another city, relocation assistance may be available. Your Human Resources Manager will discuss the details of the relocation package with you if you are interested in relocating.

## Treatment of Final Pay

You will receive final pay for time worked prior to your termination date on the first semi-monthly payroll following the separation date, as practical. You will receive your payment either by direct deposit or live check (the same way your wages had previously been paid). In order to receive direct deposit, you are requested to leave your account open until final pay and vacation pay (if applicable) is deposited. If you are receiving severance, you may also leave your direct deposit account open though the end of your severance period.

## Treatment of Severance Pay

You may elect to have your severance pay paid to you in a lump sum or in installments. Installment pay is paid coinciding with your regular pay schedule. Your CSP Agreement will allow you to select a form of payment for your severance pay (lump sum or installments). Keep in mind that if you choose a lump sum, you will not be eligible to continue any benefits, such as health care coverage, at the active associate rate.

If you receive your severance pay in installments, you will be taxed at your current withholding rate.

If you choose to receive a lump sum payment, you will be taxed at the following "special pay flat rate":

- 28% or the current applicable federal income tax
- Applicable state income tax (for example, 6 % for California)
- Social Security and Medicare deductions; and
- Any other applicable state or local taxes

You must complete the CSP Agreement indicating how you would like to receive your severance pay (installments or lump sum). If you do not complete the payment election on your CSP Agreement, your severance will automatically be paid to you in installments.

***Please note that in order to receive severance pay and benefits, an eligible employee must submit the CSP Agreement within 45 days after the notification date and the Statement of Non-Revocation no earlier than eight (8) days from the date the CSP Agreement was signed.**

## Severance Pay - Section 6 (continued)

You will be paid for any unused accrued vacation and/or floating holiday hours that you have accumulated for the current year. You will not be paid for any unused personal or sick days. Please refer to the following schedules for final year vacation and floating holiday accrual:

**Final Vacation Days**

| Month of Termination | Vacation Eligibility | | |
|---|---|---|---|
| | 10 Days* | 15 Days* | 20 Days* |
| January | 0 | 0 | 0 |
| February | 1 | 2 | 3 |
| March | 2 | 4 | 5 |
| April | 3 | 5 | 7 |
| May | 4 | 6 | 8 |
| June | 5 | 8 | 10 |
| July | 6 | 9 | 12 |
| August | 7 | 10 | 13 |
| September | 7 | 11 | 15 |
| October | 8 | 13 | 17 |
| November | 9 | 14 | 18 |
| December | 10 | 15 | 20 |

* This table assumes employee is eligible for the full vacation allotment in the calendar year.

**Floating Holidays**

| | |
|---|---|
| 1st Quarter – 0 days | 3rd Quarter – 1 day |
| 2nd Quarter – 1 day | 4th Quarter – 2 days |

***Quarter Century Day (if applicable) will also be paid out if not taken**

In the event you receive an overpayment of your regular, final or severance pay, you must repay it. You are only entitled to receive severance pay that exceeds any amount(s) you owe the company resulting from your employment (for example, business credit cards, outstanding salary overpayment, used but not accrued vacation, etc.).

For questions regarding your severance paycheck, please contact AskHR.

### Re-employment

If, during the time you are receiving severance pay, you are rehired within Bank of America, your installment severance pay will be discontinued and your regular pay will begin. If you received your severance payment in a lump sum, you will generally be required to pay back a pro-rated portion.

This policy may also be in effect in the case of company divestitures or sales, or the contracting out or outsourcing of a unit's functions or services. Your severance pay may stop if you begin work during this same time period with the purchaser of the organization to which your business unit's functions or services were outsourced.

## Benefits While Receiving Severance - Section 7

As a participant in the Corporate Severance Program, you are eligible to continue coverage in the following benefits while you are receiving severance.

**Note: If you were not eligible for or participating in the benefits programs discussed in this Guide, CSP participation does not entitle you to receive or participate in these benefits programs.**

### Health and Wellness Benefits

Generally, you may continue most of your benefits at the active associate rates, on a pre-tax basis, while you are receiving severance pay. For details about what happens to your benefits as a result of your displacement, please refer to the benefits chart in Section 8.
**Note: Any pay received after your severance pay ends will not extend your benefits end date.**

### Payment of Health and Wellness Benefits

If you elect to receive your severance pay in installments, payment for health and wellness coverage will be automatically deducted in the same manner as your deductions were taken from your active pay. You may cancel your coverage within 31 days of your end of active employment or within 31 days of a Qualified Status Change by sending your request via fax to 312-992-1611, via U.S. mail to 540 W. Madison, Suite 1102, Chicago, IL 60661. You may also change or cancel your coverage during annual enrollment if your severance pay installment continues into the following year. If you cancel your coverage, you are eligible to continue your medical, dental and vision coverage, and health care reimbursement account contributions at a higher premium through the Consolidated Omnibus Budget Reconciliation Act (COBRA). COBRA information will be mailed to your home within 45 days after your active coverage ends.

Unless you choose to end your active coverage prior to your severance pay end date (discussed above), your health and wellness coverage through Bank of America stops at the end of the month in which you receive your last severance pay. Refer to the Benefits Grid (Section 8) for more detailed information.

### Payment of Health and Wellness Benefits if Retirement Eligible

If you are eligible for retirement at end of active employment, your health and wellness coverage continues at the active rates until the end of your severance pay. If you wish to initiate retirement benefits, it is recommended that you contact AskHR sixty (60) days prior to your desired retirement date. You are eligible for retiree medical and dental coverage if you elect to start your pension benefit at the time of retirement or at the end of special pay. If you do not elect retiree medical and dental benefits when you are first eligible, you will not be able to elect such benefits at a later date. You must currently participate in the medical and dental programs as an active employee in order to receive coverage. If you declined coverage as an active employee, retiree medical and dental benefits are not available to you. If eligible, you may retire at the time your severance begins. You can collect both your pension benefit and severance benefit concurrently and commence retiree medical (if elected coverage as an active employee) at the time your health and wellness severance benefits end.

### Coverage Under COBRA

When your coverage ends at the end of the month in which your severance ends, you may elect to continue your medical, dental and vision coverage and health care reimbursement account contributions through COBRA (including Domestic Partner coverage). If you elect COBRA, the effective date of your COBRA coverage will be the first day of the next month following the date in which your active coverage ends, to prevent a break in coverage. COBRA information will be mailed to your home within 45 days after your active coverage ends. You will have 60 days from the date COBRA information is mailed to you to elect COBRA coverage. If you (or any qualified beneficiary) fail to elect COBRA coverage within this 60-day period, all rights to COBRA coverage are forfeited.

**401(k) Savings Plan**

While on severance, contributions can no longer be made to the 401(k) Savings Plan and you will be treated as a terminated associate under those plans.

**Pension Plan**

Company contributions cease at the end of active employment. If you have completed five years of service and are eligible for a pension benefit, you will automatically receive notification of these benefits as soon as administratively possible.

***Please refer to the benefits grid in section 8 for specific details on the benefits that continue during severance.***

# Benefits Grid - Section 8

Below is a summary of how the major benefit and associate programs are affected by your participation in the Corporate Severance Program. See also the list of Important Telephone Numbers and Web sites in Section 2 and the benefit information in Section 7 of the Guide.

This chart is a summary only and is not all-inclusive. For more complete information, please contact AskHR. The information in this chart is subject to the provisions of the official plan documents for each benefit, which govern the availability and amount of benefits. If there is an inconsistency between this benefit information and the provisions of the official plan documents, the plan provisions will always govern.

| Health and Wellness Coverage | If You Elect To Receive Installment Severance Pay | If You Elect a Lump Sum Severance Payment |
|---|---|---|
| ➢ **Medical** | Coverage continues through the end of the month in which severance pay ends. | Coverage will end at the end of the month in which you receive your lump sum severance pay. |
| ➢ **Dental** | Coverage continues through the end of the month in which severance pay ends. | Coverage will end at the end of the month in which you receive your lump sum severance. |
| ➢ **Vision** | Coverage continues through the end of the month in which severance pay ends. | Coverage will end at the end of the month in which you receive your lump sum severance pay. |
| ➢ **Health Care Reimbursement Account** | Your contributions continue through the end of the month in which severance pay ends. You have until March 31st of the following year to file claims for eligible expenses incurred during the time you were contributing. | Coverage will stop at the end of the month in which you receive your lump sum payment. You have until March 31st of the following year to file claims for eligible expenses incurred during the time you were contributing. |
| ➢ **Transportation or Parking Reimbursement Accounts** | Deductions end on the last day you are actively employed. You may only submit reimbursement expenses incurred prior to your termination date. Reimbursement claims must be received by January 31st of the following year. | Deductions end on the last day you are actively employed. You may only submit reimbursement expenses incurred prior to your termination date. Reimbursement claims must be received by January 31st of the following year. |

## Benefits Grid - Section 8 (continued)

| Health and Wellness Coverage | If You Elect To Receive Installment Severance Pay | If You Elect a Lump Sum Severance Payment |
|---|---|---|
| ➢ COBRA | COBRA coverage begins at the end of your severance period and is generally available for at least 18 months once active coverage ends for medical, dental and vision coverage. After-tax contributions may be made to your Health Care Reimbursement Account through the year in which severance pay ends.<br>**Note:** COBRA is an extension only of the coverage that you already had, including Domestic Partner coverage, unless you experience a qualified status change. | COBRA coverage begins on the first of the month following your severance lump sum payment date and is generally available for at least 18 months once active coverage ends for medical, dental and vision coverage. After-tax contributions may be made to your Health Care Reimbursement Account through the year in which you receive your lump sum severance pay.<br>**Note:** COBRA is an extension only of the coverage that you already had, including Domestic Partner coverage, unless you experience a qualified status change. |
| **Associate Basic Life Insurance, Associate Supplemental Life Insurance, Spouse Life Insurance, Dependent Child Life Insurance** | If you currently have basic, supplemental, and/or dependent life insurance coverage, this coverage ends on the last day of the month in which you terminate employment. You will be contacted by Prudential, our Life Insurance carrier, by mail regarding your option to convert your coverage to an individual policy. You will have 31 days from the date of the letter from Prudential to convert this coverage. | If you currently have basic, supplemental, and/or dependent life insurance coverage, this coverage ends on the last day of the month in which you terminate employment. You will be contacted by Prudential, our Life Insurance carrier, by mail regarding your option to convert your coverage to an individual policy. You will have 31 days from the date of the letter from Prudential to convert this coverage. |
| **Accidental Death & Dismemberment and Business Travel Accident Coverage** | AD & D and Business Travel Accident benefits end at the end of active employment. | AD & D and Business Travel Accident benefits end at the end of active employment. |

## Benefits Grid - Section 8 (continued)

| Health and Wellness Coverage | If You Elect To Receive Installment Severance Pay | If You Elect a Lump Sum Severance Payment |
|---|---|---|
| ➢ **Long-Term Disability** | Coverage ends at the end of active employment. | Coverage ends at the end of active employment. |
| ➢ **Dependent Care Reimbursement Account** | Deductions stop at the end of active employment. You have until March 31st of the following year to file claims for eligible expenses incurred between your participation date and the coverage end date, up to the amount contributed. | Deductions stop at the end of active employment. You have until March 31st of the following year to file claims for eligible expenses incurred between your participation date and the coverage end date, up to the amount contributed. |

## Benefits Grid - Section 8 (continued)

| Retirement Plans (401(k) and Pension) | If You Elect To Receive Installment Severance Pay | If You Elect a Lump Sum Severance Payment |
|---|---|---|
| ➢ **Contributions** | **401(k):** Contributions cease at the end of active employment.<br>**Pension:** Company contributions cease at the end of active employment. | **401(k):** Contributions cease at the end of active employment.<br>**Pension:** Company contributions cease at the end of active employment. |
| ➢ **Vesting** | **401(k):** Eligible associates are fully vested at the time of enrollment in the plan.<br>**Pension:** Eligible associates are fully vested after completion of five (5) years of active service. | **401(k):** Eligible associates are fully vested at the time of enrollment in the plan.<br>**Pension:** Eligible associates are fully vested after completion of five (5) years of active service. |
| ➢ **Company Match for 401(k) Plan** | Company match is made in cash each pay period that you contribute. If you are entitled to a year-end true-up match, it will be made after the end of the year, or when you request your distribution, if earlier. | Company match is made in cash each pay period that you contribute. If you are entitled to a year-end true-up match, it will be made after the end of the year, or when you request your distribution, if earlier. |
| ➢ **Fund Reallocations** | Fund reallocations are available at any time prior to final distribution. | Fund reallocations are available at any time prior to final distribution. |
| ➢ **Loans** | *No new loans may be requested after the end of active employment.*<br><br>If you have an outstanding Plan loan, you must repay your loan within 90 days of your termination of employment or it will be defaulted and be considered a taxable event, with an additional tax penalty, if applicable. For loan payoff information, contact the 401(k) AccessLine. | *No new loans may be requested after the end of active employment.*<br><br>If you have an outstanding Plan loan, you must repay your loan within 90 days of your termination of employment or it will be defaulted and be considered a taxable event, with an additional tax penalty, if applicable. For loan payoff information, contact the 401(k) AccessLine. |
| ➢ **Pension Plan Distribution** | If you have completed five years of service and are eligible for a pension benefit, you will automatically receive notification of these benefits as soon as administratively possible. | If you have completed five years of service and are eligible for a pension benefit, you will automatically receive notification of these benefits as soon as administratively possible. |

## Benefits Grid - Section 8 (continued)

| Retirement Plans (401(k) and Pension) | If You Elect To Receive Installment Severance Pay | If You Elect a Lump Sum Severance Payment |
|---|---|---|
| ➢ 401(k) Savings Plan Distribution | If you have a balance in your 401(k) Savings Plan you will automatically receive notification of this benefit within 30 days of termination. This notification contains required notices and directs you to call the 401(k) AccessLine at (800) 328-3151 to request a distribution with a customer service representative. No forms or paper are required.<br><br>If you have a current balance in your account of $5000 or more, you may wish to leave your account open. You will continue to accrue interest (or take any losses on portfolio performance) on your account until you take a distribution. If you decide to leave your account open, you will be able to continue making investment changes. You can do this by contacting the 401(k) AccessLine at (800) 328-3151or by accessing your account online at retirementplans.abnamro.com.<br><br>If your account balance is less than or equal to $1,000 your account may be automatically paid to you in a lump sum cash payment. If you do not wish to receive a lump sum cash payment you must call the 401(k) AccessLine to request a direct rollover.<br>If your account balance is between $1,000 and $5,000, your account may be automatically rolled over to an IRA established by your employer. The IRA will be an IRA sponsored by LaSalle Bank N.A. If you do not wish to have your account automatically rolled over to an IRA you must call the 401(k) AccessLine to request a lump sum or direct rollover payment. | If you have a balance in your 401(k) Savings Plan you will automatically receive notification of this benefit within 30 days of termination. This notification contains required notices and directs you to call the 401(k) AccessLine at (800) 328-3151 to request a distribution with a customer service representative. No forms or paper are required.<br><br>If you have a current balance in your account of $5000 or more, you may wish to leave your account open. You will continue to accrue interest (or take any losses on portfolio performance) on your account until you take a distribution. If you decide to leave your account open, you will be able to continue making investment changes. You can do this by contacting the 401(k) AccessLine at (800) 328-3151or by accessing your account online at retirementplans.abnamro.com.<br><br>If your account balance is less than or equal to $1,000 your account may be automatically paid to you in a lump sum cash payment. If you do not wish to receive a lump sum cash payment you must call the 401(k) AccessLine to request a direct rollover.<br>If your account balance is between $1,000 and $5,000, your account may be automatically rolled over to an IRA established by your employer. The IRA will be an IRA sponsored by LaSalle Bank N.A. If you do not wish to have your account automatically rolled over to and IRA you must call the 401(k) AccessLine to request a lump sum or direct rollover payment. |

## Benefits Grid - Section 8 (continued)

| Work / Life and Time Off Programs | If You Elect To Receive Installment Severance Pay | If You Elect a Lump Sum Severance Payment |
|---|---|---|
| ➢ **Vacation**<br>*See the "Severance Pay" section for details on how you will be paid for any unused vacation or how your pay will be deducted for vacation used but not accrued.* | Accrual of vacation stops at the end of your active employment.<br>You will be paid for any vacation time accrued but not taken at the time you begin receiving severance pay. If you've taken more vacation than you have accrued, the pay advance for the unearned hours of vacation may be reconciled from your final pay, or otherwise recovered from you. | Accrual of vacation stops at the end of your active employment.<br>You will be paid for any vacation time accrued but not taken at the time you receive your lump sum severance pay. If you've taken more vacation than you have accrued, the pay advance for the unearned hours of vacation may be reconciled from your final pay, or otherwise recovered from you. |
| ➢ **Floating Holidays/Quarter Century Day** | Accrual of floating holidays stops at the end of your active employment. You will be paid for any floating holiday(s) accrued but not taken at the time you begin receiving severance pay. If you've taken more floating holidays than you have accrued, the pay advance for the unearned floating holidays may be reconciled from your final pay, or otherwise recovered from you.<br><br>Quarter Century Day will be paid out if not taken. | Accrual of floating holidays stops at the end of your active employment. You will be paid for any floating holiday(s) accrued but not taken at the time you receive your lump sum. If you've taken more floating holidays than you have accrued, the pay advance for the unearned floating holidays may be reconciled from your final pay, or otherwise recovered from you.<br><br>Quarter Century Day will be paid out if not taken. |
| ➢ **Personal Days** | You will not be paid for any unused personal days. | You will not be paid for any unused personal days. |
| ➢ **Sick Days** | You will not be paid for any unused sick days. | You will not be paid for any unused sick days. |

## Benefits Grid - Section 8 (continued)

| Work / Life and Time Off Programs | If You Elect To Receive Installment Severance Pay | If You Elect a Lump Sum Severance Payment |
|---|---|---|
| ➢ **Leaves of Absence** | Once the associate has received the formal severance package, a leave of absence cannot be set up. | Once the associate has received the formal severance package, a leave of absence cannot be set up. |
| ➢ **WorkLife Matters/EAP** | Continues through your severance pay. | Not eligible to participate after lump sum severance pay has been received. |
| ➢ **Educational Reimbursement Program** | You will not be responsible for repaying any tuition benefit obligations. In addition, you will be eligible for reimbursement for the current classes (or term) in which you are currently enrolled. Employees participating in the program must notify CAEL for reimbursement. | You will not be responsible for repaying any tuition benefit obligations. In addition, you will be eligible for reimbursement for the current classes (or term) in which you are currently enrolled. Employees participating in the program must notify CAEL for reimbursement. |
| ➢ **Adoption Assistance Program** | You are eligible to receive reimbursements for any eligible adoption proceedings that began prior to the end of your active employment. | You are eligible to receive reimbursements for any eligible adoption proceedings that began prior to the end of your active employment. |

## Other Benefits - Section 9

### Banking Services

If you have direct deposit, you may continue to use this service throughout your severance period. If you maintain "fee free", "employee checking" or "brokerage" accounts with any entity of ABN AMRO, they must be converted to another type of checking account immediately after your severance period ends. If you do not transfer, your account will automatically be converted to the Convenience Checking account within 30 days after your termination.

We value your account relationship and recommend that you contact your nearest branch to assist you in the selection of an account that will best meet your financial needs.

### Employment Verification

All requests for employment verifications must be processed through The Work Number. Verifiers may access The Work Number system by calling (800) 367-5690 or at www.theworknumber.com. The ABN AMRO company code is 10583. Customer Service can be reached at (800) 996-7566 if you or the verifier have any questions.

### Unemployment Insurance

If you wish to file a claim for unemployment insurance benefits, you should file when or after severance pay begins. When filing your claim, you should go to the state unemployment office nearest to your place of residence.

Illinois residents may file a claim for unemployment benefits by internet at www.illinois.gov or at your local Illinois Employment & Training Center (IETC) office. A list of local offices may be found on the website, or you may call 1-888-FOR-IETC (367-4382) to find the nearest office.

Michigan residents may file a claim for unemployment benefits with the Michigan Unemployment Insurance Agency by telephone at (866) 500-0017 or by internet at www.michigan.gov/uia.

Florida residents may file a claim for unemployment benefits with the Florida Agency for Workforce Innovation (AWI) by internet at www.floridajobs.org/unemployment or by visiting a local AWI One Stop Center. Addresses and phone numbers of One Stop Centers are listed on the internet site.

New Jersey residents may file a claim for unemployment benefits with the New Jersey Department of Labor & Workforce Development by internet at www.nj.gov/labor or by calling 609-633-6400.

New York residents may file a claim for unemployment benefits with the New York Department of Labor by internet at www.labor.state.ny.us/ or by calling 518-457-2635.

If eligible, Bank of America will not contest any claim for unemployment compensation that you may file.

## Other Benefits - Section 9 (continued)

**DEFERRED BONUSES/ANNUAL BONUS PLANS – (If Applicable)**

You will receive a lump sum distribution of your deferred bonus according to the terms of the plan. If you choose to retire concurrently while on severance, you will receive a distribution of your deferred bonus per the irrevocable distribution method you elected. If you have further questions, please contact Tonie Hawkins in CoE Rewards at (312) 904-2960.

**LONG TERM INCENTIVE PLANS – (If Applicable)**

The bonus payout will be made in accordance with the plan documents. The payment will be automatically issued to the DDA account you currently have on file with the Payroll Department and a pay advice will be mailed to your home. If you need to change your account information and/or your address, please contact AskHR at (800) 871-8877.

If you have a question about LTIP, please contact AskHR at (800) 871-8877.

**Your Guide to the Corporate Severance Program - Section 4**

**Legacy LaSalle Bank Corporation**
**October 1, 2007**

Addendum to page 6, Incentive Pay

Bank of America will honor the bonus guarantees that have been made to associates for 2007. For those participating in an annual bonus plan and whose positions are eliminated on or after October 1, 2007, you may be eligible for an additional incentive for over achievement as outlined in your 2007 bonus guarantee letter. Payments will be made in accordance with the terms and conditions of the plan.

November 15, 2007

JUDGE KENDALL
MAGISTRATE JUDGE BROWN
TG

# EXHIBIT 6

# BANK OF AMERICA
# TRANSITION ASSISTANCE POLICY

Adopted effective June 1, 1999

TABLE OF CONTENTS

Page

ARTICLE I NAME, PURPOSE AND EFFECTIVE DATE 1
1.1 Name ..... 1
1.2 Purpose ..... 1
1.3 Effective Date ..... 1

ARTICLE II DEFINITIONS 2
2.1 Associate ..... 2
2.2 Committee ..... 2
2.3 Company ..... 2
2.4 Effective Date .....
2.5 Eligible Associate ..... 2
2.6 ERISA ..... 2
2.7 Group Benefits Program ..... 2
2.8 Participating Employers ..... 2
2.9 Plan ..... 2
2.10 Plan Year ..... 2
2.11 Subsidiary ..... 2
2.12 United States ..... 2

ARTICLE III ELIGIBILITY FOR TRANSITION ASSISTANCE 3
3.1 Eligible Associates ..... 3
3.2 Transition Assistance ..... 3
3.3 Conditions to Receipt of Benefits ..... 4
3.4 Acquisitions and Divestitures and Similar Transactions ..... 5

ARTICLE IV AMENDMENT AND ADMINISTRATION 6
4.1 Sponsor ..... 6
4.2 Plan Administration ..... 6
4.3 Powers and Duties of Committee ..... 6
4.4 Reliance Upon Information ..... 6
4.5 Action by Committee ..... 7
4.6 Claims Procedure ..... 7
4.7 Agency of Company ..... 8
4.8 Disaffiliation and Withdrawal from Program ..... 8

ARTICLE V GENERAL PROVISIONS 9
5.1 Nontransferability of Benefits ..... 9
5.2 Employment ..... 9
5.3 Ineligibility for Other Separation Pay ..... 9
5.4 Withholding for Taxes and Benefits ..... 9

ARTICLE VI LEGAL CONSTRUCTION 10
6.1 Gender and Number ..... 10

TABLE OF CONTENTS

Page

6.2 Severability ..... 10
6.3 Headings not to Control ..... 10
6.4 Governing Law ..... 10
6.5 Entire Plan ..... 10

BANK OF AMERICA
TRANSITION ASSISTANCE POLICY

ARTICLE I
NAME, PURPOSE AND EFFECTIVE DATE

1.1 Name. This document shall be known as the Bank of America Transition Assistance Policy (the "Plan"). The Plan is part of the Group Benefits Program.

1.2 Purpose. The purpose of the Plan is to help ease the transition to new employment for Associates displaced on account of workforce reduction, realign[illegible] or similar measure, as determined by the Participating Employers in their sole discretion, who are eligible under the Plan.

1.3 Effective Date. The Plan is effective June 1, 1999.

**ARTICLE II**
**DEFINITIONS**

The following terms, when used with initial capital letters, shall have the meanings set forth below:

2.1 Associate means a common law employee of the Company or any Subsidiary who is identified as an employee in the personnel records of such entity.

2.2 Committee means the Bank of America Corporation Corporate Benefits Committee, consisting of senior officers of the Company or its Subsidiaries who shall be appointed initially by and serve at the pleasure of the Board of Directors of the Company.

2.3 Company means Bank of America Corporation.

2.4 Effective Date means June 1, 1999.

2.5 Eligible Associate means an Associate described in Section 3.1.

2.6 ERISA means the Employee Retirement Income Security Act of 1974, as amended from time to time.

2.7 Group Benefits Program means the NationsBank Group Benefits Plan, as amended from time to time, and any successor to such plan.

2.8 Participating Employer means the Company or any Subsidiary which participates in the Group Benefits Program.

2.9 Plan means the Bank of America Transition Assistance Policy as set forth in this document and as amended from time to time. The Plan is part of the Group Benefits Program.

2.10 Plan Year means the calendar year.

2.11 Subsidiary means any corporation, partnership, joint venture, affiliate, or other entity in which the Company owns directly or indirectly more than fifty percent (50%) of the voting stock or voting ownership interest, as applicable, or any other business entity designated by the Committee as a Subsidiary for purposes of the Plan.

2.12 United States means the fifty (50) states, the District of Columbia, Guam, Puerto Rico and the Virgin Islands.

## ARTICLE III
## ELIGIBILITY FOR TRANSITION ASSISTANCE

3.1 Eligible Associates. An Associate shall be eligible to participate in the Plan if all of the following conditions are satisfied:

(a) The Associate is employed by a Participating Employer, and is not in a unit, division, category or group of Associates which the Company or the applicable Participating Employer has determined in its sole discretion to be ineligible for the Plan.

(b) The Associate is based in the United States.

(c) The Associate is being displaced due to workforce reduction, realignment or similar measure as determined by the applicable Participating Employer in its sole discretion and the Associate has been officially notified in writing of his or her displacement and eligibility for the Plan by an authorized representative of such Participating Employer.

3.2 Transition Assistance. The Participating Employers will determine in their sole discretion the amount, if any, of transition assistance, including severance pay, which may be available from time to time to Eligible Associates.

(a) If transition assistance, including severance pay, is made available, the amount, if any, and type may vary by unit, division, category or group, or based on the reason for the Eligible Associate's displacement, (including displacement due to a corporate transaction as described in Section 3.4) or based on such other factors as the Company or applicable Participating Employer deems appropriate in its sole discretion.

(b) The applicable Participating Employer shall determine in its sole discretion the reason for an Eligible Associate's displacement, including whether an Associate's displacement is a direct result of a particular corporate transaction. In making such determination, the Participating Employer shall consider such factors as it deems appropriate.

(c) A unit or division of a Participating Employer may, with the consent of such Participating Employer, determine the amount, if any, of transition assistance, including severance pay, available to Eligible Associates displaced from such unit or division, or from a category or group of Associates within such unit or division.

(d) On or about the time an Eligible Associate is officially notified of displacement and eligibility for the Plan by an authorized representative of the applicable Participating Employer, the Associate will be provided information about the transition assistance, including the amount of severance pay, if any, that is available to the Associate.

3.3 Conditions to Receipt of Benefits. In order to be eligible to receive severance pay and other transition assistance, an Eligible Associate must satisfy the following conditions:

(a) The Eligible Associate must continue to perform his or her job duties in a satisfactory manner until the date specified by the Participating Employer (the "position elimination date"). If the Associate does not continue to perform his or her job duties in a satisfactory manner or resigns employment before the position elimination date, the Associate will not be eligible for any benefits under the Plan.

(b) The Eligible Associate must sign, and not revoke, a general release and settlement agreement (the "release") of claims against the Participating Emplo[illegible] and their affiliates and related parties (including, without limitation their officers, directors, employees, agents, representatives and benefit plans) at the time and in the form specified by the Company. The release may contain the Associate's express agreement to Section 5.3 of the Plan. The release may contain such other provisions as the Company may specify, including but not limited to, the Associate's agreement to not disclose confidential business information, to not disparage the Company and its Subsidiaries and to refrain from (or engage in) certain acts affecting the Company and its Subsidiaries, including, but not limited to, not competing with, or soliciting employees or customers of, the Company and its Subsidiaries.

(c) (I) If the Associate is offered a comparable position, as determined by the applicable Participating Employer in its sole discretion, with the Company or any Subsidiary, the Associate will no longer be eligible for transition assistance, including severance pay, whether or not the Associate accepts the position being offered. The Company may adopt guidelines, which it may change at any time in its sole discretion, regarding which positions are comparable positions for purposes of the Plan.

(2) If the Associate accepts another position with the Company or any Subsidiary, regardless of whether such position is a comparable position, the Associate will no longer be eligible for transition assistance, including severance pay, unless the Company determines otherwise in its sole discretion.

(3) If the Participating Employer becomes aware of any circumstance which could have caused the immediate termination of the Associate, the Associate will not be eligible for transition assistance, including severance pay. Upon demand from the Participating Employer, such Associate shall immediately return to the Participating Employer any transition assistance, including severance pay, received by the Associate.

(4) If, after the Associate terminates employment with the Participating Employer, the Associate accepts a position with the Company or any

Subsidiary within the time period for which the severance pay was paid, the Associate shall be obligated to return a pro rata portion of such severance pay upon demand by the Participating Employer. The pro rata portion shall be based on the period of the Associate was not employed: for example, if an Eligible Associate received severance pay equal to 12 months salary and is rehired after 4 months, the Associate would be obligated to repay eight-twelfths (8/12) of the severance pay, upon demand by the Participating Employer.

(d) The Eligible Associate must satisfy any other conditions established by the Company or the applicable Participating Employer.

3.4 Acquisitions and Divestitures and Similar Transactions. Transition assistance, including severance pay, does not apply to Associates whose employment is affected by acquisitions, sales, divestitures, outsourcing, the contracting out of functions and similar transactions ("corporate transactions") unless an authorized representative of the Participating Employer specifically determines otherwise and notifies the affected Associates in writing.

If transition assistance, including severance pay, is made available in connection with a particular corporate transaction, the following sentence shall apply, in addition to the conditions in Section 3.3: If the Associate is offered or has available a position with the other party to the corporate transaction, or any affiliate or subsidiary of such party, which the Participating Employer determines, in its sole discretion, to be an appropriate position for the Associate, the Associate shall not be eligible for transition assistance, including severance pay, whether or not the Associate accepts or works in the position. The Company may adopt guidelines which it may change at any time in its sole discretion, regarding which positions with the other party to a corporate transaction are appropriate positions for purposes of the Plan. For purposes of this paragraph, a position may be considered appropriate for the Associate even though it would not be considered a comparable position if offered by the Company or a Subsidiary.



ARTICLE IV
AMENDMENT AND ADMINISTRATION

4.1 Sponsor. The Company is the sponsor of the Group Benefits Program, which includes the Plan. The Company may alter, amend, suspend or terminate the Plan in whole or in part at any time by a written instrument executed by an authorized officer of the Company. The Company may authorize officers of Participating Employers to take actions on behalf of the Company with respect to the Plan, including but not limited to the execution of contracts and other documents relating to the Plan.

4.2 Plan Administration. The Committee shall be responsible for administration of the Plan.

4.3 Powers and Duties of Committee.

(a) The Committee shall have discretionary authority to determine eligibility for and to construe the terms of the Plan. The Committee shall have such other discretionary authority as may be necessary to enable it to discharge its responsibilities under the Plan, including, but not limited to, the power to:

(1) Resolve disputes concerning eligibility and participation in the Plan and the amount of transition assistance, including severance pay, available to an Eligible Associate, including the ability to make factual determinations.

(2) Delegate responsibility for the administration of the Plan, including the authority to review denied claims, and appoint or employ one or more persons to assist in the administration of the Plan or to render advice with regard to any of its responsibilities under the Plan.

(3) Adopt such rules as it deems appropriate for the administration of the Plan.

(4) Prescribe procedures to be followed by Associates.

(5) Prepare and distribute information relating to the Plan.

(6) Request from Participating Employers and Associates such information as shall be necessary for proper administration of the Plan.

(b) The decision of the Committee or its delegate upon any matter within its authority shall be final and binding on all parties, including the Company, the Participating Employers and Associates and former Associates.

4.4 Reliance Upon Information. In making decisions under the Plan, the

Committee and its delegates may rely upon information furnished by, or at the request of an Associate or Participating Employer.

4.5 Action by Committee. The Committee may act either at a meeting (in person or by telephone or similar means) or, in the absence of a meeting, by an instrument in writing signed by a majority of the Committee members. The Committee may elect one of its members as chairperson and appoint a secretary to keep a record of all meetings and forward any necessary communication to the Participating Employers. The Committee may adopt such bylaws for the conduct of its business as it deems desirable. All decisions of the Committee shall be made by a majority vote including actions taken without a meeting.

4.6 Claims Procedure.

(a) An Associate or other person (the "claimant") who has a claim for benefits under the Plan must submit a written notice of such claim to the applicable Participating Employer. All claims must be submitted within six months from the date the claim for benefits arose.

(b) The claim shall be decided within 90 days by the Participating Employer (unless special circumstances require an extension of up to 90 additional days). Written notice of the decision on such claim shall be furnished promptly to the claimant. If the claim is wholly or partially denied, such written notice shall:

(1) set forth an explanation of the specific findings and conclusions on which such denial is based, making reference to the pertinent provisions of the Plan;

(2) describe any additional information or material needed to support the claim and explain why such information or material, if any, is necessary; and

(3) describe the review procedures in subsection (c).

(c) A claimant may request a review of such decision denying the claim. Any such request must be filed in writing with the Committee within 90 days after receipt by the claimant of written notice of the decision. Such written request for review shall contain all additional information which the claimant wishes to be considered.

(d) Written notice of the decision on review shall be furnished to the claimant within 60 days (unless special circumstances require an extension of up to 60 additional days) following the receipt of the request for review. The written notice of the decision by the Committee or its delegate shall include specific reasons for the decision and shall refer to the pertinent provisions of the Plan on which the decision is based.

(e) No legal action concerning the claim may be brought by the

claimant unless and until all of the following have occurred:

(1) The claimant has submitted a timely written claim.

(2) The claimant has been notified that the claim is denied.

(3) The claimant has filed a timely written appeal with the Committee for review of the denied claim.

(4) The claimant has been notified in writing of the decision of the Committee or its delegate or the Committee or its delegate has failed to take any action on the request for review within the time prescribed above.

4.7 Agency of Company. By becoming a party to the Plan, each Participating Employer designates the Company as its agent with authority to act for it in all transactions in which the Company believes such agency will facilitate the implementation or operation of the Plan, including authority to alter, amend, suspend or terminate the Plan in whole or part at any time.

4.8 Disaffiliation and Withdrawal from Program. Any Participating Employer which has participated in the Plan and which thereafter ceases for any reason to be a Participating Employer shall immediately cease to be a party to the Plan. In addition, any Participating Employer may, by written instrument executed by an authorized officer of such entity, elect to withdraw from participation in the Plan for such entity and its Associates.

## ARTICLE V
## GENERAL PROVISIONS

5.1    Nontransferability of Benefits.  No benefit under the Plan may be sold, transferred, pledged, assigned, or otherwise alienated or hypothecated, voluntarily or involuntarily, other than by will or by the laws of descent and distribution, and any attempt to do so shall be void.  Notwithstanding anything contained in the preceding sentence, the applicable Participating Employer shall have the right to offset from any benefit under the Plan the amount due and owing from the Associate to the Company or any Subsidiary to the extent permitted by law.

5.2    Employment.  Nothing in the Plan shall interfere with or limit in any way the right of the Participating Employers to terminate any Associate's employment without notice at any time, confer upon any Associate any right to continue in the employ of the Company or any Subsidiary, or change an Associate's existing at will employee status.  Nothing in the Plan shall cause an employee of a Subsidiary to be an employee of the Company.  Each Associate remains an employee of the Participating Employer that directly pays the Associate's wages.

5.3    Ineligibility for Other Separation Pay.  If an Eligible Associate receives transition assistance, including severance pay, under the Plan, the Associate shall not be eligible to receive severance pay or separation benefits under any other plan, program, policy, guideline or practice of the Company or any Subsidiary, or under any agreement between the Associate and the Company or any Subsidiary.

5.4    Withholding for Taxes and Benefits.  The Company shall have the right to deduct or withhold from the transition assistance, including severance pay, an amount sufficient to cover withholding required by law for any federal, state or local taxes or to take such other action as may be necessary to satisfy any such withholding or similar legal obligation.  The Company shall also have the right to deduct or withhold from the transition assistance, including severance pay, any amounts due from the Associate under any employee benefit plan sponsored by the Company in which the Associate is participating.

## ARTICLE VI
## LEGAL CONSTRUCTION

6.1 Gender and Number. Unless the context plainly indicates otherwise, words in any gender include the other genders and the singular includes the plural and vice versa.

6.2 Severability. In the event any provision of the Plan shall be held illegal or invalid for any reason, the illegality or invalidity shall not affect the remaining parts of the Plan, and the Plan shall be construed and enforced as if the illegal or invalid provision had not been included.

6.3 Headings not to Control. Headings and titles within the Plan are for convenience only and are not to be read as part of the text of the Plan.

6.4 Governing Law. To the extent not preempted by Federal law, the Plan, and all benefits under the Plan, shall be construed in accordance with and governed by the laws of the State of North Carolina.

6.5 Entire Plan. This document is a complete statement of the Plan. As of its Effective Date this document supersedes all prior plans, policies, guidelines, representations and proposals, written or oral, relating to the matters set forth herein. The Participating Employers shall not be bound by or liable to any person for any representation, promise or inducement made by any employee or agent of it which is not embodied in or authorized by this document or in any authorized written amendment to the Plan.

IN WITNESS WHEREOF, Bank of America Corporation has caused this instrument to be executed by its duly authorized officer this 24Th day of MAY, 1999 to be effective June 1, 1999.

BANK OF AMERICA CORPORATION

By ____________________
Charles J. Cooley
Corporate Personnel Executive

**AMENDMENT TO**
**BANK OF AMERICA TRANSITION ASSISTANCE POLICY**

Bank of America Corporation (the "Company") sponsors the Bank of America Transition Assistance Policy (the "Plan"). The Plan is a component of the Bank of America Group Benefits Program. The Corporate Personnel Executive of the Company is authorized to execute amendments to the Plan on behalf of the Company. Pursuant to such authority, the Plan is hereby amended as follows, effective as of June 1, 2001:

The name of the Plan is changed to "Bank of America Corporate Severance Program" whenever it appears.

IN WITNESS WHEREOF, Bank of America Corporation has caused this instrument to be executed by its duly authorized officer this 10th day of October, 2001.

BANK OF AMERICA CORPORATION

By [signature]
Steele Alphin
Corporate Personnel Executive

AMENDMENT TO

BANK OF AMERICA CORPORATE SEVERANCE PROGRAM

Bank of America Corporation (the "Company") sponsors the Bank of America Corporate Severance Program (the "Plan"). The Plan is a component of the Bank of America Group Benefits Program. The Corporate Personnel Executive of the Company is authorized to execute amendments to the Plan on behalf of the Company. Pursuant to such authority, the Plan is hereby amended as follows, effective as of **[January 1, 2006]**.

Section 3.1 of the Plan is amended by adding at the end thereof the following:

> "Notwithstanding the preceding provisions of this Section, any Eligible Associate who is, at any time and from time to time, identified by the Company as a 'specified employee,' as such term is described in Section 409A(a)(2)(B)(i) of the Internal Revenue Code of 1986, as amended, shall not be eligible to participate in the Plan."

IN WITNESS WHEREOF, Bank of America Corporation has caused this instrument to be executed by its duly authorized officer this 27th day of July, 2006.

BANK OF AMERICA CORPORATION

By: [signature]
Steele Alphin
Corporate Personnel Executive

08CV3867
JUDGE KENDALL
MAGISTRATE JUDGE BROWN
TG

# EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MARGUERITE MARION,<br><br>Plaintiff,<br><br>v.<br><br>BANK OF AMERICA, NATIONAL ASSOCIATION,<br><br>Defendant. | ) | Case No.____________<br><br>The Honorable __________ |

**DECLARATION OF MERRILY S. GERRISH**

I, Merrily S. Gerrish, pursuant to 28 U.S.C. § 1746, state as follows based on my personal knowledge:

1. I hold the position of Associate General Counsel and Assistant Secretary at Bank of America Corporation ("BOA").

2. In my position, I am familiar with BOA's state of incorporation and principal place of business.

3. BOA is a foreign corporation organized outside of the State of Illinois. BOA is incorporated under the laws of the State of Delaware. BOA's headquarters and principal place of business is located in Charlotte, North Carolina.

I declare under penalty of perjury that the foregoing is true and correct.

Merrily S. Gerrish
Merrily S. Gerrish
Associate General Counsel and Assistant Secretary

Subscribed and sworn to before me
this 7th day of July, 2008

Janice M. McHugh
Notary Public

1474957 v1

