**IN THE UNITED STATES DISTRICT COURT,**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MARGUERITE MARION** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 1:08 cv 03867** |
| | ) | |
| v. | ) | **Honorable Virginia M. Kendall** |
| | ) | |
| **BANK OF AMERICA, NATIONAL** | ) | |
| **ASSOCIATION** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S MOTION FOR REMAND TO STATE COURT

Plaintiff Marguerite Marion ("Marion or Plaintiff"), by her undersigned attorneys, Bellows and Bellows, P.C., hereby respond to Defendant Bank of America Corporation's[1] ("BOA" or "Defendant") Notice of Removal with this Motion for Remand to State Court pursuant to 28 U.S.C. § 1447. In support thereof, Plaintiff states as follows:

### INTRODUCTION

1.      This action was commenced in the Law Division of the Circuit Court of Cook County, Illinois on May 20, 2008 and entitled *Marguerite Marion v. Bank of America National Association*, Case 2008 L 005559. Defendant was served with the Complaint and summons on June 10, 2008.

2.      The Complaint states claims for: count I, violation of the Illinois Wage Payment and Collection Act; count II, violation of the Illinois Sales Representatives Act; count III, violation of the Illinois Earned Bonuses Administrative Code; and count IV, violation of the Illinois Continuation Law. None of the claims arise under federal law.

---

[1] The Complaint incorrectly names "Bank of America, National Association" as the Defendant.

3.    Attached to the Complaint are exhibits that identify Defendant's written representations to Plaintiff that her short term and long term bonuses were guaranteed based on her continued employment with Defendant's predecessor, ABN AMRO LaSalle Bank ("LaSalle"). Defendant did not include these exhibits in its Notice of Removal.

4.    On July 8, 2008, BOA filed its Notice of Removal and served Plaintiff's counsel. A copy of the Notice of Removal is attached hereto as Exhibit 1.

5.    This Motion for Remand is filed with this Court within 30 days of service of the Notice of Removal and thus all procedural and jurisdictional objections are timely under 28 U.S.C. § 1447(c).

6.    Written notice of the filing of this Motion for Remand has been given to Defendant together with a copy of the motion and supporting papers and has been filed with the Clerk of the Circuit Court of Cook County, Illinois.

## ARGUMENT

### Remand Based on Lack of Subject Matter Jurisdiction – No Federal Question

7.    It is well settled that the party seeking to preserve the district court's removal jurisdiction (Defendant) bears the burden of showing that the requirements for removal have been met. *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). Defendant has not met its burden and the instant matter should be remanded to the Circuit Court of Cook County, Illinois.

8.    The removal statute is strictly construed against removal and the burden of establishing federal jurisdiction falls to the party invoking the statute. *Ethridge v. Harbor House Rest.*, 861 F.2d 1389, 1393 (9th Cir. 1988)

9.    Where federal jurisdiction arises as a result of a "federal question," the

2

question "must be disclosed upon the face of the complaint, unaided by the answer or by the petition for removal." *Gully v. First Nat'l Bank of Meridian*, 299 U.S. 109, 112-13, 81 L. Ed. 70, 57 S. Ct. 96 (1936). The instant Complaint asserts no federal claims.

10.    "The well-pleaded complaint rule requires that federal question jurisdiction not exist unless a federal question appears on the face of a plaintiff's properly pleaded complaint." *Columbia Gas Transmission Corp. v. Drain*, 237 F.3d 366, 369-70 (4th Cir. 2001), citing *Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 808, 92 L. Ed. 2d 650, 106 S. Ct. 3229 (1986). Defendant's attempt to create a federal question by misstating Plaintiff's claims has no merit and does not constitute any basis for removing the instant matter.

11.    Plaintiff was employed by Defendant's predecessor, LaSalle for over 20 years. In 2007, rumors began to spread within LaSalle regarding a potential merger with BOA. In an effort to retain stability within the organization, LaSalle began to make representations to employees such as Plaintiff that employees' short term and long term bonuses for 2007 would be guaranteed at set rates.

12.    In its Notice of Removal, Defendant incorrectly contends that Plaintiff's claims arise under the law of the United States through the Employee Retirement Income Security Act of 1974 (ERISA) which "converts an ordinary state common law complaint into one stating a federal law claim for purposes of the well-pleaded complaint rule." (Notice of Removal, p. 2). While ERISA does have preemptive power over state claims as to Employee Welfare Benefit Plans and Employee Pension Benefit Plans, Plaintiff has not made any claim to benefits under any plan that would be covered under ERISA. Plaintiff's claims are based solely on LaSalle's promises relating to its short term bonus

plan which was known as the Corporate Incentive Plan ("CIP") and its long term bonus plan which was known as the Long Term Incentive Plan ("LTIP"). These claims are based, in part, on LaSalle's written representations guaranteeing payment to LaSalle employees. As LaSalle's current incarnation, Defendant acquired the rights and duties associated with those representations. Plaintiff attached those writings as exhibits to her Complaint. Tellingly, Defendant chose not to attach those exhibits to its Notice of Removal.

13.    Under ERISA definitions, neither the CIP or LTIP qualify as employee pension benefit plans. ERISA defines an employee pension plan as any plan, fund or program established or maintained, by an employer which by its expressed terms or as a result of surrounding circumstances (i) provides retirement income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, or the method of distributing benefits from the plan. 29 U.S.C. § 1002(2)(A).    Not included in this definition, however, are bonus plans.    Federal regulations define bonus plans as "payments made by an employer to some or all of its employees as bonuses for worked performed." 29 C.F.R. § 2510.3-2(c). The CIP and LTIP are bonus plans not covered by ERISA. Both plans have a vesting schedule whereby employees receive current benefits rather than deferred retirement income.

14.    In addition, neither the CIP plan nor the LTIP plan fall within the definition of a welfare benefit plan. "ERISA will recognize a plan as a welfare benefit plan if it contains the following five elements: (1) a plan, fund or program, (2) established or maintained, (3) by an employer or by an employee organization, or by both, (4) for the

purpose of providing medical, surgical, hospital care, sickness, accident, disability, death, unemployment or vacation benefits…or severance benefits, (5) to participants or their beneficiaries. *Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.*, 805 F.2d 732, 738 (7th Cir. 1986). The CIP and LTIP plans at issue, were independent plans with guaranteed payouts based on independent representations. Defendant's subsequent attempt to bring these plans within the purview of its severance plan does not change the previous representations that enticed Plaintiff to remain employed by LaSalle through its turbulent merger with BOA. Plaintiff was not even informed that the CIP and LTIP would be governed by Defendant's severance plan until after termination. The severance agreement that was proposed to Plaintiff detailed the severance compensation to include fifty-two (52) weeks pay, outplacement services and medical and dental benefits for the severance period. Notably, the agreement did not reference the payments due under the CIP and LTIP as part of the severance package. Thus, the CIP and LTIP plans would not be recognized as a welfare benefit plan under ERISA because the payments under these plans were due based on Defendant's contractual representations and not its severance plan.

15.     Defendant's oral and written promises to provide Plaintiff with full vesting of her 2007 CIP and LTIP benefits were made months prior to her termination. These representations converted LaSalle's short and long term bonuses into retention bonuses meant to foster loyalty while BOA contemplated its post-merger personnel changes. None of LaSalle's written representations were conditioned upon Plaintiff's participation in Defendant's severance plan in any way. "Significant differences between the company's existing plan and the promised benefits, as well as the lack of any evidence

linking them to each other, lead us to conclude that the promised benefits were free-standing and were not premised in any way on an existing plan." *Peggy S. Crews v. General American Life Insurance Company, Inc.,* 274 F.3d 502 (8th Cir. 2001). Since these performance bonuses were independent from benefits promised under Defendant's severance program, they are free standing, one time offers of benefits that do not come within the purview of ERISA.

**Remand Based on the Penalty Provisions of
The Illinois Wage Payment and Collection Act and
The Illinois Sales Representative Act**

16.    Defendant argues that this action may be removed based on diversity jurisdiction and relies on 28 U.S.C. § 1332 which provides "the district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between (1) citizens of different states."

17.    While Plaintiff acknowledges that there exists complete diversity in this action, this Court does not have jurisdiction over matters that require the state to exercise its police powers and penalize businesses for non-compliance with its statutes. This Court has held that it does not have jurisdiction over state matters involving penal statutes. *Tasner v. U.S. Industries, Inc.,* 379 F.Supp. 803, (N.D. Ill. 1974).

18.    It is generally recognized that penalties fixed by state law are not enforceable in federal courts. *Tasner* at 807 (citing *Wisconsin v. Pelican Insurance Co.,* 127 U.S. 265, 8.S.Ct. 1370 (1888)).

19.    In her Complaint, Plaintiff states claims for relief under the Illinois Wage Payment and Collection Act and the Illinois Sales Representative Act, both of which

include penalty provisions. The Wage Payment and Collection Act allows for a penalty of one percent (1%) interest per calendar day for each day of in payment. 820 ILCS 115/14. The Sales Representative Act includes a penalty award not to exceed treble damages. The Illinois Wage Payment and Collection Act and the Illinois Sales Representative Act are punitive in nature. *Maher and Associates, Inc. v. Quality Cabinets*, 267 Ill.App.3d 69, 80, 640 N.E. 2d 1000, 1008 (2nd Dist. 1994). If the amount sought to be recovered is arbitrarily exacted for some act or omission of the defendant, the action is penal. *Tasner* at 808. "Punitive, or exemplary damages are not awarded as compensation, but serve instead to punish the offender and to deter that party and others from committing similar acts of wrongdoing in the future." *Maher and Associates, Inc. v. Quality Cabinets*, 267 Ill.App.3d 69, 80, 640 N.E. 2d 1000, 1008 (2nd Dist. 1994). Thus, Plaintiff's demand for a penalty imposed by an Illinois statute is not enforceable in this Court and this Court does not have jurisdiction over either the Illinois Wage Payment and Collection Act or the Illinois Sales Representative Act.

20.    For the reasons stated above, the instant action fails to meet the prerequisites for removal under 28 U.S.C. § 1441 and thus, should be remanded to state court.

**Remand Pursuant to Section 28 U.S.C. § 1446(a) – Procedure for Removal**

21.    Defendant has also failed to meet the requirements for removal set forth under 28 U.S.C. § 1446(a) and remand is proper due to the procedural defects in Defendant's Notice of Removal. 28 U.S.C. § 1447(c).

22.    Section § 1446(a) states in relevant part: "A defendant or defendants desiring to remove any civil action from a state court shall file in the district court of the

United States…a notice of removal…..together with a copy of all process, pleadings, and orders served upon defendant or defendants in such action."

23.    Defendant's Notice of Removal did not include a copy of the pleadings as required by Section § 1446(a).  (See Notice of Removal Ex. 1).

24.    "If [an] instrument is attached to the pleading as an exhibit, it constitutes part of the pleading for purposes of ruling on motions relating to the pleadings." *Bajwa v. Metro. Life Ins. Co.*, 208 Ill. 2d 414, 431 (Ill. 2004).

25.    Although the stand alone Complaint was attached to Defendant's Notice of Removal, none of its exhibits were included.  (See Plaintiff's Complaint at Law attached hereto with all accompanying Exhibits).  Defendant's decision not to include Plaintiff's exhibits within its filing constitutes a failure to include a complete copy of the pleadings.

26.    Accordingly, the instant action should be remanded to state court pursuant to Section 1447(c), and Defendant should be required to comply with the strictures of Section § 1446(a).

WHEREFORE, Plaintiff Marguerite Marion moves this Court to remand this proceeding to the Circuit Court of Cook County, Illinois, for all fees and costs associated with this motion pursuant to 28 U.S.C. § 1447(c), and for such other relief as may be deemed appropriate.

Plaintiff Marguerite Marion,

By:  s/Kristen Prinz
       One of Her Attorneys

Joel J. Bellows, Esq.
Kristen E. Prinz, Esq.
BELLOWS AND BELLOWS, P.C.
209 South LaSalle Street, Suite 800
Chicago, Illinois 60604
Attorney No. 01000

# EXHIBIT

# 1

**IN THE CIRCUIT COURT OF COOK COUNTY,**
**COUNTY DEPARTMENT, LAW DIVISION**

| | |
|---|---|
| MARGUERITE MARION | ) |
| | ) |
| Plaintiff, | )    Case No. |
| | ) |
| v. | ) |
| | ) |
| BANK OF AMERICA, NATIONAL | ) |
| ASSOCIATION | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

NOW COMES Plaintiff Marguerite Marion, by her undersigned attorneys, Bellows and Bellows, P.C. and for her Complaint against Defendant Bank of America, National Association ("BOA" or "Defendant") alleges the following:

### Facts Common to All Counts

1.    Plaintiff, Marguerite Marion, is a citizen of the State of Illinois, residing at 1419 South Indiana Avenue, Chicago, Illinois 60605.

2.    Plaintiff was employed by Defendant BOA, through their assignee LaSalle Bank Corporation ("LaSalle"), from at least 1984 through December 15, 2007.  LaSalle was previously owned by ABN AMRO National Association.

3.    DefendantBOA maintains its corporate office at 101 South Tryon Street, Charlotte, North Carolina 28255, with offices throughout the State of Illinois.

4.    Venue is properly laid in this County because Defendant at all relevant times transacted business in Cook County, and all acts giving rise to this action occurred in Cook County.

## COUNT I
## <u>Violation of Illinois Wage Payment and Collection Act</u>

5.      Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 4 of the Complaint as if set forth fully herein.

6.      At various times prior to October 2007, Plaintiff, a Senior Vice President at LaSalle, was notified that LaSalle would merge into BOA and layoffs would ensue. In an effort to encourage employees to stay on during this uncertain time, LaSalle represented to Plaintiff and other employees that their outstanding Long Term Incentive Plan ("LTIP") units would fully vest (See Exhibit "A") and would vest at a rate of $200 per unit (See Exhibit "B") and that, so long as Plaintiff stayed on with LaSalle through the merger and until she was hired by BOA or terminated as a result of a reduction in force, her 2007 Corporate Incentive Plan ("CIP") bonus would be guaranteed at target. (See Exhibit "C")

7.      On or about October 1, 2007, at the beginning of the merger process, Plaintiff was informed by LaSalle that, as a Senior Vice President and in exchange for her continued service, she would receive an opportunity to interview for a position with BOA. In reliance upon these assertions, Ms. Marion remained employed with LaSalle through and until she was terminated in what has been labeled "as part of a reduction in force."

8.      Despite LaSalle's representations, Plaintiff was never provided a retention bonus or an opportunity to interview with BOA.

9.    On December 1, 2007, Plaintiff received notice from LaSalle's Human Resources Department that she was terminated effective December 15, 2007, "as part of [a] necessary reduction in force." Included with that notice was LaSalle's General Release and Program Agreement ("CSP Agreement"). (See Exhibit "D")

10.    The CSP Agreement detailed a severance package granting Plaintiff fifty-two (52) weeks of severance pay totaling $166,999.63, outplacement services, and medical and dental benefits through the weeks she was entitled to receive severance payment. The CSP Agreement also contained a restrictive covenant inhibiting Plaintiff's ability to obtain employment that, upon information and belief, was not included in the CSP Agreements offered to earlier terminated employees who were part of the same "reduction in force."

11.    Because of her inability to obtain gainful employment if subject to such a restrictive covenant, Plaintiff requested that the provision be removed from the CSP Agreement. BOA refused to make any changes to the provision and, as a result, Plaintiff refused to sign the CSP Agreement.

12.    On January 18, 2008, Plaintiff received correspondence from LaSalle regarding her LTIP benefit and the schedule of its payment. (See Exhibit "E")

13.    Despite LaSalle's numerous written and oral representations to Plaintiff that her LTIP and CIP payments were guaranteed, in or around March 2008, Plaintiff was informed by BOA that her LTIP and CIP payments would only be made if she signed and submitted the CSP Agreement.

14.    Plaintiff had earned 675 LTIP units valued at $200 per unit totaling $135,000. Payment is due within twelve months of Plaintiff's termination date, but

Defendant has already informed Plaintiff that it will not be paid.

15.    Plaintiff had a 2007 target CIP bonus of $108,549.76. This guaranteed bonus was scheduled for payment in March 2008.

16.    To date, Plaintiff has not received her guaranteed LTIP or CIP payments.

17.    At all times applicable herein, there existed in the State of Illinois a statute entitled the Wage Payment and Collection Act which reads in part:

> Every employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee. 820 ILCS 115/5

18.    Plaintiff has not received the final compensation she earned as an employee of LaSalle.

19.    For the foregoing reasons, Defendant has violated the Wage Payment and Collection Act.

WHEREFORE, Plaintiff Marguerite Marion prays that judgment be entered in her favor and against Defendant Bank of America National Association for the following relief:

1)    Compensatory damages in an amount to be determined at trial but in no event less than $248,549.76;

2)    Costs of bringing this action, including attorney's fees and filing fees;

3)    A penalty of 1% interest per calendar day for each day of delay in payment pursuant to 820 ILCS 115/14; and

4)    Such other relief as this Court deems just and proper.

## COUNT II
### Violation of the Sales Representatives Act

20.    Plaintiff repeats and realleges the allegations contained in paragraphs 1

through 19 of the Complaint as if set forth fully herein.

21.    At all times applicable herein, there existed in the State of Illinois a statute

entitled the Sales Representative Act which reads in part:

> A principal who fails to comply with the provisions of
> Section 2 concerning timely payment or with any
> contractual provision concerning timely payment of
> commissions due upon the termination of the contract with
> the sales representative, shall be liable in a civil action for
> exemplary damages in an amount which does not exceed 3
> times the amount of the commissions owed to the sales
> representative. Additionally, such principal shall pay the
> sales representative's reasonable attorney's fees and court
> costs. 820 ILCS 120/3

22.    The position of Senior Vice President at Bank of America was essentially

a sales position whereby bonuses were earned based upon business generated by the

employee and the employee's division.

23.    Plaintiff solicited and booked business for LaSalle through the date of her

separation from LaSalle and thereby earned her CIP and LTIP bonuses as a result of her

sales efforts.

24.    Defendant continues to withhold payment to Plaintiff despite her requests

for such payment.

25.    For the foregoing reasons, Defendant has violated the Illinois Sales

Representatives Act.

WHEREFORE, Plaintiff Marguerite Marion prays that judgment be entered in her

favor and against Defendant Bank of America National Association for the following

relief:

1)    Compensatory damages in an amount to be determined at trial but in no

event less than $248,549.76;

2)    Costs of bringing this action, including attorney's fees and filing fees;

3)    Exemplary damages of three times $248,549.79 totaling $745,649.37

pursuant to 820 ILCS 120/3; and

4)    Such other relief as this Court deems just and proper.

## COUNT III
## Violation of the Earned Bonuses Administrative Code

26.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 25 of the Complaint as if set forth fully herein.

27.    At all times applicable herein, there existed in the State of Illinois an administrative code entitled Earned Bonuses which reads in part: "A claim for an earned bonus arises when an employee performs the requirements for a bonus set forth in a contract or an agreement between the parties." IL Admin. Code § 300.500.

28.    Despite its numerous written representations to Plaintiff that her bonuses would be paid, Defendant has continuously and wrongfully withheld such payments.

29.    For the foregoing reasons, Defendant has violated the Illinois Earned Bonuses administrative code.

WHEREFORE, Plaintiff Marguerite Marion prays that judgment be entered in her favor and against Defendant Bank of America National Association for the following relief:

1)    Compensatory damages in an amount to be determined at trial but in no

event less than $248,549.76;

2)    Costs of bringing this action, including attorney's fees and filing fees;

3)    Punitive damages at a reasonable multiple of compensatory damages; and

4)    Such other relief as this Court deems just and proper.

## COUNT IV
### Violation of Illinois Continuation Law

20.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 19 of the Complaint as if set forth fully herein.

21.    As of March 13, 2008, Plaintiff had not received any notice of COBRA or Illinois Continuation Law from LaSalle and/or BOA.

22.    On or around March 13, 2008, Plaintiff contacted BOA's benefits department and inquired as to the status of her COBRA (the Consolidated Omnibus Budget Reconciliation Act) and/or Illinois Continuation Law notice. In violation of federal and state law, BOA informed Plaintiff that she would not be allowed access to COBRA and/or Illinois Continuation unless and until she signed and submitted the CSP Agreement.

23.    On the same date, counsel for Plaintiff contacted counsel for BOA and informed him of BOA's attempt to coerce Plaintiff into signing the CSP Agreement by denying her access to COBRA and/or Illinois Continuation. Counsel for BOA insisted that the problem would be immediately addressed.

24.    On May 1, 2008, Plaintiff and her family were still without medical insurance coverage. Plaintiff again contacted BOA's benefits department and was informed that they were not responsible for providing her with access to COBRA and/or Illinois Continuation because their benefits provider had changed.

25.    To date, despite her numerous attempts to access her benefits over the past

four months, Plaintiff and her family have been denied access to COBRA and/or Illinois

Continuation in violation of the Illinois Continuation Law, Illinois Spousal Continuation

Law, Illinois Dependent Child Continuation Law and COBRA.

26.     For the foregoing reasons, Defendant has violated the Illinois Continuation

Law, Illinois Spousal Continuation Law and Illinois Dependent Child Continuation Law.

WHEREFORE, Plaintiff Marguerite Marion prays that judgment be entered in her

favor and against Defendant Bank of America National Association for the following

relief:

1) Compensatory damages in an amount to be determined at trial but in no event

   less than $166,999.63;

2) Costs of bringing this action, including attorney's fees and filing fees; and

3) Such other relief as this Court deems just and proper.

Plaintiff Marguerite Marion,

By: _____
    One of Her Attorneys

Laurel G. Bellows, Esq.
Kristen E. Prinz, Esq.
BELLOWS AND BELLOWS, P.C.
209 South LaSalle Street, Suite 800
Chicago, Illinois 60604
Attorney No. 01000

# EXHIBIT

# A



**TO BE OPENED BY ADDRESSEE ONLY**
**PRIVATE & CONFIDENTIAL**

*EMPLOYEE NAME*

*Date*

Dear *Employee First Name*,

We are pleased to advise that you will retain your *(2004 US KEEP, 2005 US KEEP, 2006 US GKERP)* benefits upon cessation of employment with ABN AMRO and you will be granted Good Leaver status.

### Vesting

Once your employment with ABN AMRO NA Group is terminated as a result of the sale of LaSalle Bank Corporation to Bank of America, ABN AMRO will accelerate your vesting in any unvested amounts previously awarded to you under *(KEEP, GKERP)* with such vesting to occur as of legal day one anticipated to be October 1, 2007. Awards that are vested can only be forfeited by engaging in Detrimental Activity prior to the actual payment. Detrimental Activity includes such activities as improper use of confidential or proprietary information concerning any ABN AMRO Group Company or any of their respective clients, persuading or attempting to persuade any employee of any ABN AMRO Group Company to breach any of the terms of their employment or soliciting or poaching (including attempting to solicit or poach) ABN AMRO employees.

### Payment – *(KEEP 2004  KEEP 2005 )Awards*
The amounts that vest on legal day one anticipated to be October 1, 2007 will be paid out to you as soon as practicable following the vesting date, but no earlier than the next ABN AMRO open period in 2007.

Please note that the value of the units that you will receive at the time of payment will depend upon the price of ABN AMRO shares, dividend payments, the value of any other linked investments and the exchange rate at the time. Any payment to you will be paid net of any statutory deductions required to be paid at the time of payment.

### Payment – GKERP 2006 Awards
The amounts that vest on legal day one anticipated to be October 1, 2007 will be paid out to you according to the schedule specified in the GKERP Rules. Fifty per cent of the value of your GKERP Award will be paid out as soon as practicable following the second anniversary of grant and the balance of the value of your GKERP Award will be paid out as soon as practicable following the third anniversary of grant.

Please note that the value of the units that you will receive at the time of payment will depend upon the price of ABN AMRO shares, dividend payments, the value of any other linked investments and the exchange rate at the time. Any payment to you will be paid net of any statutory deductions required to be paid at the time of payment.

Any cash payments will be made to the US bank account currently held in payroll records unless you advise us otherwise. Similarly any communications will be addressed to the email address we currently hold unless you advise us otherwise. It is your responsibility to ensure that your email address and bank account information is up to date. If we are not in possession of accurate bank account and email address information we will be unable to provide you with communication documents relating to your KEEP/GKERP awards, and may be unable to make payment to you.

You may continue to access the Deferred Compensation website to view current values of KEEP/GKERP units using your existing logon and password.

Should you have any queries, please send an email to the Deferred Compensation administration team at deferredcomp@uk.abnamro.com

Yours sincerely,

*Robert Church Jr.*
ABN AMRO
Authorised Signatory
On behalf of the KEEP/GKERP Committee

# EXHIBIT

# B

## AMENDMENT TO
## ABN AMRO GROUP LONG TERM INCENTIVE PLAN

### Instrument of Amendment

THIS INSTRUMENT is executed by the Chief Administrative Officer of BANK OF AMERICA CORPORATION, a Delaware corporation with its principal office and place of business in Charlotte, North Carolina (the "Company"), on behalf of ABN AMRO North America Holding Company ("AANA").

### Statement of Purpose

AANA previously adopted the ABN AMRO Group Long Term Incentive Plan (the "Plan") for the benefit of eligible employees and reserved the right to amend the Plan from time to time. Effective as of the consummation of the transactions contemplated by the Purchase and Sale Agreement dated April 22, 2007, as amended, by and between ABN AMRO Bank N.V. and the Company, the Company acquired AANA on October 1, 2007. Pursuant to applicable resolutions, the Company's Chief Administrative Officer currently has the right to execute Plan amendments on behalf of AANA. By this Instrument, AANA is amending the Plan to (1) set the value of outstanding Performance Units, (2) provide a new payment rule for payments made following a termination of employment, and (3) freeze the Plan effective December 31, 2007, as to the inception of new Performance Periods.

NOW, THEREFORE, AANA hereby amends the Plan effective as of October 1, 2007:

1.      Section 4 of the Plan shall be amended by adding the following new sentence at the end thereof:

> "Notwithstanding the foregoing, the value of all Performance Units outstanding on October 1, 2007, shall be $200 per unit."

2.      Section 5 of the Plan shall be amended by adding the following new paragraph at the end thereof:

> "Notwithstanding any other provisions of the Plan to the contrary, no new Performance Period shall begin on or after January 1, 2008. For the avoidance of doubt, (1) the Performance Period which began on January 1, 2007, shall be the final Performance Period under the Plan, (2) payments due hereunder for vested Performance Units allocated for the Performance Periods which began in 2005, 2006 and 2007 shall be made

4831-8323-6510.04

in 2008, 2009 and 2010, respectively, pursuant to Plan terms, and (3) no additional Performance Units shall be allocated hereunder."

3.    Subsection 7.b. of the Plan shall be amended by adding the following new paragraph at the end thereof:

"Notwithstanding any other provisions of the Plan to the contrary, payment of vested Performance Units to a Participant who has terminated employment shall occur on the earlier of (x) the date specified above in the first sentence of this subsection 7.b. and (y) the first anniversary of the Participant's date of termination, unless such Performance Units are otherwise forfeited pursuant to Section 6 of the Plan above."

4.    Exhibit A of the Plan shall be amended by adding the following new paragraph at the end thereof:

"Notwithstanding the foregoing, the value of all Performance Units outstanding on October 1, 2007, shall be $200 per unit."

IN WITNESS WHEREOF, the Chief Administrative Officer of Bank of America Corporation hereby executes this Instrument on the 19th day of December, 2007 on behalf of ABN AMRO North America Holding Company.

By: _____
    J. Steele Alphin
    Chief Administrative Officer
    Bank of America Corporation

2

# EXHIBIT

# C

 

Marguerite Marion

Dear Marguerite,

I am pleased to inform you of your participation in the 2007 Corporate Incentive Plan (CIP).

The design of the CIP has been adjusted to better align the plan with our Performance Contract and the BU NA Rewards Strategy. The BU NA Rewards Strategy aims to ensure the bank can attract and retain top-quality employees and remain competitive, both as an enterprise and as an employer, by offering compensation that is comparable to what other financial services companies offer.

CIP is designed to provide incentives to employees who deliver on business objectives as outlined in their performance management SMART objectives (including any compliance-related requirements). Each CIP eligible employee has been given an incentive target.

**Your CIP target is 65.0% of your base salary.** Your 2007 CIP bonus will be paid in Q1 of 2008.

Your 2007 bonus has been guaranteed for you at your target percentage of base salary. Should the bank overachieve the goals outlined in 2007 CIP and your individual and team's performance warrants it, you may receive an increased CIP payment.

This guarantee is conditional on you being employed in good standing by ABN AMRO or its successor organization on the bonus payment date in 2008. If your employment is terminated prior to the bonus payment date due to a reduction in force or if you die, retire or terminate due to disability, the guaranteed bonus amount will become payable in full as soon as administratively possible. If you voluntarily terminate or are terminated for cause, you will forfeit your bonus.

This letter does not confer on you any rights in respect to any future potential bonus payments relating to any subsequent years. This letter supersedes any prior written or verbal commitments made in respect of any bonus arrangements for 2007. All of the other terms and conditions of your employment remain unchanged and in full force and effect.

Please see the attached summary for further information about the 2007 CIP. In addition, I invite you to attend a webcast hosted by the BU NA CoE Rewards team to learn more about the plans. The webcasts will be held later in May. You will receive a separate email with the dates, times and dial in information.

We are taking the step of awarding guaranteed bonuses to underline our appreciation of your individual contribution and to emphasise our commitment to you. While the bank is in the midst of a transition, it is important that we all continue to focus on achieving our performance objectives. My expectation is that we will deliver on our commitments on time and in full. We must continue to build on the strong momentum from the beginning of the year to ensure we meet and exceed our goals.

Regards,

Robert J. Moore
Head of BU NA

**MY REWARDS**

May 2007

 

## 2007 CIP: Summary of Plan

The 2007 CIP includes the following features:

| | |
|---|---|
| CIP Metrics | The plan metrics used to determine the funding of the bonus pool align to BU NA's Performance Contract. The new plan incorporates three metrics:<br><br>• Return on Assigned Risk Capital (50%):<br>• Revenue Growth (25%)<br>• Efficiency Ratio (25%)<br><br>*Return on Assigned Risk Capital (RoARC)*: RoARC is computed by dividing net income by assigned risk capital (assigned risk capital is economic capital times 1.25). RoARC indicates how efficiently the Bank uses capital.<br><br>*Revenue Growth*: Revenue Growth is calculated by dividing the increase in current year revenue by the prior year's revenue. This is a key metric for the market in valuing the business.<br><br>*Efficiency Ratio*: Efficiency Ratio is calculated by dividing the Bank's total expenses by our total revenue. Efficiency Ratio gives a measure of how effectively the bank operates. This is also a good measure of profitability. |
| CIP Bonus Pool Funding | Bonus pools for **Functions and Services** will fund based on overall BU NA performance.<br><br>Bonus pools for **Commercial Banking, PFS, GSTS, TB** and **ALM/Capital Markets** will fund fifty percent on the individual Line of Business' performance and fifty percent on overall BU NA performance.<br><br>The plan design provides for significant upside potential in bonus payouts if your individual and the bank's business performance goals are achieved – the bonus pool can now fund up to two times the target funding level and there is no maximum cap on an individual payout |
| Individual Bonus Targets | You have been assigned a bonus target that is a percent of your base salary. This bonus target is determined based on an assessment of our comparator companies in the financial services market (our market is defined as other financial services companies with similar asset size, competing for the same talent). |
| Individual Bonus Payments | Your individual bonus payment will be determined by your individual and team performance. |
| Eligibility | If you are actively employed as of the bonus payment date (in Q1 2008), you will be eligible to receive a payment. If you voluntarily terminate employment prior to the date bonuses are paid (for reasons other than retirement, death or total disability) or are terminated for cause you forfeit any bonus under this plan. If you are terminated as part of a restructuring of operations or due to retirement, death or total disability, you will receive your bonus in full. |

As with all compensation programs, bank management retains overall discretion on the aggregate pool funding as well as LOB/Services/Functions funding.



**Why were the new metrics chosen for 2007 CIP?**

The three metrics, Return on Assigned Risk Capital (50%), Revenue Growth (25%), Expense Ratio (25%), align the CIP design with the bank's business priorities and Performance Contract. By focusing on these three metrics, we position the bank to achieve its objectives and deliver the business results required in 2007.

**How is Return on Assigned Risk Capital (RoARC) calculated?**

RoARC is computed by dividing net income by assigned risk capital (assigned risk capital is economic capital times 1.25). RoARC indicates how efficiently the bank uses capital.

**How is Revenue Growth calculated?**

Revenue Growth is calculated by dividing the increase in current year revenue by the prior year's revenue. This is a key metric for the market in valuing the business.

**How is Efficiency Ratio calculated?**

Efficiency Ratio is calculated by dividing the bank's total expenses by our total revenue. Efficiency Ratio gives a measure of how effectively the bank operates. This is also a good measure of profitability.

**What if the Bank does very well on two metrics but not as well as on the third metric?**

Since the funding is a calculation involving all three metrics, the performance related to each metric will influence the funding of the bonus pool. It is necessary to deliver results in all three areas in order to achieve the highest level of funding available (two times the target funding).

**How will Individual Line of Business performance impact CIP funding?**

The pools for Commercial, PFS, GSTS, TB and ALM/Capital Markets will fund 50 percent based on the individual LOB's performance and 50% based on overall BU NA results.

**How will Functions and Services CIP pools be funded?**

Functions and Services bonus pools will fund based on overall BU NA results.

**What is the highest amount that bonus pools can fund?**

If the bank overachieves its performance goals, then the bonus pools can fund at a maximum of 2 times target. Individual allocations will be based on that person's individual and team performance.

**How was an employee's CIP target determined?**

CIP targets were determined based on a market assessment of each officer level position. During the market assessment we looked at other financial services companies with similar asset size who are competing for the same talent. We also used a peer group comprised of large regional banks and financial services companies with total assets greater than $50B.

**How did we determine which market information to use for each job?**

Each officer position was matched to relevant market data by a team of CoE Rewards Consultants, LOB/Function/Services leaders, HR Business Partners and outside consultants. This team ensured each job was appropriately described and matched to the requirements of similar jobs in comparator companies. Compensation surveys were used to gather the comparator company information.



**Does 2007 CIP have tiered payout levels?**

The new plan design does not have tiers. Each CIP-eligible position has been designated a CIP target that is a percentage of that person's base salary. CIP bonus pool funding can be made as high as 2 times the target, providing BU NA and Line of Business performance metrics are met. Individual CIP payments will be made based on individual and team performance.

**How are individual CIP payouts determined?**

A CIP pool will be determined for each LOB/Function/Services based on achievement of the identified metrics. An individual's CIP payout, however, is determined by that person's individual and team performance against identified SMART objectives. Managers will use the Performance Management process to determine the employee's performance for the year. Based on this assessment, managers will determine the appropriate CIP payout. For 2007, individual payouts are guaranteed at the CIP target. This is a minimum guarantee; if we overachieve on our financial performance and an employee's individual performance warrants it, payouts may be greater than target.

**Does the individual performance assessment include the Compliance Gatekeeper?**

Yes. All employees must satisfactorily achieve Compliance objectives, including the Compliance Gatekeeper. This is a component of the Performance Management process.

**Are employees hired in 2007 eligible for CIP?**

If an employee is hired into a CIP eligible officer position then the employee will be eligible to participate in the 2007 CIP. Full funding for the new hire will appear in the AASAP system. Managers should use discretion in making allocations and take into account the partial year service for newly hired employees.

# EXHIBIT

# D

TO:  **Marguerite Marion**

FROM:  Human Resources Department

DATE:  **12/1/2007**

Bank of America Corporation ("Company") has determined that the Company must undergo a job elimination and reduction in workforce. We regret that as part of this necessary reduction in force, your employment with the Company will be terminated effective **12/15/2007.**

Enclosed with this letter is a Guide to the Corporate Severance Program ("CSP Guide") which describes your benefits and how you may continue or convert some of those benefits. The CSP Guide also describes how and when you will receive your last paycheck and any accrued unused vacation and floating holidays.

Please note that in exchange for furnishing the Company with an enforceable General Release and Program Agreement and not revoking it, you will receive the following severance pay and severance benefits:

- As severance pay, you are eligible to receive **52 weeks** of pay (less required payroll tax deductions) which will be payable in accordance with the Company's regular payroll payment schedule;

- If you elect to receive your severance in installment payments, your medical and dental benefits will be provided at active employee contribution rates for the number of weeks for which you are entitled to receive payment of severance pay; and

- You are eligible to receive career transition assistance services by a career transition assistance firm selected and paid for by the Company.

As required by law, also enclosed is a copy of the Disclosure List describing, by job title and age, the employees affected by the reduction in force and those not affected.

Please note that the signed General Release and Program Agreement must be returned to Human Resources *on or within forty-five (45) days after your notification date* and you must sign and return the Statement of Non-Revocation Form 8 days after signing your General Release and Program Agreement in order for you to receive your severance pay and severance benefits.

You are encouraged to consult with an attorney of your choice at your own expense prior to signing the General Release and Program Agreement.

Any questions you may have after your severance discussion should be directed to your Human Resources representative.

Best wishes for success in your future endeavors.

## GENERAL RELEASE AND PROGRAM AGREEMENT ("CSP AGREEMENT")

**PLEASE READ THIS ENTIRE AGREEMENT CAREFULLY.**
**NOTE THAT IT CONTAINS A RELEASE AND WAIVER OF RIGHTS OR CLAIMS,**
**INCLUDING THOSE UNDER THE AGE DISCRIMINATION IN EMPLOYMENT ACT.**
**YOU ARE ENCOURAGED TO CONTACT AN ATTORNEY OF YOUR CHOICE**
**FOR ADVICE CONCERNING ITS TERMS AND LEGAL SIGNIFICANCE**
**BEFORE SIGNING IT. IF YOU AGREE TO ITS TERMS, SIGN BELOW.**

I have received information, including the publication <u>Your Guide to the Corporate Severance Program Guide</u> ("Guide") and the CSP Folder, about the Corporate Severance Program ("Program") and I now understand the options and decisions I have under this Program. In particular, I understand that to be eligible to receive Program Assistance, including severance pay, associated with this Program, I must agree to the terms of this CSP Agreement and to the terms of the Non-Revocation Form ("Form C"), which I have also received, and properly complete, sign and return both of these to Bank of America. If signed by me, this document is my voluntary resignation of any and all directorships or board memberships I hold within Bank of America Corporation, including its or their subsidiaries or affiliates (collectively "Bank of America") or on Bank of America's behalf or for Bank of America's benefit. I also agree to make myself available, provide information and otherwise cooperate with Bank of America or its representatives after my employment ends in connection with any matter, dispute or the like for which Bank of America desires my availability or cooperation, and that I will not assist in the litigation or similar pursuit of any claim against Bank of America and/or "Released Parties" (as defined later herein) except as required by law or as otherwise described in this CSP Agreement. I also understand that I am eligible for Program Assistance, including severance pay, only if I return to Bank of America all of its property (e.g., cell phones, laptop computers) it entrusted to me or came into my possession during my employment with it, and only if I pay in full the entire balance remaining on my corporate credit card or other indebtedness I have to Bank of America arising from my employment within it except that which I incurred solely as a customer or client. I further agree not to criticize, defame or disparage Bank of America or "Released Parties" (as defined later herein), their plans, actions, procedures, conduct or judgment to any third party, either orally or in writing.

I also acknowledge, if I am age 40 or over, that I received the Disclosure List which informed me of any class, unit, or group of individuals covered by the Program applicable to me, the eligibility factors for the Program, and the time limits applicable to the Program. From such Disclosure List (which is required by the federal Age Discrimination in Employment Act, as amended by the Older Workers Benefit Protection Act), I have also been informed of the job titles and ages of the individuals eligible or selected for the Program and the ages of the individuals in my same job classification or organizational unit who are not eligible or selected for the Program.

I recognize and acknowledge that by reason of my employment within Bank of America I had access to trade secrets and confidential or privileged information of Bank of America, including without limitation: business plans, records and affairs, reports, databases, personnel data, customer lists and other customer information, prospective customer lists and other prospective customer information, strategies and plans, financial business or trade secret information, mergers and acquisitions, pricing information and other similar matters which are confidential (hereinafter "Trade Secrets and other Confidential Information"). I acknowledge that such Trade Secrets and other Confidential Information are valuable and unique assets and that unauthorized use or disclosure would cause immediate and irreparable damage to the business of Bank of America. I agree that I will not directly or indirectly, use, divulge, publish or otherwise reveal or allow to be revealed any aspect of the Trade Secrets and other Confidential Information to any person or entity outside of Bank of America without its prior written permission by an authorized representative.

I agree that for a period of 12 months following the termination of my employment with Bank of America, I will not, directly or indirectly, for myself or on behalf of my subsequent employer(s) or any other entity: a) solicit or recruit for employment or as a consultant or contractor, or assist in the solicitation or recruitment for employment or as a consultant or contractor, any other associate who is then employed within the Bank in any capacity; or b) solicit, induce or attempt to solicit or induce any of the Bank's existing and/or prospective commercial, corporate, business, organizational, institutional or individual private wealth management customers, or any similar Bank customers, in an attempt to divert, transfer or otherwise take away business or prospective business from the Bank.

If I receive my severance pay in a lump sum and am subsequently reinstated or rehired within Bank of America during the period of time represented by or used as a basis to calculate my severance pay, I agree to reimburse Bank of America the pro rata portion (as described in the Guide) of my severance pay. If I receive my severance pay in installment payments and am subsequently reinstated or rehired within Bank of America while receiving such payments, I agree those payments will cease (as described in the Guide).

I further understand and agree that, as described in the Guide, I could lose my eligibility for severance pay or benefits and be required to return or repay any severance pay I received, if, during my severance pay period, Bank of America becomes aware of circumstances that could have caused my immediate termination.

As consideration and in exchange for my receipt and acceptance of the Program Assistance, including severance pay, associated with the Program, and to the extent permitted by law, I hereby waive, release and fully discharge, and agree not to pursue, any and all claims, claims for relief and/or causes of action I have or may have as of the date I sign (execute) this CSP Agreement against Bank of America Corporation, and/or its or their current or former affiliates, subsidiaries, successors, or predecessors, and/or any of the current or former officers, directors, shareholders, associates, representatives or agents of the foregoing entities (hereinafter collectively "Released Parties"), arising out of and/or connected in any way with my employment relationship within Bank of America and/or its predecessors or successors and/or the termination of that employment relationship. I specifically waive and release any and all rights I may have to receive from any of the Released Parties, and discharge each of them, from any obligation they may have to provide me any reasonable accommodation, including any continuing assistance to seek or find continuing employment opportunities within Bank of America, and specifically release any claims that Bank of America should have or will at any time in the future be required to rehire me, or obtain or locate employment on my behalf either within or outside of the Bank of America. In addition, if I am currently a class member in any pending shareholder litigation, I understand that this Agreement is not intended to preclude my continuing participation as a class member in such shareholder litigation.

I recognize and agree that such released claims, claims for relief, and/or causes of action include, but are not limited to, claims under Title VII of the Civil Rights Act of 1964, Section 1981 of Title 42 of the United States Code, age claims under the federal Age Discrimination in Employment Act, the Employee Retirement Income Security Act of 1974, the Americans With Disabilities Act ("ADA"), the federal Family and Medical Leave Act ("FMLA"), the California Fair Employment and Housing Act, the California Labor Code and all other laws, whether federal, state or local, as amended.

I also affirm, acknowledge and agree that I have been afforded and received during my employment with Bank of America all rights, privileges and benefits, including time-off and/or leaves of absence, I have, had or may have under the ADA, FMLA and for any similar federal, state or local law. Similarly, I affirm, acknowledge and agree that with receipt of my "final pay" from Bank of America, I have been paid in full for all wages or other compensation I earned throughout my employment with Bank of America.

I further hereby waive all rights under Section 1542 of the California Civil Code or any similar law. I recognize that Section 1542 provides:

> *"A general release does not extend to claims which the creditor does not know*
> *or suspect to exist in his favor at the time of executing the release, which if*
> *known by him must have materially affected his settlement with the debtor."*

However, under this CSP Agreement, I recognize that I am not waiving rights or claims that may arise after the date I sign (execute) this CSP Agreement or which arise out of or in connection with this CSP Agreement itself. I also understand that, to the extent required by law, nothing in this CSP Agreement prohibits me from proceeding before or participating with a government agency, and nothing in this CSP Agreement penalizes, imposes any condition or adversely limits my rights to do so. While I understand that this CSP Agreement does not affect my right to file a charge or claim with, or to participate as a witness in an investigation or proceeding conducted by, such government agency, by accepting the terms provided herein I give up my right to receive any relief whatsoever (including but not limited to financial benefit or monetary recovery) from any lawsuit, administrative action or settlement related to such rights and claims as I now give up, whether the lawsuit or action is filed, or the settlement reached by, the government agency or anyone else.

I acknowledge and understand that if I breach any provision of this Agreement, I will cease to be eligible for the compensation and benefits provided under it and the Bank may, in its sole discretion, cease remaining payments and seek reimbursement for amounts already paid. I further understand and agree that any breach of this Agreement shall entitle the Bank to bring legal action to enforce the Agreement and to recover any resulting damages. I agree to reimburse the Bank for all reasonable attorneys' fees and costs associated with such an action. In addition, I agree that the remedy at law for breach of this Agreement may be inadequate and that, in such an instance, the Bank shall be entitled to injunctive relief.

I understand that should any provision of this CSP Agreement be determined to be invalid by a court or government agency of competent jurisdiction or should I fail to fulfill my obligations under it, the remainder of this CSP Agreement shall, to the fullest extent permitted by applicable law and at Bank of America's option, remain in full force and effect and/or I shall be required to return, in full or in part, as determined by Bank of America, any and all consideration I received in exchange for my agreeing to this CSP Agreement, except for Five Hundred Dollars ($500.00) which represents the consideration I received from Bank of America in exchange for my release and waiver of rights or claims under the federal Age Discrimination in Employment Act.

Nothing in this CSP Agreement constitutes an admission of liability by the parties. This CSP Agreement constitutes the complete understanding of the parties concerning its subject matter, and supersedes any and all prior agreements, promises or inducements except as specifically set forth in the Guide. No other promises or agreements, or any modifications to or of this CSP Agreement, shall be binding unless reduced to writing and signed by an authorized representative of Bank of America and me.

I recognize and agree that when agreed to by me, as indicated by my signature below, this CSP Agreement shall be binding on me, my heirs, representatives, administrators, executors, successors and assigns. I also acknowledge that I have read this CSP Agreement, that I fully understand and appreciate its meaning and that it includes a full and final release and settlement of all claims, to the extent permitted by law, regarding my employment relationship and/or the termination of my employment relationship, known or unknown, as of the date I sign (execute) this CSP Agreement which I may have against any and all Released Parties, and that I agree knowingly and voluntarily to each of its terms.

If I am retiring, this CSP Agreement does not affect my participation in any benefit program made available to retirees by Bank of America.

**I UNDERSTAND THAT THIS CSP AGREEMENT SHOULD BE SIGNED AND RETURNED ON OR BEFORE 1/15/2008. I UNDERSTAND AND AGREE THIS CSP AGREEMENT SHALL BECOME EFFECTIVE AND ENFORCEABLE WHETHER OR NOT I PROPERLY SIGN AND RETURN THE NON-REVOCATION FORM ON 1/23/2008. I UNDERSTAND AND AGREE I MAY REVOKE THIS CSP AGREEMENT AT ANY TIME PRIOR TO THAT DATE BUT THAT ANY ATTEMPT BY ME TO REVOKE THIS CSP AGREEMENT AFTER THAT DATE IS OR WILL BE INEFFECTIVE.**

**SEVERANCE PAYMENT ELECTION:**

I elect to receive my severance pay in the following manner:

_____    In Installment Payments

_____    In One Lump Sum Payment*

_____          _____
Associate Signature                                    Date

Marguerite Marion_____143730_____
Associate Name (Printed Name) and  UEI Employee ID

*Please note that Lump Sum Payments are taxed at a special tax rate, see *Your Guide to the Corporate Severance Program* for additional information.

**Mail in the enclosed business reply envelope to:**

Severance Administrator
135 S. LaSalle Street, Suite 3300
Chicago, IL 60603

# STATEMENT OF NON-REVOCATION
## AS OF THE DATE SHOWN ON THIS FORM

By signing below, I hereby verify that I have chosen not to revoke my agreement to and execution of the General Release and Program Agreement ("CSP Agreement").  My signature also confirms my renewed agreement, as of the date shown below, to the terms of the CSP Agreement, including the release and waiver of any and all claims I have or may have against Bank of America Corporation, and its subsidiaries and affiliates, and its or their predecessors and successors (collectively "the company") and the officers, associates and / or agents of the company.

Marguerite Marion
_____
Name

143730
_____
Employee ID

_____
Signature*

_____
Date*

**\*This form must be signed, dated and returned no earlier than 8 days from the date you signed the CSP Agreement.**

**Mail in the enclosed business reply envelope to:**

Severance Administrator
135 S. LaSalle Street, Suite 3300
Chicago, IL 60603

# EXHIBIT

# E

January 18, 2008                                                    **Bank of America**

To:     ABN AMRO Group Long Term Incentive Plan participants

Re:     Important information about your LTIP benefit

Bank of America's records indicate that you are a former LaSalle associate who has vested
Performance Units under the ABN AMRO Group Long Term Incentive Plan ("LTIP"). The purpose
of this letter is to notify you of a change to the LTIP involving the timing of LTIP payments. A copy
of the LTIP is enclosed for your reference.

Under the LTIP, payments must be made within 75 days after the end of a Performance Period.
Bank of America has decided to amend the LTIP payment provision as follows.

For associates who terminate employment and have vested Performance Units under the LTIP,
payment will be made within 75 days after the earlier of
        1) the end of the Performance Period; or
        2) 12 months following the associate's termination date.

However, for former associates who have already been terminated for more than 12 months,
payment of vested Performance Units will be made during the first 75 days of 2008. Bank of
America has chosen to apply the highest valuation set forth in the LTIP and will value vested
Performance Units at $200 per unit.

For questions about these changes, please contact your Compensation Client Consultant (see
contact list below).

| Client Group(s) | Compensation Client Consultant |
|---|---|
| Commercial Banking<br>Finance<br>Transaction Banking | Robert Tays<br>312.904.8326<br>robert.tays@bankofamerica.com |
| PFS<br>Compliance<br>Risk | Jenny Liu<br>312.904.7987<br>j.liu@bankofamerica.com |
| Services<br>HR<br>Audit<br>Civic & Community Development | Debbie Williams<br>312.904.2026<br>deborah.e.williams@bankofamerica.com |
| Legal<br>GSTS | Christine Murray<br>312.904.8860<br>Christine.murray@bankofamerica.com |

Sincerely,

Executive Compensation

Enclosure:
    1.  LTIP
    2.  FAQ

Recycled Paper

02/15/2008 01:12 FAX  8474240421          LARK MANAGEMENT                        ☑003/018



**Bank of America**

*LaSalle – ABN AMRO Group Long Term Incentive Plan (LTIP)*
*Questions and Answers relating to Plan Amendment and Clarification of Non-Compete*

### Timing of LTIP Payments

**Q:**   When will I receive my payment if I am terminated?
**A:**   If you have vested units, payment will be processed within 75 days after the underlined earlier of: 1) the end of the Performance Period; or 2) 12 months following your termination date. This assumes you have not engaged in competitive employment or services prohibited under the LTIP and have certified you are not competing, if applicable.

**Examples**
**Assumptions:**
*Units were awarded in 2006 and 2007*
*Normal payment date for 2006 awards would be 2/28/09*
*Normal payment date for 2007 awards would be 2/28/10*

Example 1: Termination date of February 1, 2007 and associate has a 2005 award in addition to a 2006 and 2007 award
Payment would be made no later than March 15, 2008, for any vested pro-rated units for the 2005 award AND payment would be made no later than April 16, 2008 (75 days after the first anniversary of the termination date) for any vested pro-rated units for both the 2006 and 2007 awards, assuming in each case that you have not competed and have completed the certification process, if applicable.

Recycled Paper

## IN THE UNITED STATES DISTRICT COURT,
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **MARGUERITE MARION** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 1:08 cv 03867** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **BANK OF AMERICA, NATIONAL** | ) | |
| **ASSOCIATION** | ) | |
| | ) | |
| **Defendant.** | ) | |

## NOTICE OF MOTION

TO:    Jeffrey K. Ross
       Ronald J. Kramer
       Kathryn S. Clark
       SEYFARTH SHAW LLP
       131 South Dearborn Street
       Suite 2400
       Chicago, Illinois 60603

PLEASE TAKE NOTICE that on August 20, 2008, we caused to be filed with the United States District Court clerk, Plaintiff's Motion For Remand To State Court. On July 28, 2008, the Court Ordered that Defendant shall file its Response by August 25, 2008 and Plaintiff shall file her Reply by September 2, 2008.  The Court will rule by mail.

BELLOWS AND BELLOWS, P.C.


By: s/Kristen Prinz_____
    One of the Attorneys for
    Plaintiff


Joel J. Bellows, Esq.
Kristen E. Prinz, Esq.
BELLOWS AND BELLOWS, P.C.
209 South LaSalle, Suite 800
Chicago, Illinois 60604
(312) 332-3340
Attorney # 01000