## IN THE UNITED STATES DISTRICT COURT,
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| **MARGUERITE MARION** )<br>)<br>      **Plaintiff,** )<br>)<br>      **v.** )<br>)<br>**BANK OF AMERICA, NATIONAL** )<br>**ASSOCIATION** )<br>)<br>      **Defendant.** ) | **Case No.  1:08 cv 03867** |

### PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO REMAND

Plaintiff Marguerite Marion ("Marion or Plaintiff"), by her undersigned attorneys, Bellows and Bellows, P.C., hereby submits her Reply in Support of Motion to Remand.  In support thereof, Plaintiff states as follows:

### INTRODUCTION

Despite the fact that Defendant was granted an extension of time by which it was to file its Response, Defendant failed to do so in a timely manner. Plaintiff opposes Defendant's Motion for Leave to File.  Nevertheless, Plaintiff is filing her Reply to avoid prejudice that would result if Defendant's motion for leave is not denied.

Plaintiff's motion to remand should be granted.  Despite Defendant, Bank of America Corporation's ("BOA") creative recitation of the facts, there is no federal question at issue here and Plaintiff's claims involve one or more penalty provisions that are penal in nature.

### FACTUAL BACKGROUND

Plaintiff worked for Defendant's predecessor, ABN AMRO ("LaSalle") for over twenty years. During her tenure, she regularly earned and received compensation under the Bank's two bonus plans:  the short term bonus plan, Corporate Incentive Plan ("CIP"), and the long term

1

bonus plan, Long Term Incentive Plan ("LTIP"). Although both of these plans initially provided that an employee who terminates during a plan year is not ordinarily entitled to any incentive bonus for that year, to maintain stability during the acquisition stage, LaSalle altered the plans to guarantee the bonuses for 2007. LaSalle and Bank of America sent letters to employees promising that vesting of the LTIP bonus units would be accelerated upon "termination as a result of the sale of LaSalle Bank Corporation to Bank of America." (Exhibit A). Nothing in the letters or in the plan itself required that Plaintiff participate in Defendant's Corporate Severance Program ("CSP") to obtain this bonus. Not long after, LaSalle issued an Amendment to the LTIP plan that stated that the 2007 plan year would be the final year of this incentive plan. (Exhibit B). Again, nothing in this Amendment referred to a severance plan or any other plan. In fact, the Amendment specifically stated that "payments due hereunder for vested Performance Units allocated for the Performance Periods which began in 2005, 2006, and 2007 shall be made in 2008, 2009 and 2010 respectively pursuant to Plan terms ..." (Exhibit B). Similarly, LaSalle also sent a letter to Plaintiff promising that she would be paid her 2007 CIP bonus. (Exhibit C). The letter went on to explain that "[i]f your employment is terminated prior to the bonus payment date due to a reduction in force or if you die, retire, or terminate due to disability, the guaranteed bonus amount will become payable in full as soon as administratively possible." (Exhibit C). The letter further emphasized that the Bank was "taking the step of awarding guaranteed bonuses to underline our appreciation of your individual contribution and to emphasize our commitment to you." (Exhibit C). Once again, nowhere in this letter or in the CIP plan itself is there any mention that participation in the CSP was a prerequisite to payment under these bonus plans. (CIP Plan attached as Exhibit D). Notably, even the CIP plan summary highlights the fact that the bonus would be paid in full if an employee was terminated as part of a

2

restructuring, but no reference to a severance plan is made. (Exhibit D). On December 1, 2007, Plaintiff was informed that she was being terminated as part of Defendant's reduction in force. On that date, she was provided with a final letter. This letter stated that, in exchange for Plaintiff's signature on the CSP General Release and Program Agreement ("Release"), Plaintiff would receive "52 weeks of pay." (Exhibit E). Plaintiff's earned bonuses were not consideration for such an agreement.

Because Plaintiff was presented with a Release that contained a provision that would prevent her from seeking employment within her area of expertise, Plaintiff chose not to participate in Defendant's CSP and elected to take only her earned bonus compensation and waive her right to severance pay. Only after Plaintiff refused to execute the Release did Defendant begin to claim that Plaintiff's bonuses would not be paid. Even more egregious, Defendant then claimed that Plaintiff would not be eligible to elect to continue her medical coverage unless she signed the Release. Defendant made good on these threats. Plaintiff was denied the compensation she earned and had been guaranteed and was denied access to continue her healthcare coverage in violation of the Illinois Continuation Act. (See Exhibit F)

Without other recourse, on May 20, 2008 Plaintiff filed her state law claims in the Circuit Court of Cook County. On July 8, 2008, Defendant filed its Notice of Removal. On August 8, 2008, Plaintiff filed the instant Motion.

## ARGUMENT

### I. There is No Federal Question at Issue

#### A. Plaintiff Seeks Compensation Under Bonus Plans Not Subject to ERISA Regulation.

The LTIP and CIP plans are bonus plans as defined by federal regulations. Bonus plans are "payments made by an employer to some or all of its employees as bonuses for work

3

performed." 29 C.F.R. § 2510.3-2(c). Long before LaSalle contemplated an acquisition by BOA, it had in place two bonus plans: the CIP plan and the LTIP plan. Neither plan was ever or is today dependent on Defendant's Corporate Severance Plan ("CSP"). In fact, Defendant's argument to the contrary is illogical since the CIP and LTIP plans were functioning long before the acquisition that created the CSP to which Defendant's repeatedly refer. These plans involved bonuses for work performed. In her more than twenty years of employment with LaSalle, Plaintiff repeatedly earned and was repeatedly paid a yearly CIP bonus. Throughout her tenure, Plaintiff also earned compensation based on performance and longevity through the LTIP plan. In fact, Plaintiff relied on these plans and LaSalle's promises that payment of compensation due under these plans was guaranteed when she continued to work for Defendant through the acquisition stage.

Where, as here, the benefits sought are not linked to an ERISA plan, they are free standing and not subject to ERISA. See Peggy S. Crews v. General American Life Insurance Company, Inc., 274 F.3d 502 (8th Cir. 2001). Plaintiff is claiming compensation due under bonus plans that are separate and unrelated to any severance or ERISA plan. Defendant argues that the CIP and LTIP plans fall under ERISA because the later created CSP refers to them, but this argument is illogical. There is no reference to any severance plan or any other ERISA plan in the CIP and LTIP bonus plans. Performance under these plans has no relation whatsoever to any ERISA plan. Both the LTIP and the CIP specifically set forth the criteria by which an employee earned compensation through these plans. And neither plan refers to the CSP.

Defendant's lengthy argument that ERISA preempts Plaintiff's state law claims is irrelevant because it misstates the facts in Plaintiff's case. Defendant argues that Plaintiff was only entitled to receive the bonus payments if she was employed at the time they were normally

4

paid out, but this argument ignores the written alterations to the plans that guaranteed payment. The fact that Defendant later created a severance plan that refers to the CIP and LTIP bonus plans is immaterial because that alteration would only apply to employees that participated in the severance plan. Without an employee's participation in the CSP, the LTIP and CIP continued to be free standing bonus programs, not subject to ERISA.

The authority relied upon by Defendant is also irrelevant because it assumes that the CIP and LTIP plans were related to the CSP. Clearly, that is not the case. Despite Defendant's desire to change history and create a connection between the bonus plans and ERISA, none exists. There is no connection with or reference to an ERISA regulated plan.

**B.      Plaintiff Does Not Allege A COBRA Violation.**

Although Plaintiff could have alleged a violation of COBRA based on Defendant's willful and wrongful withholding of benefits, she chose to instead allege a violation of the parallel state law, the Illinois Continuation Act. "The well pleaded complaint rule requires that federal question jurisdiction not exist unless a federal question appears on the face of a properly pleaded complaint." Columbia Gas Transmission Corp. v. Drain, 237 F.3d 366, 369-70 (4th Cir. 2001). Plaintiff's did not plead any claim for a violation of any federal statute. Defendant's repeated misstatements of the facts and the pleadings in this matter should be disregarded.

**II.      Remand is Necessary Based on the Penalty Provisions Involved**

This Court has held that it does not have jurisdiction over state matters involving penal statutes. Tasner v. U.S. Industries, Inc., 379 F.Supp. 803, (N.D. Ill. 1974). (where the Illinois Business Corporation Act penalty provision in a *civil* action was found to be a "penal" remedy not enforceable in federal courts). Like the Business Corporation Act, the Illinois Sales

Representatives Act (the "ISRA") involves an exemplary damages provision that is a penal remedy not enforceable in federal courts.

In <u>Hendrick-Walker Assoc., Inc. v. Viktron Tech, Inc.</u>, improperly relied on by Defendant, this Court noted that the exemplary damages provision in the ISRA is punitive and intended "to punish and deter intentional or egregious conduct." <u>Hendrick-Walker</u>, 878 F. Supp. 119, 121 (N.D. Ill. 1995). Furthermore, contrary to Defendant's argument, <u>Hendrick-Walker</u> stands for the proposition that the exemplary damages provision is arbitrary in nature. <u>Id.</u> This Court specifically emphasized that such damages are arbitrarily left to the discretion of the trial judge. <u>Id.</u> at 120. Defendant argues that the award is not arbitrary because it is capped, but there is no authority for this argument and, as such, Defendant points to none.

The similarities between the penalty provision at issue here and that in the Business Corporation Act reveal the legislature's intent to penalize businesses that refuse to pay Illinois residents the sales commissions they earned. The failure of the defendant in <u>Hendrick-Walker</u> to identify this jurisdictional issue is not authority for ignoring the true purpose of the penalty provision of the ISRA. Defendant should not be allowed to hide behind a previous party's error.

## CONCLUSION

There is no federal question at issue here and this Court does not have jurisdiction to enforce the penal penalty provision at issue. Accordingly, this matter should be remanded to state court.

DATED: September 5, 2008

Plaintiff Marguerite Marion,

By: s/Kristen E. Prinz_____
One of Her Attorneys

Joel J. Bellows, Esq.
Kristen E. Prinz, Esq.
BELLOWS AND BELLOWS, P.C.
209 South LaSalle Street, Suite 800
Chicago, Illinois 60604
Attorney No. 01000

# EXHIBIT

# A

Feb. 21 08 01:34p                                    (312)341-9430                    p.2

 

**TO BE OPENED BY ADDRESSEE ONLY**
**PRIVATE & CONFIDENTIAL**

*EMPLOYEE NAME*

*Date*

Dear *Employee First Name*,

We are pleased to advise that you will retain your *(2004 US KEEP, 2005 US KEEP, 2006 US GKERP)* benefits upon cessation of employment with ABN AMRO and you will be granted Good Leaver status.

**Vesting**

Once your employment with ABN AMRO NA Group is terminated as a result of the sale of LaSalle Bank Corporation to Bank of America, ABN AMRO will accelerate your vesting in any unvested amounts previously awarded to you under *(KEEP, GKERP)* with such vesting to occur as of legal day one anticipated to be October 1, 2007. Awards that are vested can only be forfeited by engaging in Detrimental Activity prior to the actual payment. Detrimental Activity includes such activities as improper use of confidential or proprietary information concerning any ABN AMRO Group Company or any of their respective clients, persuading or attempting to persuade any employee of any ABN AMRO Group Company to breach any of the terms of their employment or soliciting or poaching (including attempting to solicit or poach) ABN AMRO employees.

**Payment – (KEEP 2004  KEEP 2005 )Awards**
The amounts that vest on legal day one anticipated to be October 1, 2007 will be paid out to you as soon as practicable following the vesting date, but no earlier than the next ABN AMRO open period in 2007.

Please note that the value of the units that you will receive at the time of payment will depend upon the price of ABN AMRO shares, dividend payments, the value of any other linked investments and the exchange rate at the time. Any payment to you will be paid net of any statutory deductions required to be paid at the time of payment.

**Payment – GKERP 2006 Awards**
The amounts that vest on legal day one anticipated to be October 1, 2007 will be paid out to you according to the schedule specified in the GKERP Rules. Fifty per cent of the value of your GKERP Award will be paid out as soon as practicable following the second anniversary of grant and the balance of the value of your GKERP Award will be paid out as soon as practicable following the third anniversary of grant.

Please note that the value of the units that you will receive at the time of payment will depend upon the price of ABN AMRO shares, dividend payments, the value of any other linked investments and the exchange rate at the time. Any payment to you will be paid net of any statutory deductions required to be paid at the time of payment.

Any cash payments will be made to the US bank account currently held in payroll records unless you advise us otherwise. Similarly any communications will be addressed to the email address we currently hold unless you advise us otherwise. It is your responsibility to ensure that your email address and bank account information is up to date. If we are not in possession of accurate bank account and email address information we will be unable to provide you with communication documents relating to your KEEP/GKERP awards, and may be unable to make payment to you.

You may continue to access the Deferred Compensation website to view current values of KEEP/GKERP units using your existing logon and password.

Should you have any queries, please send an email to the Deferred Compensation administration team at deferredcomp@uk.abnamro.com

Yours sincerely,

*Robert Church Jr.*
ABN AMRO
Authorised Signatory
On behalf of the KEEP/GKERP Committee

02/05/2008 01:12 FAX  8474240421          LARK MANAGEMENT                    ☑ 002/018

January 18, 2008



To:    ABN AMRO Group Long Term Incentive Plan participants

Re:    Important Information about your LTIP benefit

Bank of America's records indicate that you are a former LaSalle associate who has vested
Performance Units under the ABN AMRO Group Long Term Incentive Plan ("LTIP"). The purpose
of this letter is to notify you of a change to the LTIP involving the timing of LTIP payments. A copy
of the LTIP is enclosed for your reference.

Under the LTIP, payments must be made within 75 days after the end of a Performance Period.
Bank of America has decided to amend the LTIP payment provision as follows.

For associates who terminate employment and have vested Performance Units under the LTIP,
payment will be made within 75 days after the earlier of
         1) the end of the Performance Period; or
         2) 12 months following the associate's termination date.

However, for former associates who have already been terminated for more than 12 months,
payment of vested Performance Units will be made during the first 75 days of 2008. Bank of
America has chosen to apply the highest valuation set forth in the LTIP and will value vested
Performance Units at $200 per unit.

For questions about these changes, please contact your Compensation Client Consultant (*see
contact list below*).

| Client Group(s) | Compensation Client Consultant |
|---|---|
| Commercial Banking<br>Finance<br>Transaction Banking | Robert Tays<br>312.904.8326<br>robert.tays@bankofamercia.com |
| PFS<br>Compliance<br>Risk | Jenny Liu<br>312.904.7987<br>j.liu@bankofamerica.com |
| Services<br>HR<br>Audit<br>Civic & Community Development | Debbie Williams<br>312.904.2026<br>deborah.e.williams@bankofamerica.com |
| Legal<br>GSTS | Christine Murray<br>312.904.8860<br>Christine.murray@bankofamerica.com |

Sincerely,

Executive Compensation

Enclosure:
    1.  LTIP
    2.  FAQ

Recycled Paper

02/15/2008 01:12 FAX  8474240421          LARK MANAGEMENT                    ☑003/018



*LaSalle – ABN AMRO Group Long Term Incentive Plan (LTIP)*
*Questions and Answers relating to Plan Amendment and Clarification of Non-Compete*

### Timing of LTIP Payments

**Q:**   **When will I receive my payment if I am terminated?**
**A:**   If you have vested units, payment will be processed within 75 days after the <u>earlier of:</u> 1) the end
of the Performance Period; or 2) 12 months following your termination date. This assumes you
have not engaged in competitive employment or services prohibited under the LTIP and have
certified you are not competing, if applicable.

<u>Examples</u>
<u>Assumptions:</u>
*Units were awarded in 2006 and 2007*
*Normal payment date for 2006 awards would be 2/28/09*
*Normal payment date for 2007 awards would be 2/28/10*

<u>Example 1: Termination date of February 1, 2007 and associate has a 2005 award in addition to a 2006
and 2007 award</u>
Payment would be made no later than March 15, 2008, for any vested pro-rated units for the 2005 award
AND payment would be made no later than April 16, 2008 (75 days after the first anniversary of the
termination date) for any vested pro-rated units for both the 2006 and 2007 awards, assuming in each
case that you have not competed and have completed the certification process, if applicable.

Recycled Paper

# EXHIBIT

# B

02/05/2008 01:14 FAX  8474240421          LARK MANAGEMENT                    ☑017/018

## AMENDMENT TO
## ABN AMRO GROUP LONG TERM INCENTIVE PLAN

### Instrument of Amendment

THIS INSTRUMENT is executed by the Chief Administrative Officer of BANK OF AMERICA CORPORATION, a Delaware corporation with its principal office and place of business in Charlotte, North Carolina (the "Company"), on behalf of ABN AMRO North America Holding Company ("AANA").

### Statement of Purpose

AANA previously adopted the ABN AMRO Group Long Term Incentive Plan (the "Plan") for the benefit of eligible employees and reserved the right to amend the Plan from time to time. Effective as of the consummation of the transactions contemplated by the Purchase and Sale Agreement dated April 22, 2007, as amended, by and between ABN AMRO Bank N.V. and the Company, the Company acquired AANA on October 1, 2007. Pursuant to applicable resolutions, the Company's Chief Administrative Officer currently has the right to execute Plan amendments on behalf of AANA. By this Instrument, AANA is amending the Plan to (1) set the value of outstanding Performance Units, (2) provide a new payment rule for payments made following a termination of employment, and (3) freeze the Plan effective December 31, 2007, as to the inception of new Performance Periods.

NOW, THEREFORE, AANA hereby amends the Plan effective as of October 1, 2007:

1.     Section 4 of the Plan shall be amended by adding the following new sentence at the end thereof:

> "Notwithstanding the foregoing, the value of all Performance Units outstanding on October 1, 2007, shall be $200 per unit."

2.     Section 5 of the Plan shall be amended by adding the following new paragraph at the end thereof:

> "Notwithstanding any other provisions of the Plan to the contrary, no new Performance Period shall begin on or after January 1, 2008. For the avoidance of doubt, (1) the Performance Period which began on January 1, 2007, shall be the final Performance Period under the Plan, (2) payments due hereunder for vested Performance Units allocated for the Performance Periods which began in 2005, 2006 and 2007 shall be made

4831-8323-6510.04

02/05/2008 01:14 FAX  8474240421          LARK MANAGEMENT                    ⌀018/018

in 2008, 2009 and 2010, respectively, pursuant to Plan terms, and (3) no additional Performance Units shall be allocated hereunder."

3.    Subsection 7.b. of the Plan shall be amended by adding the following new paragraph at the end thereof:

"Notwithstanding any other provisions of the Plan to the contrary, payment of vested Performance Units to a Participant who has terminated employment shall occur on the earlier of (x) the date specified above in the first sentence of this subsection 7.b. and (y) the first anniversary of the Participant's date of termination, unless such Performance Units are otherwise forfeited pursuant to Section 6 of the Plan above."

4.    Exhibit A of the Plan shall be amended by adding the following new paragraph at the end thereof:

"Notwithstanding the foregoing, the value of all Performance Units outstanding on October 1, 2007, shall be $200 per unit."

IN WITNESS WHEREOF, the Chief Administrative Officer of Bank of America Corporation hereby executes this Instrument on the 19th day of December, 2007 on behalf of ABN AMRO North America Holding Company.

By: _____
    J. Steele Alphin
    Chief Administrative Officer
    Bank of America Corporation

2

4831-4523-6610.04

# EXHIBIT

# C

 **LaSalle Bank**
ABN AMRO
 **ABN·AMRO**

Marguerite Marion

Dear Marguerite,

I am pleased to inform you of your participation in the 2007 Corporate Incentive Plan (CIP).

The design of the CIP has been adjusted to better align the plan with our Performance Contract and the BU NA Rewards Strategy. The BU NA Rewards Strategy aims to ensure the bank can attract and retain top-quality employees and remain competitive, both as an enterprise and as an employer, by offering compensation that is comparable to what other financial services companies offer.

CIP is designed to provide incentives to employees who deliver on business objectives as outlined in their performance management SMART objectives (including any compliance-related requirements). Each CIP eligible employee has been given an incentive target.

**Your CIP target is 65.0% of your base salary.** Your 2007 CIP bonus will be paid in Q1 of 2008.

Your 2007 bonus has been guaranteed for you at your target percentage of base salary. Should the bank overachieve the goals outlined in 2007 CIP and your individual and team's performance warrants it, you may receive an increased CIP payment.

This guarantee is conditional on you being employed in good standing by ABN AMRO or its successor organization on the bonus payment date in 2008. If your employment is terminated prior to the bonus payment date due to a reduction in force or if you die, retire or terminate due to disability, the guaranteed bonus amount will become payable in full as soon as administratively possible. If you voluntarily terminate or are terminated for cause, you will forfeit your bonus.

This letter does not confer on you any rights in respect to any future potential bonus payments relating to any subsequent years. This letter supersedes any prior written or verbal commitments made in respect of any bonus arrangements for 2007. All of the other terms and conditions of your employment remain unchanged and in full force and effect.

Please see the attached summary for further information about the 2007 CIP. In addition, I invite you to attend a webcast hosted by the BU NA CoE Rewards team to learn more about the plans. The webcasts will be held later in May. You will receive a separate email with the dates, times and dial in information.

We are taking the step of awarding guaranteed bonuses to underline our appreciation of your individual contribution and to emphasise our commitment to you. While the bank is in the midst of a transition, it is important that we all continue to focus on achieving our performance objectives. My expectation is that we will deliver on our commitments on time and in full. We must continue to build on the strong momentum from the beginning of the year to ensure we meet and exceed our goals.

Regards,

Robert J. Moore
Head of BU NA

# EXHIBIT

# D

**MY REWARDS**

May 2007

 

## 2007 CIP: Summary of Plan

The 2007 CIP includes the following features:

| | |
|---|---|
| CIP Metrics | The plan metrics used to determine the funding of the bonus pool align to BU NA's Performance Contract. The new plan incorporates three metrics: <br><br> • Return on Assigned Risk Capital (50%): <br> • Revenue Growth (25%) <br> • Efficiency Ratio (25%) <br><br> *Return on Assigned Risk Capital (RoARC)*: RoARC is computed by dividing net income by assigned risk capital (assigned risk capital is economic capital times 1.25). RoARC indicates how efficiently the Bank uses capital. <br><br> *Revenue Growth*: Revenue Growth is calculated by dividing the increase in current year revenue by the prior year's revenue. This is a key metric for the market in valuing the business. <br><br> *Efficiency Ratio*: Efficiency Ratio is calculated by dividing the Bank's total expenses by our total revenue. Efficiency Ratio gives a measure of how effectively the bank operates. This is also a good measure of profitability. |
| CIP Bonus Pool Funding | Bonus pools for **Functions and Services** will fund based on overall BU NA performance. <br><br> Bonus pools for **Commercial Banking, PFS, GSTS, TB** and **ALM/Capital Markets** will fund fifty percent on the individual Line of Business' performance and fifty percent on overall BU NA performance. <br><br> The plan design provides for significant upside potential in bonus payouts if your individual and the bank's business performance goals are achieved – the bonus pool can now fund up to two times the target funding level and there is no maximum cap on an individual payout |
| Individual Bonus Targets | You have been assigned a bonus target that is a percent of your base salary. This bonus target is determined based on an assessment of our comparator companies in the financial services market (our market is defined as other financial services companies with similar asset size, competing for the same talent). |
| Individual Bonus Payments | Your individual bonus payment will be determined by your individual and team performance. |
| Eligibility | If you are actively employed as of the bonus payment date (in Q1 2008), you will be eligible to receive a payment. If you voluntarily terminate employment prior to the date bonuses are paid (for reasons other than retirement, death or total disability) or are terminated for cause you forfeit any bonus under this plan. If you are terminated as part of a restructuring of operations or due to retirement, death or total disability, you will receive your bonus in full. |

As with all compensation programs, bank management retains overall discretion on the aggregate pool funding as well as LOB/Services/Functions funding.



**Why were the new metrics chosen for 2007 CIP?**

The three metrics, Return on Assigned Risk Capital (50%), Revenue Growth (25%), Expense Ratio (25%), align the CIP design with the bank's business priorities and Performance Contract. By focusing on these three metrics, we position the bank to achieve its objectives and deliver the business results required in 2007.

**How is Return on Assigned Risk Capital (RoARC) calculated?**

RoARC is computed by dividing net income by assigned risk capital (assigned risk capital is economic capital times 1.25). RoARC indicates how efficiently the bank uses capital.

**How is Revenue Growth calculated?**

Revenue Growth is calculated by dividing the increase in current year revenue by the prior year's revenue. This is a key metric for the market in valuing the business.

**How is Efficiency Ratio calculated?**

Efficiency Ratio is calculated by dividing the bank's total expenses by our total revenue. Efficiency Ratio gives a measure of how effectively the bank operates. This is also a good measure of profitability.

**What if the Bank does very well on two metrics but not as well as on the third metric?**

Since the funding is a calculation involving all three metrics, the performance related to each metric will influence the funding of the bonus pool. It is necessary to deliver results in all three areas in order to achieve the highest level of funding available (two times the target funding).

**How will individual Line of Business performance impact CIP funding?**

The pools for Commercial, PFS, GSTS, TB and ALM/Capital Markets will fund 50 percent based on the individual LOB's performance and 50% based on overall BU NA results.

**How will Functions and Services CIP pools be funded?**

Functions and Services bonus pools will fund based on overall BU NA results.

**What is the highest amount that bonus pools can fund?**

If the bank overachieves its performance goals, then the bonus pools can fund at a maximum of 2 times target. Individual allocations will be based on that person's individual and team performance.

**How was an employee's CIP target determined?**

CIP targets were determined based on a market assessment of each officer level position. During the market assessment we looked at other financial services companies with similar asset size who are competing for the same talent. We also used a peer group comprised of large regional banks and financial services companies with total assets greater than $50B.

**How did we determine which market information to use for each job?**

Each officer position was matched to relevant market data by a team of CoE Rewards Consultants, LOB/Function/Services leaders, HR Business Partners and outside consultants. This team ensured each job was appropriately described and matched to the requirements of similar jobs in comparator companies. Compensation surveys were used to gather the comparator company information.



**Does 2007 CIP have tiered payout levels?**

The new plan design does not have tiers. Each CIP-eligible position has been designated a CIP target that is a percentage of that person's base salary. CIP bonus pool funding can be made as high as 2 times the target, providing BU NA and Line of Business performance metrics are met. Individual CIP payments will be made based on individual and team performance.

**How are individual CIP payouts determined?**

A CIP pool will be determined for each LOB/Function/Services based on achievement of the identified metrics. An individual's CIP payout, however, is determined by that person's individual and team performance against identified SMART objectives. Managers will use the Performance Management process to determine the employee's performance for the year. Based on this assessment, managers will determine the appropriate CIP payout. For 2007, individual payouts are guaranteed at the CIP target. This is a minimum guarantee; if we overachieve on our financial performance and an employee's individual performance warrants it, payouts may be greater than target.

**Does the individual performance assessment include the Compliance Gatekeeper?**

Yes. All employees must satisfactorily achieve Compliance objectives, including the Compliance Gatekeeper. This is a component of the Performance Management process.

**Are employees hired in 2007 eligible for CIP?**

If an employee is hired into a CIP eligible officer position then the employee will be eligible to participate in the 2007 CIP. Full funding for the new hire will appear in the AASAP system. Managers should use discretion in making allocations and take into account the partial year service for newly hired employees.

# EXHIBIT E

JUN-10-2008 10:25 From:BANK OF AMERICA          13128281201          To:BankofAmerica ATL00A P.24/33

TO:          **Marguerite Marion**

FROM:       Human Resources Department

DATE:        **12/1/2007**

Bank of America Corporation ("Company") has determined that the Company must undergo a job elimination and reduction in workforce. We regret that as part of this necessary reduction in force, your employment with the Company will be terminated effective **12/15/2007.**

Enclosed with this letter is a Guide to the Corporate Severance Program ("CSP Guide") which describes your benefits and how you may continue or convert some of those benefits. The CSP Guide also describes how and when you will receive your last paycheck and any accrued unused vacation and floating holidays.

Please note that in exchange for furnishing the Company with an enforceable General Release and Program Agreement and not revoking it, you will receive the following severance pay and severance benefits:

- As severance pay, you are eligible to receive **52 weeks** of pay (less required payroll tax deductions) which will be payable in accordance with the Company's regular payroll payment schedule;

- If you elect to receive your severance in installment payments, your medical and dental benefits will be provided at active employee contribution rates for the number of weeks for which you are entitled to receive payment of severance pay; and

- You are eligible to receive career transition assistance services by a career transition assistance firm selected and paid for by the Company.

As required by law, also enclosed is a copy of the Disclosure List describing, by job title and age, the employees affected by the reduction in force and those not affected.

Please note that the signed General Release and Program Agreement must be returned to Human Resources *on or within forty-five (45) days after your notification date* and you must sign and return the Statement of Non-Revocation Form 8 days after signing your General Release and Program Agreement. In order for you to receive your severance pay and severance benefits.

You are encouraged to consult with an attorney of your choice at your own expense prior to signing the General Release and Program Agreement.

Any questions you may have after your severance discussion should be directed to your Human Resources representative.

Best wishes for success in your future endeavors.

## GENERAL RELEASE AND PROGRAM AGREEMENT ("CSP AGREEMENT")

**PLEASE READ THIS ENTIRE AGREEMENT CAREFULLY.
NOTE THAT IT CONTAINS A RELEASE AND WAIVER OF RIGHTS OR CLAIMS,
INCLUDING THOSE UNDER THE AGE DISCRIMINATION IN EMPLOYMENT ACT.
YOU ARE ENCOURAGED TO CONTACT AN ATTORNEY OF YOUR CHOICE
FOR ADVICE CONCERNING ITS TERMS AND LEGAL SIGNIFICANCE
BEFORE SIGNING IT.  IF YOU AGREE TO ITS TERMS, SIGN BELOW.**

I have received information, including the publication Your Guide to the Corporate Severance Program Guide ("Guide") and the CSP Folder, about the Corporate Severance Program ("Program") and I now understand the options and decisions I have under this Program.  In particular, I understand that to be eligible to receive Program Assistance, including severance pay, associated with this Program, I must agree to the terms of this CSP Agreement and to the terms of the Non-Revocation Form ("Form C"), which I have also received, and properly complete, sign and return both of these to Bank of America.  If signed by me, this document is my voluntary resignation of any and all directorships or board memberships I hold within Bank of America Corporation, including its or their subsidiaries or affiliates (collectively "Bank of America") or on Bank of America's behalf or for Bank of America's benefit.  I also agree to make myself available, provide information and otherwise cooperate with Bank of America or its representatives after my employment ends in connection with any matter, dispute or the like for which Bank of America desires my availability or cooperation, and that I will not assist in the litigation or similar pursuit of any claim against Bank of America and/or "Released Parties" (as defined later herein) except as required by law or as otherwise described in this CSP Agreement.  I also understand that I am eligible for Program Assistance, including severance pay, only if I return to Bank of America all of its property (e.g., cell phones, laptop computers) it entrusted to me or came into my possession during my employment with it, and only if I pay in full the entire balance remaining on my corporate credit card or other indebtedness I have to Bank of America arising from my employment within it except that which I incurred solely as a customer or client.  I further agree not to criticize, defame or disparage Bank of America or "Released Parties" (as defined later herein), their plans, actions, procedures, conduct or judgment to any third party, either orally or in writing.

I also acknowledge, if I am age 40 or over, that I received the Disclosure List which informed me of any class, unit, or group of individuals covered by the Program applicable to me, the eligibility factors for the Program, and the time limits applicable to the Program.  From such Disclosure List (which is required by the federal Age Discrimination in Employment Act, as amended by the Older Workers Benefit Protection Act), I have also been informed of the job titles and ages of the individuals eligible or selected for the Program and the ages of the individuals in my same job classification or organizational unit who are not eligible or selected for the Program.

I recognize and acknowledge that by reason of my employment within Bank of America I had access to trade secrets and confidential or privileged information of Bank of America, including without limitation: business plans, records and affairs, reports, databases, personnel data, customer lists and other customer information, prospective customer lists and other prospective customer information, strategies and plans, financial business or trade secret information, mergers and acquisitions, pricing information and other similar matters which are confidential (hereinafter "Trade Secrets and other Confidential Information").  I acknowledge that such Trade Secrets and other Confidential Information are valuable and unique assets and that unauthorized use or disclosure would cause immediate and irreparable damage to the business of Bank of America.  I agree that I will not directly or indirectly, use, divulge, publish or otherwise reveal or allow to be revealed any aspect of the Trade Secrets and other Confidential Information to any person or entity outside of Bank of America without its prior written permission by an authorized representative.

JUN-10-2008 10:26 From:BANK OF AMERICA        13128281201        To:BankofAmerica ATL00A P.25/33

I agree that for a period of 12 months following the termination of my employment with Bank of America, I will not, directly or indirectly, for myself or on behalf of my subsequent employer(s) or any other entity: a) solicit or recruit for employment or as a consultant or contractor, or assist in the solicitation or recruitment for employment or as a consultant or contractor, any other associate who is then employed within the Bank in any capacity; or b) solicit, induce or attempt to solicit or induce any of the Bank's existing and/or prospective commercial, corporate, business, organizational, institutional or individual private wealth management customers, or any similar Bank customers, in an attempt to divert, transfer or otherwise take away business or prospective business from the Bank.

If I receive my severance pay in a lump sum and am subsequently reinstated or rehired within Bank of America during the period of time represented by or used as a basis to calculate my severance pay, I agree to reimburse Bank of America the pro rata portion (as described in the Guide) of my severance pay. If I receive my severance pay in installment payments and am subsequently reinstated or rehired within Bank of America while receiving such payments, I agree those payments will cease (as described in the Guide).

I further understand and agree that, as described in the Guide, I could lose my eligibility for severance pay or benefits and be required to return or repay any severance pay I received, if, during my severance pay period, Bank of America becomes aware of circumstances that could have caused my immediate termination.

As consideration and in exchange for my receipt and acceptance of the Program Assistance, including severance pay, associated with the Program, and to the extent permitted by law, I hereby waive, release and fully discharge, and agree not to pursue, any and all claims, claims for relief and/or causes of action I have or may have as of the date I sign (execute) this CSP Agreement against Bank of America Corporation, and/or its or their current or former affiliates, subsidiaries, successors, or predecessors, and/or any of the current or former officers, directors, shareholders, associates, representatives or agents of the foregoing entities (hereinafter collectively "Released Parties"), arising out of and/or connected in any way with my employment relationship within Bank of America and/or its predecessors or successors and/or the termination of that employment relationship. I specifically waive and release any and all rights I may have to receive from any of the Released Parties, and discharge each of them, from any obligation they may have to provide me any reasonable accommodation, including any continuing assistance to seek or find continuing employment opportunities within Bank of America, and specifically release any claims that Bank of America should have or will at any time in the future be required to rehire me, or obtain or locate employment on my behalf either within or outside of the Bank of America. In addition, if I am currently a class member in any pending shareholder litigation, I understand that this Agreement is not intended to preclude my continuing participation as a class member in such shareholder litigation.

I recognize and agree that such released claims, claims for relief, and/or causes of action include, but are not limited to, claims under Title VII of the Civil Rights Act of 1964, Section 1981 of Title 42 of the United States Code, age claims under the federal Age Discrimination in Employment Act, the Employee Retirement Income Security Act of 1974, the Americans With Disabilities Act ("ADA"), the federal Family and Medical Leave Act ("FMLA"), the California Fair Employment and Housing Act, the California Labor Code and all other laws, whether federal, state or local, as amended.

I also affirm, acknowledge and agree that I have been afforded and received during my employment with Bank of America all rights, privileges and benefits, including time-off and/or leaves of absence, I have, had or may have under the ADA, FMLA and for any similar federal, state or local law. Similarly, I affirm, acknowledge and agree that with receipt of my "final pay" from Bank of America, I have been paid in full for all wages or other compensation I earned throughout my employment with Bank of America.

JUN-10-2008 10:26 From:BANK OF AMERICA    13128281201    To:BankofAmerica ATL00A P.27/33

I further hereby waive all rights under Section 1542 of the California Civil Code or any similar law. I recognize that Section 1542 provides:

> *"A general release does not extend to claims which the creditor does not know*
> *or suspect to exist in his favor at the time of executing the release, which if*
> *known by him must have materially affected his settlement with the debtor."*

However, under this CSP Agreement, I recognize that I am not waiving rights or claims that may arise after the date I sign (execute) this CSP Agreement or which arise out of or in connection with this CSP Agreement itself. I also understand that, to the extent required by law, nothing in this CSP Agreement prohibits me from proceeding before or participating with a government agency, and nothing in this CSP Agreement penalizes, imposes any condition or adversely limits my rights to do so. While I understand that this CSP Agreement does not affect my right to file a charge or claim with, or to participate as a witness in an investigation or proceeding conducted by, such government agency, by accepting the terms provided herein I give up my right to receive any relief whatsoever (including but not limited to financial benefit or monetary recovery) from any lawsuit, administrative action or settlement related to such rights and claims as I now give up, whether the lawsuit or action is filed, or the settlement reached by, the government agency or anyone else.

I acknowledge and understand that if I breach any provision of this Agreement, I will cease to be eligible for the compensation and benefits provided under it and the Bank may, in its sole discretion, cease remaining payments and seek reimbursement for amounts already paid. I further understand and agree that any breach of this Agreement shall entitle the Bank to bring legal action to enforce the Agreement and to recover any resulting damages. I agree to reimburse the Bank for all reasonable attorneys' fees and costs associated with such an action. In addition, I agree that the remedy at law for breach of this Agreement may be inadequate and that, in such an instance, the Bank shall be entitled to injunctive relief.

I understand that should any provision of this CSP Agreement be determined to be invalid by a court or government agency of competent jurisdiction or should I fail to fulfill my obligations under it, the remainder of this CSP Agreement shall, to the fullest extent permitted by applicable law and at Bank of America's option, remain in full force and effect and/or I shall be required to return, in full or in part, as determined by Bank of America, any and all consideration I received in exchange for my agreeing to this CSP Agreement, except for Five Hundred Dollars ($500.00) which represents the consideration I received from Bank of America in exchange for my release and waiver of rights or claims under the federal Age Discrimination in Employment Act.

Nothing in this CSP Agreement constitutes an admission of liability by the parties. This CSP Agreement constitutes the complete understanding of the parties concerning its subject matter, and supersedes any and all prior agreements, promises or inducements except as specifically set forth in the Guide. No other promises or agreements, or any modifications to or of this CSP Agreement, shall be binding unless reduced to writing and signed by an authorized representative of Bank of America and me.

I recognize and agree that when agreed to by me, as indicated by my signature below, this CSP Agreement shall be binding on me, my heirs, representatives, administrators, executors, successors and assigns. I also acknowledge that I have read this CSP Agreement, that I fully understand and appreciate its meaning and that it includes a full and final release and settlement of all claims, to the extent permitted by law, regarding my employment relationship and/or the termination of my employment relationship, known or unknown, as of the date I sign (execute) this CSP Agreement which I may have against any and all Released Parties, and that I agree knowingly and voluntarily to each of its terms.

If I am retiring, this CSP Agreement does not affect my participation in any benefit program made available to retirees by Bank of America.

JUN-10-2008 10:26 From:BANK OF AMERICA        13128281201              To:BankofAmerica ATL00A P.28/33

I UNDERSTAND THAT THIS CSP AGREEMENT SHOULD BE SIGNED AND RETURNED ON OR BEFORE 1/15/2008. I UNDERSTAND AND AGREE THIS CSP AGREEMENT SHALL BECOME EFFECTIVE AND ENFORCEABLE WHETHER OR NOT I PROPERLY SIGN AND RETURN THE NON-REVOCATION FORM ON 1/23/2008. I UNDERSTAND AND AGREE I MAY REVOKE THIS CSP AGREEMENT AT ANY TIME PRIOR TO THAT DATE BUT THAT ANY ATTEMPT BY ME TO REVOKE THIS CSP AGREEMENT AFTER THAT DATE IS OR WILL BE INEFFECTIVE.

SEVERANCE PAYMENT ELECTION:

I elect to receive my severance pay in the following manner:

_____  In Installment Payments


_____  In One Lump Sum Payment*




_____          _____
Associate Signature                                          Date


Marguerite Marion_____143730_____
Associate Name (Printed Name) and  UEI Employee ID

*Please note that Lump Sum Payments are taxed at a special tax rate, see *Your Guide to the Corporate Severance Program* for additional information.




Mail in the enclosed business reply envelope to:

Severance Administrator
135 S. LaSalle Street, Suite 3300
Chicago, IL 60603

# EXHIBIT F

**From:** Kristen Prinz
**Sent:** Wednesday, April 30, 2008 5:46 PM
**To:** 'thomas.guyer@bankofamerica.com'
**Subject:** M. Marion COBRA

Tom,

Ask we discussed in our telephone conversation today, since her termination Ms. Marion has continuously been denied COBRA coverage by Bank of America and its agents. In fact, on March 13, 2008, Ms. Marion telephoned the Bank of America Benefits Department and was informed by Bank of America that her COBRA paperwork would not be processed unless Ms. Marion signed and submitted the Corporate Severance Program document to which the bank knew Ms. Marion objected. Because the bank's attempt at coercion was in violation of federal law, I contacted your office immediately and was assured that there was a mistake and Ms. Marion's paperwork would be processed immediately. Relying on that assurance, I told Ms. Marion that Bank of America would be sending out her COBRA paperwork promptly. Approximately two weeks later, Ms. Marion had still not received COBRA information from Bank of America or its agent. Again, I contacted your office and was assured that the matter would be addressed immediately. Nearly a month later, Ms. Marion finally received and submitted the necessary paperwork. In response to her submission, Bank of America's agent administering COBRA for severed employees informed Ms. Marion that they were not responsible for administering her COBRA coverage because they were no longer the bank's agent. Ms. Marion again contacted the Bank of America Benefits Department and was informed by Bank of America employee Diane Chisholm that Bank of America did not consider itself responsible for Ms. Marion's COBRA coverage.

Throughout the time since the bank's termination of coverage, Ms. Marion and her family have been incurring fees relating to medical treatment without the benefit of medical insurance coverage. Please keep in mind that Ms. Marion's employment was terminated in October of 2007, over six months ago.

As I stated during our telephone conversation, based on the bank's actions to date, we will be filing claims related to Ms. Marion's discriminatory treatment and wrongful termination; claims relating to the bank's wrongful withholding of guaranteed bonus and LTIP payments due to Ms. Marion; and, unless Bank of America cures its wrongful conduct in connection with Ms. Marion's COBRA coverage, claims relating to the bank's use of COBRA coverage as a method of coercion and the bank's denial of access to COBRA for Ms. Marion and her family.

If Bank of America is interested in an amicable resolution to this matter, please respond to this correspondence by the end of business day on May 7, 2008. I look forward to hearing from you.

Regards,

KRISTEN E. PRINZ
**BELLOWS AND BELLOWS, P.C.**
The Rookery Building
209 South LaSalle Street, Suite 800
Chicago, Illinois 60604
(Tel) 312-332-3340 | (Fax) 312-332-1190
kprinz@bellowspc.com
www.bellowspc.com

IN THE UNITED STATES DISTRICT COURT,
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARGUERITE MARION | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 1:08 cv 03867** |
| | ) | |
| **v.** | ) | |
| | ) | |
| BANK OF AMERICA, NATIONAL | ) | |
| ASSOCIATION | ) | |
| | ) | |
| **Defendant.** | ) | |

## NOTICE OF FILING

TO:   Jeffrey K. Ross
Ronald J. Kramer
Kathryn S. Clark
SEYFARTH SHAW LLP
131 South Dearborn Street
Suite 2400
Chicago, Illinois 60603

PLEASE TAKE NOTICE that on September 5, 2008, we caused to be filed with the United States District Court clerk, Plaintiff's Reply In Support of Motion To Remand.

Dated at Chicago, Illinois this 5th day of September 2008.

BELLOWS AND BELLOWS, P.C.

By:  s/Kristen Prinz_____
One of the Attorneys for
Plaintiff

Joel J. Bellows, Esq.
Kristen E. Prinz, Esq.
BELLOWS AND BELLOWS, P.C.
209 South LaSalle, Suite 800
Chicago, Illinois 60604
(312) 332-3340
Attorney # 01000

## CERTIFICATE OF SERVICE

I, Priscella Medina, a non-attorney, being first duly sworn upon oath, do hereby certify that copies of the foregoing Plaintiff's Reply In Support of Motion to Remand to be filed electronically in the United States District Court for the Northern District of Illinois on this 5th day of September, and that a true and correct copy of the foregoing was served on the following via the Court's electronic filing system:

Jeffrey K. Ross
Ronald J. Kramer
Kathryn S. Clark
SEYFARTH SHAW LLP
131 South Dearborn Street
Suite 2400
Chicago, Illinois 60603

Priscella Medina

SUBSCRIBED and SWORN to
before me this 5th day of September, 2008

Notary Public

OFFICIAL SEAL
TINA HOYT
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:03/15/10